```
 1                 UNITED STATES DISTRICT COURT
              EASTERN DISTRICT OF NORTH CAROLINA
 2                      WESTERN DIVISION

 3  _____)
                                   )
    ANTHONY WRIGHT,                 )
 4              Plaintiff,          )
                                   )
 5                                  )   5:13-CT-3245-D
                                   )
 6          vs.                     )
                                   )
    KENNETH E. LASSITER,            )
 7              Defendant.          )
    _____)
 8

 9                      AUGUST 24, 2017
                     BENCH TRIAL - DAY 1
10         BEFORE THE HONORABLE JAMES C. DEVER III
                CHIEF UNITED STATES DISTRICT JUDGE
11

12  APPEARANCES:

13  On Behalf of the Plaintiff:

14  TAITTIONA MILES
    MICHELE LUEKING-SUNMAN
15  North Carolina Prisoner Legal Services
    P.O. Box 25397
16  Raleigh, North Carolina  27611

17  ,

18  On Behalf of the Defendant:

19  KIMBERLY D. GRANDE
    North Carolina Department of Justice
20  114 West Edenton Street
    9001 Mail Service Center
21  P.O. Box 629
    Raleigh, North Carolina  27602
22


23
                    AMY M. CONDON, CRR, CSR, RPR
24                    Official Court Reporter
                    United States District Court
25                     Raleigh, North Carolina
             Stenotype with computer-aided transcription
```

1               I N D E X

2           <u>PLAINTIFF'S WITNESSES</u>

3   SANDRA DUNSTON

4           Direct Examination by Ms. Miles              6
            Cross-Examination by Ms. Grande             37
5           Redirect Examination by Ms. Miles           42

6   LINWOOD PARRISH

7           Direct Examination by Ms. Miles             43
            Cross-Examination by Ms. Grande             50
8           Redirect Examination by Ms. Miles           54
            Recross-Examination by Ms. Grande           54

9

10  ANTHONY WRIGHT

11          Direct Examination by Ms. Miles             56
            Cross-Examination by Ms. Grande             79
            Redirect Examination by Ms. Miles          114

12

13  RALPH SEVERIN

14          Direct Examination by Ms. Miles            116
            Cross-Examination by Ms. Grande            143
            Redirect Examination by Ms. Miles          164
15          Recross-Examination by Ms. Grande          166

16

17          <u>DEFENDANT'S WITNESSES</u>

18

19  CHARLES PRICE

20          Direct Examination by Ms. Grande           170
            Cross-Examination by Ms. Miles             190
            Redirect Examination by Ms. Grande         197

21  RANDALL SPEER

22

23          Direct Examination by Ms. Grande           198
            Cross-Examination by Ms. Miles             201
            Redirect Examination by Ms. Grande         211

24

25

1 TERRI STRATTON

2        Direct Examination by Ms. Grande            213
         Cross-Examination by Ms. Miles              232
3
  BETTY BROWN
4
         Direct Examination by Ms. Grande            236
5        Cross-Examination by Ms. Miles              248

6 CARLTON JOYNER

7        Direct Examination by Ms. Grande            250
         Cross-Examination by Ms. Miles              260
8        Redirect Examination by Ms. Grande          265

9 KENNETH LASSITER

10       Direct Examination by Ms. Grande            268
         Cross-Examination by Ms. Miles              276
11       Redirect Examination by Ms. Grande          278

12                    <u>PLAINTIFF'S EXHIBITS</u>

13 NUMBER                                        RECEIVED

14
   1                                                72
15
   3                                                78
16
   4                                                13
17
   5                                                 8
18
   6                                                30
19
   7                                                24
20
   8                                                20
21
   9                                                27
22
   10                                               34
23
   11            Page 15 of Exhibit 11             136
24

25

## DEFENDANT'S EXHIBITS

| NUMBER | RECEIVED |
|---|---|
| 2 and 7 | 238 |
| 4 and 11 | 212 |
| 8, 9 and 10 | 239 |
| 11, 12, 13 | 280 |
| 16 | 248 |
| 18 | 248 |
| 22 | 247 |
| 23 | 214 |
| 24 | 220 |
| 25 | 221 |
| 26 | 224 |
| 27 | 225 |
| 28 | 225 |
| 29 | 227 |
| 30 | 231 |
| 61 | 243 |
| 62 | 244 |
| 64 | 242 |

```
 1              (Thursday, August 24, 2017, commencing 9:00 a.m.)

 2                        P R O C E E D I N G S

 3              THE COURT:  Good morning and welcome to the United

 4   States District Court for the Eastern District of North

 5   Carolina.

 6              We're here today for the trial in Wright v. Lassiter.

 7   I've read all the materials.

 8              Any preliminary matters from the plaintiffs?

 9              MS. MILES:  No, Your Honor.

10              THE COURT:  Any preliminary matters from the defense?

11              MS. GRANDE:  No, Your Honor.

12              THE COURT:  All right.  The plaintiff may call its

13   first witness.

14              MS. MILES:  Your Honor, may I give a brief opening

15   statement?

16              THE COURT:  I read all the proposed findings.  I'm

17   ready.

18              MS. MILES:  We call Ms. Sandra Dunston.

19              THE COURT:  Thank you.

20

21                        SANDRA DUNSTON,

22         having been duly sworn, testified as follows:

23

24              THE COURT:  You may examine the witness.

25
```

1                    DIRECT EXAMINATION
2    BY MS. MILES:
3    Q.    Good morning.  Could you state your full name for the
4    Court.
5    A.    Sandra Dunston.
6    Q.    And where are you employed?
7    A.    At the Department of Public Safety at Central Prison,
8    chaplain.
9    Q.    How long have you worked for DPS?
10   A.    About eight years.
11   Q.    Have you worked as a chaplain since you began working with
12   DPS?
13   A.    Yes.
14   Q.    What are your job duties as a chaplain?
15   A.    As a chaplain, I provide pastoral and spiritual care to
16   the staff and to the inmates in the facility that I'm working
17   in.  I supervise services.  When I say "supervise services," I
18   supervise different faith groups.  I do so many things.
19   Q.    Thank you, Ms. Dunston.
20         Can you please describe a typical day working as a
21   chaplain?
22   A.    Yes, ma'am.  Come in, I check my mail, I go -- sometimes
23   I'm briefed by my supervisor what to do that day.  I check my
24   internet -- the internet, my e-mail.  I check to see pretty
25   much what I need to be doing that particular day.

1    After that I may be talking with the inmate.  I may be

2 talking with staff members that are going through different

3 things.  I may be supervising a service.  I may be doing a

4 funeral service.  It's just unlimited things that I could be

5 doing in a day's time.  And it varies.  It always changes.

6 There's no set schedule.  I do what's needed for the spiritual

7 community at the facility.

8 Q.    Are you familiar with the DPS's policy and procedure

9 titled Religious Services?

10 A.    Yes.

11 Q.    And does that policy and procedure govern your work as a

12 chaplain at Central Prison?

13 A.    Absolutely.  I have to continue to stay under policy

14 procedure.

15        MS. MILES:  Your Honor, may I have permission to show

16 the witness what has been previously marked as Plaintiff's

17 Exhibit 5?

18        THE COURT:  You may.

19 BY MS. MILES:

20 Q.    Ms. Dunston, have you seen this policy before?

21 A.    Yes, ma'am.

22 Q.    What state agency issued this policy?

23 A.    North Carolina.

24 Q.    When was this policy issued?

25 A.    9/1/16.

1  Q.   Have you previously reviewed this policy?

2  A.   Yes, ma'am.

3  Q.   Can you please tell me what this policy governs?

4  A.   I don't quite understand the question.

5  Q.   What does this policy outline specifically?

6  A.   It outlines what we're permitted to do within our work.

7        MS. MILES:  Your Honor, we ask that Plaintiff's

8  Exhibit 5 be entered into evidence at this time.

9        THE COURT:  It'll be received.

10       (Plaintiff's Exhibit No. 5 was admitted into evidence.)

11 BY MS. MILES:

12 Q.   Can you read paragraph D on the first page of this policy?

13 A.   The Chaplaincy Services Director is responsible for

14 maintaining the Prison Religious Policy Manual.  The manual

15 accommodates the official religions, practices, and authorize

16 religious items for the inmate population.  The manual also

17 includes a list of authorized religious items for inmate in

18 restrictive housing, safe keepers, RHAP, RHDP, HCON and RHCP.

19 Q.   Ms. Dunston, what is the manual referring to in that

20 paragraph?

21 A.   Pardon me?

22 Q.   What manual does that paragraph refer to?

23 A.   Chaplaincy department.

24 Q.   The portion that says, "the manual accommodates the

25 official religions;" do you know the name of that manual?

1  A.    The Religious Manual.

2  Q.    On the third page of this policy, can you read paragraph C

3  for me?

4  A.    Specific religious practices, policies and procedures are

5  detailed in the prison's Religious Practice Reference Manual.

6  This manual includes a list of the current faith practices that

7  are now officially recognized by prisons.  It also includes a

8  brief description of the basic beliefs, authorized practices,

9  worship procedures, and authorized religious items associated

10 with each faith.  A copy of this manual may be found in the

11 office of the chaplain or other designated staff.

12 Q.    Is the manual referenced in this paragraph the same one

13 that was referenced earlier, the one that you called the

14 prison's religious policy?

15 A.    State that again.  I'm sorry.

16 Q.    Is the manual referenced in paragraph C the same manual

17 referenced earlier?

18 A.    Yes, the Religious Practice Manual.

19 Q.    And can you please take a look at the bottom of page 4

20 where it says "Inmate Requests for Religious Assistance."  Are

21 you familiar with the process that an inmate would follow to

22 request religious services that are not currently provided?

23 A.    Yes, I am.

24 Q.    And does paragraph -- does this paragraph outline those

25 policies?

1  A.    Yes, it does.

2  Q.    Can you please explain that process for us?

3  A.    They just submit in writing what they are requesting to

4  the chaplaincy services and we carry out the process.

5  Q.    Once they submit in writing the accommodations that they

6  are requesting, what happens after that?

7  A.    Then we continue to process it.  We begin to -- actually,

8  I pass it up to my supervisor, my supervisors process it, go

9  through the different changes that needs to be taken care of.

10 Q.    And do you know specifically what that process would

11 entail as far as making the accommodations?

12 A.    No.

13 Q.    Ms. Dunston, can you please take a look at the bottom of

14 page 5.  Can you explain the paragraph under Subsection D's

15 rule regarding some inmates not being able to attend corporate

16 worship services?

17        MS. GRANDE:  Your Honor, I'm going to object as to

18 the relevance of this particular area of the policy.

19        MS. MILES:  Your Honor, it specifically outlines

20 which inmates are allowed to attend religious services and it

21 goes towards defendant's concern about staffing concerns and

22 security interests.

23        THE COURT:  The exhibit is in evidence.  It says, due

24 to safety and security concerns, safe keepers, inmates in

25 restrictive housing units will not be allowed to attend

1   corporate worship services with the general population, et

2   cetera.

3          I'm not really sure what we're getting at when we're

4   just reading things that are already in evidence.

5          MS. MILES:  Your Honor, we were just going to get the

6   plaintiff to explain what type of inmates or which inmates are

7   able to attend services or any religious programs.

8          THE COURT:  Well, just ask that.  It's not helpful

9   for us just to read a document that's in evidence.  I read

10  everything.  So just ask the next question.

11         I sustain the objection.

12  BY MS. MILES:

13  Q.   Ms. Dunston, did you know -- can you tell the Court what

14  inmates are allowed to attend religious services or religious

15  programs?

16  A.   Those inmates that are registered in our OPUS prison, OPUS

17  computer as that particular faith, practitioner of that faith.

18  They have to be -- they have to be registered in the computer

19  as that particular faith to participate in the services, that

20  particular service.

21  Q.   And what would happen if an inmate is under disciplinary

22  segregation?

23  A.   I'm not sure.

24  Q.   Would they be able to still attend religious programs or

25  services?

1  A.   It all depends.

2  Q.   Ms. Dunston, can you tell the Court, describe the role

3  of -- an inmate faith helper's role in the prison?

4  A.   Faith helper, inmates are questioned, thoroughly

5  questioned of their level of capacity of being a faith helper.

6  They have to answer specific questions listing their knowledge

7  of the faith.  They cannot have -- they cannot have

8  disciplinary actions, infractions for so many years.  I'm not

9  quite -- I can't remember how many years, but it's a little

10  while.  The faith helper has to be very knowledgeable of the

11  faith.

12  Q.   What would their role be as a faith helper once they're

13  selected?

14  A.   They would lead the other faith members of that faith,

15  they would lead them in that particular timing that has been

16  set aside for them in their faith.  They would bring topics,

17  different topics informing the other members of the faith,

18  enhancing their faith.

19  Q.   And are you familiar with Mr. Wright's role as a faith

20  helper?

21  A.   Yes.  Yes, ma'am.

22  Q.   What do you recall?

23  A.   When I -- when I was employed at Central Prison, Anthony

24  was a faith helper already, already the faith helper and he was

25  very adamant about leading his group.  He would pick different

1  topics to talk about, the faith.  Very dependable.  He did --

2  he tried to do different things to make sure that he was

3  teaching the other inmates the religious faith.

4  Q.   Ms. Dunston, we referenced the Religious Practices Manual

5  several times now.  Are you familiar with that manual?

6  A.   Pretty much so.

7        MS. MILES:  Your Honor, can we have permission to

8  show Ms. Dunston the Religious Practices Manual?

9        THE COURT:  You may.  It'll be received.  That's

10  Plaintiff's Exhibit 4?

11        MS. MILES:  Yes.

12     (Plaintiff's Exhibit No. 4 was admitted into evidence.)

13  BY MS. MILES:

14  Q.   Ms. Dunston, can you describe what this manual is used

15  for?

16  A.   It's used for us as chaplains to refer to when

17  providing -- and to follow when providing inmates with their

18  faith, religious faith.

19        MS. MILES:  Your Honor, the defendants have

20  stipulated as to the authenticity of what has been previously

21  marked as Plaintiff's Exhibit 4.  This is the complete

22  Religious Practices Manual that the chaplain and staff used

23  throughout DPS prisons and we ask that it be entered into

24  evidence.

25        THE COURT:  It'll be received.

1  BY MS. MILES:

2  Q.   Ms. Dunston, who writes the information that is included

3  in this manual?

4  A.   Directors, I believe, directors.

5  Q.   Can you please describe the process, as you understand it,

6  for creating or updating the manual?

7  A.   I really don't know how it's created.  I just know it's

8  handed down from my directors to us.

9  Q.   Do you know if any research is conducted in order to

10  create this manual?

11  A.   That's a little bit out of my scope.

12  Q.   Okay.

13  A.   I'm sure it is, but I don't know how.

14  Q.   Ms. Dunston, do you consult this manual regularly?

15  A.   Yes.

16  Q.   Can you please explain how you use the information when

17  you consult it?

18  A.   If an inmate would come to me and had questions about

19  items that they allowed to have, I would reference the

20  religious manual.  Whatever their questions pertaining to

21  religion, I use this to follow.  I follow the policy, the

22  manual.

23  Q.   And to your knowledge, how do other chaplains use this

24  manual?

25  A.   They follow policy.  That's required of us.  We have to

1 use -- we have to follow the manual.

2 Q.   And is this the same -- is this the same for other staff

3 members as well?

4 A.   I know the chaplaincy department does.

5 Q.   Ms. Dunston, looking at page 86 of Exhibit 4.  Is this the

6 portion of the manual that deals with Rastafarians and their

7 faith practice in the DPS custody?

8 A.   Yes.  It looks like it, yes.

9 Q.   Are you familiar with this section of the manual?

10 A.   Yes.

11 Q.   What work have you done with Rastafarians at Central

12 Prison?

13 A.   I supervised their services.

14 Q.   And how does the manual guide your supervision?

15 A.   It informs me what is permitted and what is not permitted.

16 Q.   Have you assisted Rastafarian services?

17 A.   Have I?

18 Q.   Yes.

19 A.   Yes.

20 Q.   And have you ever noted any security concerns during

21 Rastafarian services?

22 A.   I can't recollect.

23 Q.   Have you assisted with any research regarding Rastafarians

24 and the prison policy?

25 A.   Say that again.  I'm sorry.

1   Q.    Have you assisted with any research regarding

2   Rastafarians' religious practices and DPS's policy?

3   A.    No.   I just follow policy.

4   Q.    And have you provided any assistance to Rastafarians with

5   respect to religious items?

6   A.    Say that again.   I'm sorry.

7   Q.    Have you provided any assistance to Rastafarians with

8   respect to any religious items?

9   A.    Yes.

10  Q.    Are you familiar with the holy days outlined in the

11  Religious Practices Manual for Rastafarians?

12  A.    I've read them.

13  Q.    Looking at page 88 of Exhibit 4.   Can you tell the Court

14  what days are listed as holy days for Rastafarians?

15  A.    You want me to read it?   May 25th, African Liberation Day;

16  July 23rd, His Imperial Majesty's birthday; August the 17th,

17  Marcus Garvey's birthday; and November the 2nd, Coronation of

18  Him, HIM.

19  Q.    Do you know why these holy days were listed as Rastafarian

20  holy days?

21  A.    I just know they're listed.

22  Q.    Are you aware of any holidays or holy days celebrated by

23  Rastafarians that are not listed?

24  A.    No.

25  Q.    Have you ever seen an earlier version of this policy that

1  included different holidays for Rastafarians?

2  A.    No.

3  Q.    What experience have you had with other Rastafarian holy

4  days?

5  A.    Only what we have here.

6  Q.    Ms. Dunston, are Rastafarians at Central Prison permitted

7  to celebrate holy days communally?

8  A.    Corporately?

9  Q.    Communally, together.

10  A.    When you say "celebrate," I don't understand.

11  Q.    Are they able to gather together outside of their regular

12  scheduled corporate worship services on holy days?

13  A.    They are allowed according to policy, because this is

14  policy.  We follow policy.

15  Q.    So are they allowed to gather together outside of their

16  regular scheduled corporate meetings?

17  A.    I'm not sure.  They are allowed to recognize it -- I'm

18  thinking -- I'm thinking they recognize it individually, not so

19  much corporately.

20  Q.    Thank you, Ms. Dunston.

21      Are Rastafarians permitted to celebrate religious holy

22  days with a meal?

23  A.    No.

24  Q.    Can you explain the nature of your interactions with

25  Mr. Wright as he requested accommodations for celebrating holy

1  days communally?

2  A.   He requested many times and we've dealt with it and

3  talked, and I've passed it on to my supervisor, his concerns

4  and his questions relating to that, yes.

5  Q.   Were most of your interactions with Mr. Wright regarding

6  his request for accommodations?

7  A.   We had many interactions in reference to Rastafarians.

8  Q.   Have you ever had any security concerns with Mr. Wright?

9  A.   No, not really.

10 Q.   Ms. Dunston, what other religions do you provide support

11 for at Central Prison?

12 A.   We have 15 different faith groups.  I supervise -- I have

13 supervised the Buddhists, the American Indians, the Islamic

14 group, Rastafarian group.

15 Q.   Ms. Dunston, you just stated that you've provided support

16 to the American Indians at Central Prison.  What type of

17 support do you provide for that group?

18 A.   I follow policy with that group just like I do with

19 Rastafarians, so...

20 Q.   Do you assist in their services?

21 A.   Yes, I make sure they're following policy.

22 Q.   Are American Indians permitted to celebrate holy days with

23 a religious meal?

24 A.   Yes, they have.

25 Q.   And what holy day is that?

1  A.    They're -- the Eid Al-Adha, different ones.

2  Q.    Do they --

3  A.    Ramadan.

4  Q.    Ms. Dunston, do they celebrate the Green Corn festival?

5  A.    No, they don't.  The Islamic group does not.

6  Q.    The American Indians.

7  A.    Yes, they do.

8  Q.    Ms. Dunston, looking at page 18 of Exhibit 4.  Can you

9  tell the Court how the Green Corn festival is celebrated?

10  A.    Green Corn ceremony is in September.  A memo will be

11  produced annually and the celebration consists of a meal,

12  special meal and service.  The service should last no more than

13  one hour.

14  Q.    Ms. Dunston, can you read the section under the holy day

15  portion?

16  A.    That's just what I was reading.

17  Q.    The memo that it references, is that this memo here or

18  what memo is it referencing?  I'm sorry.

19  A.    A memo that's delivered to us from the directors' prison.

20  Q.    Are you familiar with the memoranda that are issued yearly

21  for the Green Corn festival?

22  A.    Yes.

23        MS. MILES:  Your Honor, may I show the witness what

24  has been previously marked as Exhibit 8?

25        THE COURT:  You may.

1  BY MS. MILES:

2  Q.   Ms. Dunston, can you explain what this memorandum

3  describes?

4  A.   It describes the Green Corn observance under George

5  Solomon from August 26th, 2014.

6  Q.   And who is the memo directed to?

7  A.   To the facility heads and the facility chaplains.

8  Q.   Is this a system-wide guideline on the celebration of the

9  Green Corn festival?

10  A.   Is it wide?

11  Q.   System-wide.

12  A.   It's to the State of North Carolina.

13       MS. MILES:  Your Honor, defendants have stipulated to

14  the authenticity of this exhibit.  We request to move what has

15  been marked as Exhibit 8 into evidence.

16       THE COURT:  It'll be received.

17       (Plaintiff's Exhibit No. 8 was admitted into evidence.)

18  BY MS. MILES:

19  Q.   Ms. Dunston, I'm going to turn to page 11 of this exhibit.

20  Looking at this memo, what is the date issued on this?

21  A.   August 19th, 2016, last year.

22  Q.   And looking at the last full paragraph on page 11 that

23  begins, "The observance consists of," can you describe to this

24  Court what this exhibit -- what this paragraph is explaining?

25  A.   It explains that we -- as chaplains we will follow for the

1 Green Corn observance one hour of observance, meal not to

2 exceed two hours.  It is to take place the same day, either

3 September 23rd or September 24.

4 Q.    Thank you, Ms. Dunston.

5 A.    Uhm-uhm.

6 Q.    In looking at page 12 of this exhibit, can you tell the

7 Court who provides the meals for the Green Corn festival?

8 A.    The participants have a -- they have an account that they

9 give money to that help -- that we use to provide the meals.

10 Q.    And what's the name of that account?

11 A.    I can't recall.  We have several accounts.

12 Q.    Ms. Dunston, are there any other sources that provides the

13 food for the Green Corn festival?

14 A.    Not that I recollect.

15 Q.    Do volunteers provide food?

16 A.    When you say "volunteers," whom are you referring to?

17 Q.    Volunteers from the American Indian community.

18 A.    Different of the American Indian faith, different ones

19 have friends that donate money to the account, if that's what

20 you mean by "volunteer."  They volunteer to donate the money to

21 the account sometimes.  Sometimes.

22 Q.    Thank you, Ms. Dunston.

23      Ms. Dunston, can you take a look at paragraph 5 on page 13

24 of Exhibit 8?  Can you please read that sentence?

25 A.    The Offender Service Club funds may be used to purchase

1  food items for the observance meal.  The appropriate procedures

2  to approve the use of funds must be followed and food items

3  must be purchased from a vendor, by the chaplain or other

4  designated staff.

5  Q.    What is the Offender Service Club?

6  A.    I'm not sure.  I worked at the women prison and I think

7  they had one.  I'm not familiar with any of that at CP.

8  Q.    Ms. Dunston, you stated earlier that this memoranda was

9  issued in 2016.

10  A.    Uhm-uhm.

11  Q.    To your knowledge, is this substantially similar to the

12  memoranda issued in past years?

13  A.    Similar, yes.

14  Q.    How many staff members are present at the meal for the

15  Green Corn festival observance?

16  A.    Custody are present, staff, chaplains are present, and

17  that's all -- that's the only ones I've known at Central

18  Prison.

19  Q.    On average, about how many would you say number-wise,

20  numerically?

21  A.    You talking about inmates?

22  Q.    The staff members and chaplains.

23  A.    It varies because they provide enough to provide security

24  for that particular group, however many there are there.  So,

25  you know, it varies.

1  Q.   To your knowledge, when an inmate is not able to use their

2  fundraisers or there's no volunteers available to provide the

3  food, does the prison still provide the meal for the Green Corn

4  observance?

5  A.   They eat before everybody else eats.  It's the -- if they

6  didn't have the money, I would think -- I would think they

7  would use just what is serving in the cafeteria that everybody

8  else eat.

9  Q.   Ms. Dunston, have you provided support for Muslims at

10 Central Prison?

11 A.   Yes, I supervised their programs.

12 Q.   And is this the same support that you provide for other

13 religious groups, services, perform services, research, giving

14 religious items?

15 A.   I follow policy for every group, yes, ma'am.

16 Q.   Are Muslims permitted to celebrate holy days with a

17 religious meal?

18 A.   They do the Ramadan, yes.

19 Q.   In looking at page 68 of Exhibit 4, does this page outline

20 the celebration of Eid al-Fitr?

21 A.   Yes.  Yes, ma'am.

22 Q.   I'm going to turn to page 69.  Does this -- does this

23 portion outline the celebration of Eid al-Adha?

24 A.   Yes, ma'am.

25 Q.   And are you familiar with how those days are celebrated?

1   A.   Yes, ma'am.

2   Q.   Are you familiar with the memoranda that are issued yearly

3   for Eid al-Fitr and Eid al-Adha?

4   A.   Yes.  We have to have a memoranda sent down in order to...

5        MS. MILES:  Your Honor, may I show this witness what

6   has been previously marked as Exhibit 7?

7        THE COURT:  You may.

8   BY MS. MILES:

9   Q.   Ms. Dunston, can you explain what this memoranda

10  describes?

11  A.   It advises the facilities of the process and procedures to

12  observe Ramadan, the Islamic Muslim holy day, for 2016 and the

13  Night Of Power and Eid al-Fitr.

14       MS. MILES:  Your Honor, defendants have stipulated to

15  the authenticity of this exhibit.  We request that what has

16  been marked as Exhibit 7 be moved into evidence.

17       THE COURT:  It'll be received.

18     (Plaintiff's Exhibit No. 7 was admitted into evidence.)

19  BY MS. MILES:

20  Q.   Ms. Dunston, I'm going to turn to page 18 of this exhibit.

21  Can you tell the Court what date this was issued?

22  A.   May 1st, 2016.

23  Q.   Who wrote the memo?

24  A.   It's from Director Solomon, George Solomon to the facility

25  heads and the facility chaplains.

1  Q.    Who was the memo directed to?

2  A.    Facility heads and facility chaplains.

3  Q.    Again, is this a system-wide policy?

4  A.    North Carolina, yes.

5  Q.    Looking at page 20 of this exhibit, can you please explain

6  to the Court the section that starts with, "The observation

7  meal will be provided."  Can you please describe to the Court

8  what this section outlines?

9  A.    The procedure on how to go about -- how to go about

10 observing the meal for the Islamic community.  I'm not quite

11 sure which meal we talking about here, though.  I don't know if

12 this -- is this the same one?

13 Q.    Yes.

14 A.    It just tells us how we go about proceeding to...

15 Q.    Who provides the meal for the Muslim inmates for Eid

16 al-Fitr?

17 A.    The Islamic -- they also have a fund that they withdraw

18 their money out of to -- that we use, the chaplaincy department

19 uses to provide foods for their celebration.

20       Unlike the Rastafarians, the Islamic group has volunteers.

21 When I say "volunteers," it's a group of leaders from the

22 outside community that comes in and teach the Islamic group and

23 they assist, they help with -- they enhance the celebration for

24 those Islamic.

25 Q.    What's the name of the fund that you were describing?

1  A.    I can't -- Zakat I think is what it's called.

2  Q.    So would it be safe to say that either the volunteers

3  provide the meal or the Zakat fund provides the meal?

4  A.    It would be safe to say that they help and assist in

5  seeing that it's -- the meal is provided.  They don't

6  necessarily provide it at all times.  Sometimes they help out,

7  they assist.  Sometimes they provide it, yeah.

8  Q.    And what will happen if neither the volunteers nor the

9  Zakat fund was able to provide the meal for Eid al-Fitr?

10  A.    They would just eat what everyone else eat.

11  Q.    Would they still be able to gather communally or together

12  with just Muslim inmates?

13  A.    Yes.  They still go to the dining hall as a community,

14  uhm-uhm.

15  Q.    Looking at page 23 of Exhibit 7, paragraph 5, can you

16  describe what this page is referencing?

17  A.    The Zakat funds to purchase the food items.

18  Q.    Do you know how the Zakat fund works?  How do they raise

19  the money?

20  A.    They are -- the inmates are allowed to give money into the

21  Zakat funds.

22  Q.    To the best of your knowledge, you stated that this

23  memoranda was issued in 2016.  To the best of your knowledge,

24  is this substantially similar to memoranda issued in previous

25  years regarding the Eid al-Fitr, celebration of Eid al-Fitr?

1  A.    Pretty much.

2          MS. MILES:  Your Honor, may I show this witness what

3  has been previously marked as Exhibit 9?

4          THE COURT:  You may.

5  BY MS. MILES:

6  Q.    Ms. Dunston, can you please explain what this memoranda

7  describes?

8  A.    The observance for the Islamic group, the Eid al-Adha,

9  their prayer time, and just telling us how to carry out the

10 Islamic observance and celebration of the Sacrifice of Abraham.

11         MS. MILES:  Your Honor, defendants have stipulated to

12 the authenticity of this exhibit.  We request that what has

13 been marked as Exhibit 9 be moved into evidence.

14         THE COURT:  It'll be received.

15     (Plaintiff's Exhibit No. 9 was admitted into evidence.)

16 BY MS. MILES:

17 Q.    Ms. Dunston, looking at page 10 of Exhibit 9, can you

18 please tell the Court what date this was issued?

19 A.    August 19th, 2016.

20 Q.    And who wrote the memo?

21 A.    Director Solomon to the facility heads and facility

22 chaplains.

23 Q.    And who was the memo directed to again?

24 A.    Facility heads and the facility chaplains.

25 Q.    Is this a system-wide guideline on the celebration of Eid

1  al-Adha?

2  A.   Yes, it is.

3  Q.   Are volunteers permitted to bring food for this meal as

4  well?

5  A.   Yes.  The volunteers have to use a vendor, and I think it

6  stipulates that in here, yes, ma'am.

7  Q.   And if there are no volunteers available, will the food

8  still be provided by the prison?

9  A.   Whatever they have in their funds, Zakat funds, we would

10 use that to provide their meal.

11 Q.   If there's nothing in the Zakat fund, where would the food

12 come from?

13 A.   They would eat what everyone else in the facility eats.

14 Q.   To your knowledge, you stated that this memoranda was

15 issued in 2016.  Is this substantially similar to previous

16 years' memoranda issued for Eid al-Adha?

17 A.   Yes, ma'am.

18 Q.   Ms. Dunston, how many staff members would you say would be

19 present for Eid al-Fitr and Eid al-Adha?

20 A.   It varies.  The chaplains would be present and the custody

21 would be present.  The number of custody is -- they usually

22 depend on participants, the practitioners of the faith, they

23 make sure our security, safety is provided.

24 Q.   Do you know how many food service workers would be there

25 at any time?

1  A.    What do you mean "there"?

2  Q.    Would be present for the holy day meal.

3  A.    They don't participate in the holy day meal.  They in the

4  kitchen area.

5  Q.    Ms. Dunston, have you ever provided support for Jewish

6  faith practitioners in Central Prison?

7  A.    No.  You mean -- I provide services for everyone.  Are you

8  saying corporately, because we don't do corporate?

9  Q.    Okay.  Are Jewish faith practitioners permitted to

10 celebrate a holy day with a meal?

11 A.    They permitted to practice the holy day.  I'm not quite

12 sure what your question is.

13 Q.    Are Jewish faith practitioners able to celebrate Passover?

14 A.    Corporately, is that your question?

15 Q.    Yes.

16 A.    Not corporately.

17 Q.    What about with a meal?

18 A.    That's provided in the facility.

19 Q.    Ms. Dunston, looking at page 73 of Exhibit 4.  Does this

20 portion of the policy outline the holy day celebrated for

21 Jewish faith practitioners?

22 A.    Pretty much, yes, ma'am.

23 Q.    To the best of your knowledge, do you know how this day is

24 celebrated?

25 A.    The inmates request to celebrate.  They have to be

1  practitioners of their faith and then they are -- their meals

2  are sent out to them, uhm-uhm.

3  Q.   Are you familiar with the memoranda that are issued yearly

4  for the celebration of Passover?

5  A.   Yes, ma'am.

6       MS. MILES:  Your Honor, may I show her what has been

7  previously marked as Plaintiff's Exhibit 6?

8       THE COURT:  You may.

9  BY MS. MILES:

10 Q.   Ms. Dunston, looking at what has been marked as Exhibit 6,

11 can you please tell the Court what this memoranda describes?

12 A.   It describes 2014 Passover for offenders registered in the

13 OPUS as Jewish faith practitioners, March 12th, 2014, by

14 Director Solomon.

15      MS. MILES:  Your Honor, we request to move what has

16 been marked as Exhibit 6 into evidence.

17      THE COURT:  It'll be received.

18      (Plaintiff's Exhibit No. 6 was admitted into evidence.)

19 BY MS. MILES:

20 Q.   Ms. Dunston, I'm going to turn to page 25 of Exhibit 6.

21 Looking at page 25, can you tell the Court what date this

22 exhibit -- this memorandum was issued?

23 A.   February 17th, 2017.

24 Q.   And who wrote the memo?

25 A.   George Solomon, the director.

1  Q.    And who was the memo directed to?

2  A.    To the regional directors, facility heads and the

3  chaplains.

4  Q.    Is this a system-wide guideline for the celebration of

5  Passover?

6  A.    Yes, North Carolina.

7  Q.    Now, looking at page 26, can you describe for the Court

8  who provides the meal?

9  A.    Who provides the meal?

10  Q.    The Seder plate, who provides that?

11  A.    This paper you have here, it says, "The two Passover

12  Seders are not considered meals."  So they're not considered --

13  they're not meals -- so we don't have to provide meals because

14  they're not meals.

15  Q.    What is provided?

16  A.    They're not considered meals.

17  Q.    Right.  So what would be provided on this day?

18  A.    The Seder food items for the ritual.

19  Q.    And looking at page 27, can you tell the Court what type

20  of food is provided?

21  A.    Roasted chicken leg bone, hard boiled egg, lettuce,

22  vegetable, boiled potato, raw onion.

23  Q.    Ms. Dunston --

24  A.    Yes, ma'am.

25  Q.    -- looking at page 28, paragraph 5, can you tell the Court

1  how the plate is provided?

2  A.   I don't understand your question.

3  Q.   Where did the funds come from in order to provide the

4  Seder plate?

5  A.   I'm not sure.  We always go to the kitchen and get these

6  items.

7  Q.   Can you read the first bullet point under paragraph 5?

8  A.   Offender Service Club funds may be used, may be used, the

9  appropriate procedures to approve the use of the funds must be

10 followed and the items must be purchased from a vendor, or...

11 Q.   Can you read the second bullet point?

12 A.   Or P card account, meaning the facility's authorized to

13 use a P card.

14 Q.   What's a P card?

15 A.   It's -- I'm not sure -- it's used to purchase different

16 religious items, but I don't know who provides for it.  I don't

17 have a P card so -- and I don't use a P card, so I'm not

18 familiar with P cards.

19 Q.   And you stated that this memoranda was issued in 2017.  Is

20 this substantially similar to past years' memoranda?

21 A.   Pretty much so.

22 Q.   And to the best of your knowledge, how many staff members

23 are present for the Passover Seder plate?

24 A.   It's not a corporate service.

25 Q.   You said it's not a corporate service?

1  A.    It's not a corporate service.  So therefore, it's not a

2  corporate service.

3  Q.    Ms. Dunston, have you ever provided support for the

4  Moorish Science Temple of America at Central Prison?

5  A.    No, ma'am.

6  Q.    Are you familiar with whether or not Moorish inmates are

7  permitted to celebrate a holy day with food that is part of

8  their religious observance?

9  A.    No, I'm not familiar.  I've never supervised a service.

10  Q.    Ms. Dunston, looking at page 84 of Exhibit 4, can you tell

11  the Court what holy days are celebrated?

12  A.    This is the Moorish Science.  Moorish Science holy days,

13  on this particular paper you have January 8th, birthday of the

14  Prophet, a memo will be provided annually from the Central

15  Office; January 15th, the Moorish American New Year.

16  Q.    And are you familiar with the memoranda that are issued

17  yearly about the birthday of Prophet Ali?

18  A.    I'm not familiar with it.

19         MS. MILES:  Your Honor, may I show this witness what

20  has been previously marked as Exhibit 10?

21         THE COURT:  You may.

22  BY MS. MILES:

23  Q.    Can you explain what this memoranda describes?

24  A.    It's the Moorish Science Temple observance of the

25  Prophet's birthday, January 8th, 2015, and Moorish American New

1  Year, January 15th, 2015.

2          MS. MILES:  Your Honor, we request to move what has

3  been marked Exhibit 10 into evidence.

4          THE COURT:  It'll be received.

5      (Plaintiff's Exhibit No. 10 was admitted into evidence.)

6  BY MS. MILES:

7  Q.   Ms. Dunston, looking at page 11 of Exhibit 10.  What date

8  was this memoranda issued?

9  A.   December 7th, 2016.

10 Q.   Who issued it?

11 A.   George Solomon, the director.

12 Q.   And who was this issued to?

13 A.   The regional directors, the facility heads and the

14 facility chaplains.

15 Q.   And is this a system-wide guideline that goes out?

16 A.   Yes, it is.

17 Q.   In looking at page 12 of this exhibit, looking at the

18 highlighted portion, Ms. Dunston, can you tell the Court what

19 this portion -- or describe to the Court what this portion of

20 this memorandum discusses.

21 A.   Yes.  The Moorish Science memorandum, the observance of

22 the Prophet for Sunday, January 8th, 2017.

23 Q.   In looking at page 12 of this exhibit -- I'm sorry,

24 page 13, number 5, paragraph 5.  Can you tell the Court how the

25 food for this day is purchased?

1  A.    The memoranda says because we don't have -- we don't

2  recognize this group so -- we recognize the group, but I'm

3  saying we don't have -- I don't supervise this group.

4        But under 5 it says, the Offender Service Club funds may

5  be used to purchase food items for the observance meal.  The

6  appropriate procedure to approve the use of the funds must be

7  followed and the food items must be purchased from a vendor, by

8  the chaplain or other designated facility staff.

9  Q.    Thank you, Ms. Dunston.

10       In addition to the religions that we just went over,

11 including the Islams, Judaism, Moorish Science Temple of

12 American practitioners, and American Indians, do you know of

13 any other religious groups that are permitted to celebrate holy

14 days with a meal?

15 A.    No.

16 Q.    Do you know of the Kairos organization?

17 A.    Yes.

18 Q.    What is this organization?

19 A.    It's an organization that comes into the facility through

20 programs.  It's not a religion faith group.

21 Q.    Are they permitted to have meals similar to the religious

22 groups that we just discussed?

23 A.    It's nothing -- we talking about apples and oranges.

24 They're a program.  They're not a religious faith -- the two

25 are not the same.  You're talking about two different things.

1  Q.   Are they permitted to have meals in general?

2  A.   They have meals in their program.

3  Q.   Do you know how these meals are provided?

4  A.   The volunteers of the program provides -- supports the

5  program.

6  Q.   Do you know how much DPS spends each year providing the

7  meals in general for Kairos and for the religious groups?

8  A.   To the best of my knowledge, it would be zero on the

9  Kairos.

10  Q.   Are Rastafarians permitted to gather communally for any

11  meal?

12  A.   They're not.

13  Q.   Does DPS provide any funding at all for a holy day

14  communal celebration for Rastafarians?

15  A.   No.

16  Q.   Are Rastafarians permitted to use volunteers to bring food

17  for a religious meal?

18  A.   They do not have volunteers, but if they did have a

19  volunteer -- they do not have a volunteer so...

20  Q.   Are they permitted to raise money through the Inmate

21  Service Club for religious meals?

22  A.   I believe they tried to set up that fund for the group;

23  but at this point, no.

24  Q.   Are they permitted to gather together in the dining hall

25  on holy days to eat their regular food tray with other

1  Rastafarians on holy days?

2  A.   They can always go to the cafeteria to eat, the dining

3  hall.   They're permitted to go to the dining hall.   It's not

4  corporately.

5  Q.   So with just Rastafarian --

6  A.   They can celebrate individually.

7  Q.   You said they can eat individually?

8  A.   They eat individually and they celebrate individually.

9         MS. MILES:   No further questions.

10        THE COURT:   Cross-examination.

11        MS. GRANDE:   Thank you, Your Honor.

12                     CROSS-EXAMINATION

13  BY MS. GRANDE:

14  Q.   Just to clarify a few things, Ms. Dunston.   To your

15  knowledge, is the Seder plate required according to the tenets

16  of the Jewish faith?

17  A.   To my knowledge, it is.

18  Q.   What about Eid al-Fitr or Eid al-Adha?

19  A.   According to their faith, it is required.

20  Q.   It's a required practice?

21  A.   Their faith, yes, ma'am.

22  Q.   And what about the Green Corn celebration, is that

23  required of the tenets of the American Indian faith?

24  A.   Yes.

25  Q.   To your knowledge, are there any holy days or holidays

1  within the Rastafarian faith that have the same tenets that

2  require a feast?

3  A.    Not that I know of.

4  Q.    And you have no knowledge of MSTA services or feasts,

5  correct?

6  A.    No.

7  Q.    Never been held at Central Prison that you know of,

8  correct?

9  A.    Not since I've been there.  I've only been there three

10 years.

11 Q.    And as far as purchasing items or purchasing foodstuffs or

12 providing them, do you do that or you don't do that?

13 A.    A particular faith?

14 Q.    For the faith groups, do you personally ever purchase the

15 items?

16 A.    Not personally.

17 Q.    Do you ever use funds out of any account to purchase

18 items?

19 A.    Yes, I have.

20 Q.    Okay.  To your knowledge does the Zakat fund still exist?

21 A.    I'm not familiar with the Zakat fund.

22 Q.    So is it fair to say that you aren't responsible for the

23 maintenance or the spending from Zakat funds?

24 A.    That's correct.

25 Q.    What about the Inmate Service Club, that you're not

1  authorized or you don't personally make the purchases or

2  maintain the accounts?

3  A.   No, ma'am.

4  Q.   Okay.  And as far as what a kitchen may or may not

5  provide, you're not involved with the purchasing process for

6  the kitchen supplies either, correct?

7  A.   No, ma'am.

8  Q.   Okay.  So it would be safe to say that you don't know how

9  the food is provided to the inmate group separate and apart,

10 that you just supervise the meal itself, correct?

11 A.   I supervise, yes, and I do whatever my supervisor instruct

12 me, that's all I do.

13 Q.   Okay.  To your knowledge, inmates, including Rastafarian

14 inmates, they can congregate and eat as groups in the dining

15 hall, correct, during meal time?

16 A.   Yes, they can.

17 Q.   Any day of the week as long as their custody level permits

18 they eat together?

19 A.   Yes.

20 Q.   How many faith services would you say that you supervise

21 in any given week?

22 A.   In Central Prison?

23 Q.   Yes, ma'am.

24 A.   I supervise all those, the Indians, the American Indians,

25 the Rastafarians, the Muslim, the Buddhists.  I believe that's

1  the four groups I supervise.

2  Q.   How many hours a week would you say that you spend

3  supervising services?

4  A.   American Indians meet -- I don't know how to calculate it.

5  Q.   Would you say it's most of your day, not a lot of your

6  day, majority of your time, maybe not a majority of your day?

7  A.   Maybe three or four hours of the day.

8  Q.   How many chaplains are there at Central Prison?

9  A.   There are three chaplains.

10  Q.   How frequently are inmate services, faith services being

11  held at Central Prison, would you say they are pretty much

12  throughout the day or just occasional?

13  A.   No.  They're specifically set throughout -- once a day,

14  one hour and it varies.  We're very conscious of --

15  Q.   Are there several different groups a day?

16  A.   Yes, there are.

17  Q.   Would you characterize the chaplaincy staff as busy, not

18  busy, overwhelmed?

19  A.   Very busy.

20  Q.   Okay.  What about custody staff?  Based on your

21  observation of custody staff, are they busy, not busy,

22  overwhelmed?

23  A.   Very busy.

24  Q.   Okay.  When you are going to supervise religious meals

25  that are in the dining hall for -- let's say, for example, for

1  Eid al-Adha, are custody staff required to attend that meal as
2  well?
3  A.    They do provide custody services.  Yes, they are required.
4  Q.    And food service staff are present in the kitchen,
5  correct?
6  A.    Correct.
7  Q.    And are the dining schedules of other inmates shifted or
8  altered because of the dining meal, the communal meal for the
9  Islamic inmates?
10  A.    No, no.  We usually schedule it around the other inmates.
11  Q.    But it requires that the kitchen be open and the dining
12  room open?
13  A.    Yes, ma'am.
14  Q.    To your knowledge, have you ever became aware of whether
15  there were any Rastafarian volunteers that had offered to come
16  into Central Prison?
17  A.    No one has offered, no, not that I'm aware of.
18  Q.    How frequently do the Rastafarian group -- how frequently
19  do they meet?
20  A.    On Tuesday mornings from 9 to -- 9:30 to 10:30, I believe
21  it is, every Tuesday morning.
22  Q.    Are they permitted to have corporate services during that
23  time; pray, chant, engage in whatever corporate or rituals that
24  they need to engage in?
25  A.    Yes, ma'am.

1          MS. GRANDE:  I don't have anything further.

2          THE COURT:  Anything else?

3          MS. MILES:  Briefly, Your Honor.

4                    REDIRECT EXAMINATION

5   BY MS. MILES:

6   Q.   Ms. Dunston, based off the memoranda that are issued for

7   the various religious groups we just discussed, are you able to

8   adequately prepare staffing for those days where they have to

9   celebrate with a meal?

10  A.   Yes.  We usually adequately --

11  Q.   When religious groups, like Muslims or the Jews, are able

12  to meet in the dining hall for their meals and no volunteers or

13  Zakat fund is able to provide the food, do they still meet with

14  just those faith practitioners in the dining hall?

15  A.   I don't understand your question because the Jewish don't

16  meet in the dining hall.  They don't meet as corporate.

17  Q.   Does the Muslim inmates just meet together in the dining

18  hall with no general population?

19  A.   You mean within their religious service?

20  Q.   Yes.

21  A.   Yes, without general population we supervise them.

22  Sometimes volunteers.  Not there -- always there, but we

23  supervise them and custody is always present.

24          MS. MILES:  No other questions, Your Honor.

25          THE COURT:  Thank you.

1          Anything else, Ms. Grande?

2          MS. GRANDE:  No, Your Honor.

3          THE COURT:  Thank you, Ms. Dunston.  Please watch

4  your step stepping down.

5          The plaintiff may call its next witness.

6          MS. MILES:  The plaintiff calls Mr. Linwood Parrish.

7

8                    LINWOOD PARRISH,

9          having been duly sworn, testified as follows:

10

11         THE COURT:  Good morning, Mr. Parrish.

12         You may examine the witness.

13                   DIRECT EXAMINATION

14  BY MS. MILES:

15  Q.   Good morning.

16  A.   Good morning.

17  Q.   Can you state your full name for the Court.

18  A.   Linwood Parrish.

19  Q.   Mr. Parrish, are you now a prisoner in the custody of

20  North Carolina Department of Public Safety?

21  A.   Yes, ma'am, I am.

22  Q.   Are you a habitual felon?

23  A.   Yes, ma'am, I am.

24  Q.   Are you currently serving a sentence for larceny?

25  A.   Yes, ma'am, I am.

1  Q.   Where are you housed?

2  A.   Central Prison HL-302.

3  Q.   How long have you been at Central Prison?

4  A.   Approximately five years.

5  Q.   How many disciplinary infractions have you had?

6  A.   Within a seven- to five-year period, two.

7  Q.   Were these infractions while at Central Prison?

8  A.   Yes, ma'am.

9  Q.   Were these infractions for being in an unauthorized

10 location?

11 A.   Yes, it was.

12 Q.   What about for substance possession?

13 A.   That was one, yes.

14 Q.   Mr. Parrish, do you know Mr. Wright?

15 A.   Yes, I do.

16 Q.   How?

17 A.   He was the faith helper for the Rastafarian services.

18 Q.   What faith do you practice?

19 A.   Islamic.

20 Q.   How long have you been practicing?

21 A.   Around about 28 years.

22 Q.   Are you the faith helper for the Islamic Muslims at

23 Central Prison?

24 A.   Yes, ma'am, I have been so for five years.

25 Q.   Do you celebrate or observe holy days while at Central

1  Prison?

2  A.   We actually do two.

3  Q.   What are those days?

4  A.   Eid al-Fitr and Eid al-Adha.

5  Q.   When is Eid al-Fitr celebrated?

6  A.   Eid al-Fitr is to commemorate the coming of Kaaba.  Eid

7  al-Adha is to celebrate the Sacrifice of Abraham, Ishmal.  In

8  the Bible it says Isaac.

9      So we celebrate this after fasting for 30 days, so it's

10 like a reward from God after abstaining from all your evil

11 deeds or after abstaining from eating food, drink and any other

12 lust.

13 Q.   And just to go back, is Eid al-Fitr celebrated at the end

14 of Ramadan?

15 A.   Yes, it is.

16 Q.   Is celebration of this day important to your religion?

17 A.   Yes, ma'am, it is.

18 Q.   Why specifically?

19 A.   Well, again, it's like a reward from God and what it does

20 is it helps the faith helper or the believer increase his faith

21 towards God a little bit more.

22 Q.   Can you describe for the Court what typically happens on

23 Eid al-Fitr?

24 A.   As far as being at Central Prison, we have a date that we

25 set aside for this feast.  We have at least an hour to two

1  hours for that feast.  Our guests bring in foods from the

2  streets.  The chaplain coordinates that for us.  We have maybe

3  15, 20 minutes roughly before we go to eat to offer a prayer

4  service or to gather to be informed on how the prayer is going

5  to be done.  Once this is done, we are then taken to the chow

6  hall later and you have one officer, three chaplains and

7  whoever the people that are volunteers come in and bring the

8  food.

9  Q.  So you said that you have volunteers that provide the

10  meal.  What type of food do you eat on this day?

11  A.  Usually we have things that may be prepared, chicken,

12  maybe fish sometimes, maybe lamb.  It depends on whatever the

13  volunteers choose to bring in for us.

14  Q.  Outside of the volunteers providing the food, can the food

15  be purchased from any other source?

16  A.  Well, it has to be food from a vendor.  At one point we

17  were allowed to have our families contribute food to us, but

18  somehow that got distorted.  So I don't know what happened with

19  that, but they started saying we can use vendors.  And with

20  that being done, we have to either use the Zakat fund or our

21  volunteers bring it in.

22  Q.  When you have the volunteers bring the food in, how do you

23  coordinate with the volunteers?

24  A.  Usually it's through the chaplains and the chaplains

25  inform us that the volunteers are either going to bring a

1  particular food or we are allowed to contribute toward a

2  particular food.  Once that is done, once the chaplain and the

3  warden have approved it, then it's brought to us.

4  Q.    Are the volunteers members of your faith?

5  A.    Yes, they are.

6  Q.    Are volunteers allowed to attend group services?

7  A.    Yes, they are.

8  Q.    Are they allowed to attend the meals afterwards?

9  A.    Yes, they are.  Normally they don't eat because they

10  already did their feast maybe a day before ours or two.

11  Normally they come in and intermingle and sit down and talk to

12  us.  The chaplains also are present and they come through and

13  talk to us.

14  Q.    And what happens when the volunteers are unable to provide

15  the food?

16  A.    If they're unable to provide food for us?

17  Q.    Yes.

18  A.    We provide our own food.

19  Q.    And what was the source of that?

20  A.    It's a Zakat fund.

21  Q.    Can you describe to the Court how the Zakat fund works?

22  A.    The Zakat fund is funded through inmates going to the

23  canteen and we collect in 25-cent intervals.  This is then

24  tallied up at the end of the month.  Whatever we have -- the

25  chaplain gives us an invoice sheet to let us know how much

48

L. Parrish - Direct Examination

1  money we have exact.  With that being done, she coordinates
2  between the population inmates and death row inmates and she
3  keeps that tally separated.  She let's us know as much as we
4  have allotted to us as far as what we can use for getting food.
5  Q.   So what happens if another inmate was not able to
6  contribute to the Zakat fund?
7  A.   He's still not excluded.
8  Q.   Would he be able to partake in the meal?
9  A.   Yes, he would.
10 Q.   What procedure -- is there a specific vendor that you use
11 to purchase the food --
12 A.   Uhm-uhm.
13 Q.   -- through the Zakat fund?
14 A.   Yes.
15 Q.   Can you tell the Court what happens if you're unable to
16 have volunteers or use the Zakat fund, what will happen?
17 A.   Normally, we'll get the regular meal for the day.  If it
18 happens to be pork, which is a dietary restriction for us, they
19 will make provisions for us to have something else in its
20 place, usually beans or some other supplemental nutrient.
21 Q.   And where do you gather?
22 A.   In the chow hall.
23 Q.   And for Eid al-Adha, is this the same structure?
24 A.   Pretty much.
25 Q.   How long would you say that you gather on Eid al-Fitr and

Case 5:13-ct-03245-D   Document 128   Filed 06/25/18   Page 48 of 294

1  Eid al-Adha?

2  A.   As I repeated before, it's usually between an hour to two

3  hours.  Either between two hours.  Never exceeds two hours.

4  Q.   And you stated earlier that prison officials are available

5  during these gatherings?

6  A.   Yes, they are.

7  Q.   How many chaplains would you say are present?

8  A.   All three, maybe four.  We have four now, so I'm quite

9  sure that he'll come in, too, to see how things go.  But

10  usually all three.  Either Chaplain Dunston will come through,

11  Chaplain Anten (phonetic) will come through, then Chaplain

12  Stratton will come through.  Usually they pushing carts,

13  bringing sodas and bringing condiments and trying to fix the

14  tables up to make it look a little more festive.

15  Q.   How many guards?

16  A.   One guard.  You may have a lieutenant on the outside or

17  captain standing in the hallway.

18  Q.   Can you tell the Court what would happen if a member of

19  your faith is placed on disciplinary segregation?

20  A.   If he's participated during the month of Ramadan and was

21  arrested or locked up after completing the month of Ramadan,

22  then he would receive a tray, but he is not going to be allowed

23  to come and participate with us.  He would do it from his cell.

24  Q.   Mr. Parrish, are there different sects within the Muslim

25  faith?

1  A.   There are.

2  Q.   Do all sects celebrates the holy days that we discussed?

3  A.   Yes.

4  Q.   Is the only variation between the various sects the

5  doctrinal teachings?

6  A.   Yes.

7  Q.   Can you tell the Court why it is important to celebrate

8  these days with a meal, religiously significant meal?

9  A.   Once again, it helps us to remember how it is for people

10  who don't have any food.  It also brings us closer and makes us

11  more thankful to God for providing this meal for us in

12  particular because he said that all things are for man, but

13  fasting is for me.  So once we have fasted for God, he says

14  this is my reward for you and it's sort of kind of like a

15  little piece of Heaven.

16  Q.   And I have one final question for you, Mr. Parrish.  How

17  would you feel if you were unable to celebrate your holy days

18  with a meal?

19  A.   It would be unheard of.  It would be unheard of because

20  that goes synonymous with the religion.  Without it we might as

21  well don't have a religion because this is one of the things we

22  use as a tool to introduce people to it.  We want them to know

23  that we're kind of like one big happy family and in this we try

24  to introduce people to what this religion is about.  A lot of

25  people have misconceptions about it.

1    MS. MILES:  Thank you, Mr. Parrish.  No further

2  questions.

3    THE COURT:  Cross-examination?

4    CROSS-EXAMINATION

5  BY MS. GRANDE:

6  Q.  Hi, Mr. Parrish.  How long have you served again as faith

7  helper at CP?

8  A.  Almost five years.

9  Q.  And during that five years, in your experience have you

10  ever used Zakat funds to buy food for Eid al-Fitr or Eid

11  al-Adha?

12  A.  This last feast we had we made an attempt to do so because

13  the volunteers have been doing too much for us and no need for

14  us to have this money here and not try to help them.  They

15  became very angry, they were very irate about it and they was

16  like we don't appreciate that.  So we were not permitted to use

17  the money for that.

18  Q.  So the answer is no, you never used Zakat funds to buy

19  food?

20  A.  No.

21  Q.  And volunteers always supply the food for your Eid al-Fitr

22  and Eid al-Adha?

23  A.  Yes, ma'am.

24  Q.  To your knowledge, are there Rastafarian volunteers that

25  come in?

1  A.   Again?

2  Q.   Are there Rastafarian volunteers that come in?

3  A.   I wouldn't know.

4  Q.   And do you know whether the Rastafarian faith requires

5  feast meals?

6  A.   In New York they do, yes.

7  Q.   Here in North Carolina do the tenets of the Rastafarian

8  faith require feast meals?

9           MS. MILES:  Objection, Your Honor.

10           THE WITNESS:  I don't know.

11           THE COURT:  He said he doesn't know.

12           Next question.

13  BY MS. GRANDE:

14  Q.   You would say that the tenets of the Islamic faith

15  requires that you participate in a communal meal?

16  A.   Yes.

17  Q.   To your knowledge, is the Zakat fund still in existence at

18  Central Prison?

19  A.   We've had some glitches in it; but to my knowledge, yes,

20  it's still up and going.

21  Q.   But you're not in charge of administering or monitoring

22  the Zakat fund?

23  A.   I have access to its amount.  If I request it, it would be

24  brought available to me, yes.

25  Q.   From chaplaincy services?

1  A.   Yes.

2  Q.   To your knowledge, is there any funds in the Zakat fund at

3  Central Prison?

4  A.   I think they had, once again, a glitch and an accident

5  happened where some of it went to the NA and AA funds, and they

6  were supposed to reimburse everybody back, but they was putting

7  it back into the inmates' accounts.

8  Q.   So no is the answer to that question, correct?

9  A.   I can't say.

10  Q.   Okay.  To clarify, as far as the food that is served on

11  Eid al-Adha or Eid al-Fitr, you are served food that's

12  according to the tenets of your faith, correct?

13  A.   Correct.

14  Q.   So it's pork free, correct?

15  A.   Yes.

16  Q.   And even if, let's say, there's an inmate who does not

17  adhere to a Eid al-Adha diet or to a non-pork diet, he still is

18  required to consume the non-pork food that's provided?

19  A.   Yes.

20  Q.   Again, the Eid al-Adha and Eid al-Fitr is common to both

21  the Sunnis and the Shias, correct?

22  A.   Correct.

23  Q.   Required by both Sunnis and Shias, correct?

24  A.   Yes.

25  Q.   Are religious services divided amongst Sunnis and Shias?

1  A.   In prison?

2  Q.   Correct.

3  A.   We -- we have more Sunnis than we have Shias.

4  Q.   Do you have separate services for Sunnis and Shias?

5  A.   No, it's all the same.

6  Q.   Do you have separate feast meals for Sunnis and Shias?

7  A.   No, we're all the same.

8          MS. GRANDE:  I don't have anything further, Your

9  Honor.

10          THE COURT:  Any other questions?

11          MS. MILES:  Briefly.

12                    REDIRECT EXAMINATION

13  BY MS. MILES:

14  Q.   Mr. Parrish, are you able to still use the Zakat fund if

15  you chose to?

16  A.   Sure.

17  Q.   Regarding the different sects, can they choose how they

18  would celebrate these various holy days?

19  A.   No.  It's all preordained.  It's already set.  It's set by

20  how our Prophet practices and this was sent down by God how it

21  should be practiced.  It's of old, it's followed through in the

22  Bible.  So all of it has already been set up for us, so we

23  can't add or take away from it.

24          MS. MILES:  No further questions, Your Honor.

25          THE COURT:  Thank you.

1          Anything else, Ms. Grande?

2                    RECROSS-EXAMINATION

3    BY MS. GRANDE:

4    Q.   Mr. Parrish, I'm going to ask you a question.  If the

5    Shias, let's say, believe that something was required during a

6    feast meal that the Sunnis did not believe, would prisons allow

7    the Shias to request special things they wanted?

8              MS. MILES:  Objection, Your Honor.  Calls for

9    speculation.

10             THE COURT:  Do you know, sir?  Has that ever

11   happened?

12             THE WITNESS:  No, it hasn't, but I think I can

13   probably clear it up a little bit.

14             THE COURT:  He said it hadn't happened, so that's

15   fine.

16             Anything else, Ms. Grande?

17   BY MS. GRANDE:

18   Q.   Again, just to reiterate.  It's a general service and a

19   general policy for all Islamic inmates, correct?

20   A.   Yes, ma'am.

21             MS. GRANDE:  Thank you.

22             THE COURT:  Thank you, Mr. Parrish.  Please watch

23   your step stepping down.

24             The plaintiff may call its next witness.

25             MS. MILES:  We call Mr. Anthony Wright.

1

2                          ANTHONY WRIGHT,

3            having been duly sworn, testified as follows:

4

5            THE COURT:  You may examine the witness.

6                          DIRECT EXAMINATION

7    BY MS. MILES:

8    Q.    Can you state your name for the Court.

9    A.    Anthony Wright.

10   Q.    Where are you from?

11   A.    From New York.

12   Q.    What part of New York?

13   A.    Queens, New York.

14   Q.    Are you married?

15   A.    No, ma'am.

16   Q.    Do you have any children?

17   A.    One.

18   Q.    What brought you to North Carolina?

19   A.    I came down here to help somebody fix up a house.

20   Q.    Mr. Wright, are you in prison now?

21   A.    Yes, ma'am.

22   Q.    Where are you housed?

23   A.    Tabor City.

24   Q.    What are you serving time for?

25   A.    I'm convicted for murder charge.

1  Q.   How long is your sentence?

2  A.   Life since 26.

3  Q.   How do you feel about serving a life sentence?

4  A.   Well, I'm at -- I'm at peace with it.  I really don't try

5  to think about it too much, but it's there.  I utilize my

6  religion to try to block it out, even me out.  Once in awhile

7  it'll surface and we just chat down Babylon and we just read.

8  Q.   Mr. Wright, I want to talk about your time in New York a

9  little bit.  While you lived in New York, what type of

10 community did you grow up in?

11 A.   Multi-cultural community, a lot of Haitians, large in

12 Queens.  There's a lot of Haitians, a lot of Jamaicans and

13 Rastafarians.

14 Q.   And are any of the members of your family Rastafarians?

15 A.   My brother.

16 Q.   When did you become a Rastafarian?

17 A.   2003.

18 Q.   Where were you baptized?

19 A.   In Bare Hill Correctional Facility.

20 Q.   Who baptized you?

21 A.   Abuna -- couple of them.  Abuna was there, Chris was

22 there, the Abbot was there.  So --

23 Q.   Why did you become a Rastafarian?

24 A.   It made me look at things differently.  It made me look at

25 life differently.

1   Q.   What did you do to practice your faith?

2   A.   Well, you read, you go into the history of it, you attend

3   service faithfully.  That's what you do.

4   Q.   And by reading, what exactly do you read?

5   A.   Well, you read Rastalogy, you read the Bible and you have

6   certain books out there that you can get.  The church tell us

7   that we have to be cautious of the books we read because

8   they're misleading.

9   Q.   Mr. Wright, did you celebrate holy days?

10  A.   Yes, ma'am.

11  Q.   What about holidays?

12  A.   We celebrate that, too.

13  Q.   How did you celebrate these days while in New York?

14  A.   Well, you have four that you celebrated with a feast.  You

15  have -- the other three we gather and commemorate about it and

16  that's what we do.

17  Q.   Once you were released, did you continue to practice your

18  faith?

19  A.   Yes.

20  Q.   How?

21  A.   Go to the church and continue to read.

22  Q.   What's the name of the church you attended?

23  A.   Ba Beta Kristiyan.

24  Q.   Are you currently a member of that church?

25  A.   Yes, ma'am.

1  Q.   How often did you go to church before coming to North

2  Carolina?

3  A.   Every Sunday, and I was in -- there was talk about me

4  trying to become a Levi, but I'm still wrestling with myself

5  with that, supposed to go on Wednesday with that -- every

6  Sunday.

7  Q.   Mr. Wright, what is a holy day within the Rastafarian

8  faith?

9  A.   A holy day is to commemorate a historical event in the

10  divinity of Haile Selassie I.

11  Q.   And what's a holiday?

12  A.   A holiday is like Ethiopian New Year's, Christmas and

13  Constitutional Day, like sometimes where certain things happen

14  at that time.

15  Q.   So is there a difference between celebrating a holy day

16  and celebrating a holiday?

17  A.   Yes.

18  Q.   What's that difference?

19  A.   Well, for me I look at -- like Constitutional Day, I look

20  at that day like the laws and stuff that Constitutional Day

21  that Emperor Haile Selassie I established.  I use that like the

22  rules and the laws of inside the facility.  We try to walk like

23  there is rules governing my life.  I try to walk like that.

24  Q.   How many holy days are there in the Rastafarian faith?

25  A.   There's four holy days.

1  Q.    And what do you celebrate on January 7th?

2  A.    That's a holiday.

3  Q.    So what do you celebrate on that day?

4  A.    That's Christmas.

5  Q.    And how do you celebrate this day?

6  A.    Well, we gather and we'll discuss what it means to us as

7  Joshua Christ being divine and Emperor Haile Selassie being a

8  part of the branch and we just -- we compare what happened back

9  then to what's happening into modern times.

10  Q.    Is a meal required for this day?

11  A.    No.

12  Q.    What do you celebrate on May 5th?

13  A.    May 5th is Fasika.

14  Q.    Is this considered a holy day or holiday?

15  A.    It's holy day.

16  Q.    What is the importance of Fasika?

17  A.    Mussolini invaded Ethiopia in 1936 and occupied it for

18  five years and May 5th is when Emperor Haile Selassie I

19  retrieved it back.

20  Q.    Does this day require a meal?

21  A.    Yes, ma'am.

22  Q.    What does the meal consist of?

23  A.    The meal is -- it's a veggie meal because at the time the

24  warden didn't have time to prepare anything else, so it was

25  something put together and commemorate of that day.

1  Q.    Can you tell the Court what happens on July 16th?

2  A.    July 16th is Constitutional Day.  It's when the Imperial

3  Majesty established the constitution to govern Ethiopia.

4  Q.    Is this day considered a holy day or holiday?

5  A.    Holiday.

6  Q.    Is a feast required for this day?

7  A.    No, ma'am.

8  Q.    What happens on July 23rd?

9  A.    July 23rd is Earth Day, the second coming of Emperor Hale

10 Selassie I.

11 Q.    Is this considered a holy day or holiday?

12 A.    It's a holy day.

13 Q.    And what is the importance of this day?

14 A.    It's the second coming of Christ, Emperor Haile Selassie

15 I.

16 Q.    Does it require a meal?

17 A.    Yes, ma'am.

18 Q.    What does the meal consist of?

19 A.    We have chicken, fish, I believe goat, rice, corn and

20 plantains and stuff like that.

21 Q.    What happens on September 11th?

22 A.    September 11 is Ethiopian New Year's as we Rastafarians

23 consider ourselves abstaining Ethiopian, so it's Ethiopian New

24 Year's.

25 Q.    Is this a holy day or holiday?

1  A.    Holiday.

2  Q.    Mr. Wright, can you tell the Court what is celebrated on

3  October 7th?

4  A.    October 7th is Negus Day, so Emperor Selassie I was

5  crowned King October 7, 1928.

6  Q.    Would this be considered a holy day or holiday?

7  A.    Holy day.

8  Q.    How is this day celebrated?

9  A.    With a -- we commemorate of the holiday and we gather

10  after we discuss what it means to the Rastafarian community,

11  after everything is said and done we have a feast.

12  Q.    What does the feast consist of?

13  A.    Certain menu the church has set up for us similar to

14  July 23rd.

15  Q.    And can you tell the Court what is celebrated on

16  November 2nd?

17  A.    November 2nd is Transfiguration Day, and they have it as a

18  Coronation Day, it's the same, but it's the Crown Emperor Haile

19  Selassie I, King of Kings, Lord of Lords, Conquering Lion Tribe

20  of Judah.  We gather -- it's a holy day, we gather and we

21  commemorate on it, and then you have a feast, too.

22  Q.    What does the feast consist of?

23  A.    There's a menu set up.  It consists of like the same as

24  the other three.

25  Q.    Mr. Wright, is celebration of these days important to the

1  practice of your faith?

2  A.    Yes, it is.

3  Q.    Why?

4  A.    Because it highlights the time Emperor Selassie I on that

5  lineage to November 2nd.  He just didn't -- he crowned King of

6  Kings, Lords of Lords.  It was -- he transfigurated.  First he

7  was Rastafari -- first he was Ras, then Ras Tafari, then he was

8  Emperor Selassie I.  So it was like certain steps before he

9  became Emperor Selassie I.

10 Q.    And to the best of your knowledge, how is the menu

11 selected for the days in which a meal is required?

12 A.    Well, the church, the church sets up the menus.  So as far

13 as me helps them setting it up, me don't know that part right

14 there, but I know that it was always a menu.  We never deviate

15 from that menu.

16 Q.    Mr. Wright, how did you celebrate these holy days while

17 you were incarcerated in New York?

18 A.    We celebrated without any problems.  They just -- it was

19 already set up.  Like the church had it in writing and it was

20 there.

21 Q.    Were you able to gather communally?

22 A.    Yes.

23 Q.    Were you able to celebrate with a meal?

24 A.    Yes.

25 Q.    Was the menu for the meal already set or did you guys --

1  A.   No.  We prepared the meal with fundraisers and stuff like

2  that.  We prepared the meal and served it.

3  Q.   And once you were released, how did you celebrate holy

4  days?

5  A.   Well, you can go to the church at the time.  I came to

6  North Carolina around November, so we didn't celebrate at the

7  church, we celebrated individually at the house.

8  Q.   Mr. Wright, what prison were you first admitted to?

9  A.   In North Carolina?

10  Q.   In North Carolina.

11  A.   CP, Central Prison.

12  Q.   Do you remember what year that was?

13  A.   2010.

14  Q.   Were you convicted when you were admitted to Central

15  Prison?

16  A.   No.

17  Q.   Mr. Wright, what is a safe keeper?

18  A.   A safe keeper, is many reasons, either you're a problem in

19  the county or medical reasons.  Or -- I came for religious

20  purposes, the facility -- the jail I was in, they used to come

21  in the block and just do regular Christian service, and I

22  complained about it so they just sent me to Central Prison.

23  Q.   And at that time were you considered a safe keeper?

24  A.   Yes.

25  Q.   Once you were convicted, did you stay at Central Prison?

1  A.   Yes.

2  Q.   Why?

3  A.   I don't do too much moving around when I'm incarcerated.

4  I stay where I'm at.  So I stayed at CP, and I just felt that

5  it was in Raleigh, it was close to the airport.  I just felt it

6  was better for me to stay there.

7  Q.   Did you have a job in Central Prison?

8  A.   Yes.

9  Q.   What was that job?

10 A.   The last job I had was canteen, but I worked in the

11 kitchen, I worked in the kitchen -- I worked in the hospital, I

12 worked in mental health and the last one was canteen.

13 Q.   And how long were you in the position for canteen?

14 A.   Twenty-six months.

15 Q.   As a safe keeper and once you were finally convicted, did

16 you continue to practice your faith while at Central Prison?

17 A.   Yes.

18 Q.   How?

19 A.   First they didn't have -- they didn't have it -- I read my

20 Bible and stuff like that, but first they didn't have it, so I

21 spoke to the chaplain about it.

22      And while I was safe keeper, I had the policy and

23 procedure of the Rastafarian.  So when I inquired to the

24 chaplain about it, I went to the chaplain and I had the

25 policies and stuff like that.  So we spoke about it and then I

1  went to rec, and when I went to rec, they called me to come up

2  there.  Supposedly I had contraband, I had the policy, and I

3  was put in the hole for it.  So when I got out of the hole, I

4  continue on this journey for the services.

5  Q.    Did you attend group services?

6  A.    No, they didn't have it there.

7  Q.    Were there any other practicing Rastafarians at Central

8  Prison?

9  A.    Yes.

10  Q.    How many?

11  A.    There was about -- I'll give it about probably about 13,

12  but I know that you can't -- by the people that walk around

13  with crowns, you can't count those.  So the people that attend

14  services, those are the ones that I would count.

15  Q.    Mr. Wright, were you a faith helper at Central Prison?

16  A.    In the beginning I wasn't.

17  Q.    Did you become a faith helper?

18  A.    Yes.

19  Q.    What is a faith helper?

20  A.    A faith helper is like you help the community with the

21  faith.  It's like you're the bridge between you and the

22  population and the chaplain, so I assist on both sides if

23  needed.

24  Q.    Can you tell the Court, what was some of your

25  responsibilities as a faith helper?

1  A.   I prepared weekly topics.  It was -- it was told to me

2  that if something goes wrong in the services that I would be

3  held accountable, so I had to be mindful of that.  I had to

4  always think of the community and what can hurt the community.

5  Q.   And what year did you become a faith helper?

6  A.   2013.

7  Q.   How long were you a faith helper?

8  A.   Until it was shut down in 2017.

9  Q.   And are you currently a faith helper at Tabor?

10  A.   No.

11  Q.   How did you become a faith helper?

12  A.   In the beginning you had to apply as a faith helper, so we

13  just felt that it was the right time for me to become a faith

14  helper.  He just -- it can be demanding sometimes, so he just

15  felt that it was just a good opportunity now for me to become

16  faith helper.

17  Q.   Did you have to fill out any applications?

18  A.   Yes.

19  Q.   What qualifies you as -- what qualifications did you have

20  to have in order to become a faith helper?

21  A.   First of all, you have to be knowledgeable of the faith

22  and you had to have -- the write-ups had to be an -- A and B

23  charge had to be a year, and C and D charge had to be six

24  months infraction free.

25  Q.   And did you have any disciplinary infractions?

1  A.   Yeah, I had -- I think I had two at that time.

2  Q.   Are they for any acts of violence?

3  A.   Yes.

4  Q.   What about gang affiliation?

5  A.   No gang affiliation.

6  Q.   Did you have to show that you had knowledge of the faith

7  in order to become a faith helper?

8  A.   Yes.

9  Q.   How was that tested?

10 A.   Well, they -- I can't really -- they ask you certain --

11 they just ask you whether or not you know.  It's not -- they

12 really -- they really don't know.

13 Q.   Mr. Wright, were there any religious group services held

14 for Rastafarians at Central Prison when you first arrived?

15 A.   No.

16 Q.   What led you to believe that there were not group services

17 for Rastafarians?

18 A.   Because I asked around.

19 Q.   What steps did you take in order to receive religious

20 group services for Rastafarians?

21        MS. GRANDE:  Your Honor, I object.  This is

22 cumulative and this is irrelevant.  We have already covered

23 what steps he took.

24        THE COURT:  Sustained.

25        Next question.  We've been over that.

1  BY MS. MILES:

2  Q.   Mr. Wright, what days were the group services held?

3  A.   Tuesday from 9:30 to 10:30.

4  Q.   And who were the group services open to?

5  A.   It was open to the population.

6  Q.   Was it just open to registered Rastafarians?

7  A.   No.

8  Q.   What would happen if someone was in segregation for a

9  disciplinary infraction?

10  A.   In segregation?  They would be in segregation, I have no

11  way of seeing them.

12  Q.   Would they be able to attend the group services?

13  A.   No.

14  Q.   As a faith helper, did you monitor who came into the group

15  services?

16  A.   Yeah.  I paid attention to certain -- yeah, I paid

17  attention to it, yes.

18  Q.   And were chaplains present during group services?

19  A.   Yes, they was present.

20  Q.   How many?

21  A.   It was only one.

22  Q.   Were there any officers present during group services?

23  A.   Sometimes they don't be, you know, but usually there is

24  one.

25  Q.   How many?

1  A.   One.

2  Q.   Mr. Wright, do you know of staff members at Central Prison

3  attending any other group services or programs?

4  A.   There is I believe, yeah, they be.

5  Q.   What about the Kairos meeting, do you know anything about

6  that?

7  A.   Yes, they be.  Yes, they there.

8  Q.   What do you know?

9  A.   You have a lot of staff members there coming to Kairos.

10 Q.   And how do you know this?

11 A.   Because at one time I was in canteen, but at the WRB where

12 they held -- they be helding these events at, you walking by

13 when you going to programs, either you going to unit two

14 somewhere down there, you walk by, you'll see, you'll see them

15 walking up the hallway or something like that.

16 Q.   And Mr. Wright, you said you're currently at Tabor

17 Correctional, correct?

18 A.   Yes.

19 Q.   Are there Rastafarians at Tabor?

20 A.   Yes, a lot of Rastafarians at Tabor.

21 Q.   Do you have group services at Tabor?

22 A.   No.

23 Q.   Do you celebrate holy days or holidays at Tabor?

24 A.   No.

25 Q.   I want to talk a little bit more about the holy days or

1  holidays that you celebrate.

2      How soon after you were admitted to Central Prison did you

3  notice that Rastafarians were not able to celebrate holy days?

4  A.   I got there, I think, April of 2010 and I asked around.  I

5  asked -- I had asked the chaplain.

6          MS. GRANDE:  Your Honor, we've already covered this.

7          THE COURT:  We have.  We've been over this.

8  BY MS. MILES:

9  Q.   Mr. Wright, did you speak with anyone regarding the

10 celebration of holy days?

11 A.   Yes, I spoke to a couple guys.

12 Q.   Who?

13 A.   A couple Rastafarians.  You talking about as far as staff?

14 Q.   Staff, yes.

15 A.   Yes.  I spoke to the staff.  It didn't -- it didn't become

16 an issue until I realized that they -- they wasn't providing

17 for us.  I thought that they was providing something, but they

18 wasn't providing it, then I questioned about it.

19 Q.   Do you recall who you specifically spoke to, which

20 chaplain?

21 A.   Yeah.  It was the first -- when I looked at the policy and

22 I saw the policy is wrong, I spoke to Chaplain Speer -- and I

23 spoke to Chaplain Speer and we spoke about it and he got in

24 contact with the church in New York, but it didn't become an

25 issue until July, July, I think it was '14 or something like

1 that, July when we didn't have that feast, that's when I filed

2 a grievance about it.

3 Q.   And when did you file a grievance again?

4 A.   I think it was either July 23rd, 2014 or 2013, I don't

5 know.

6 Q.   Did prison officials respond?

7 A.   Yes, they responded.

8         MS. MILES:  Your Honor, may I show the witness what

9 has previously been marked as Exhibit 1?

10         THE COURT:  You may.

11 BY MS. MILES:

12 Q.   Mr. Wright, is this a copy of the grievance you filed?

13 A.   Yes, ma'am.

14 Q.   What date did you file this?

15 A.   July 23rd, 2013.

16 Q.   And is this your signature at paragraph 7?

17 A.   Yes.

18         MS. MILES:  Your Honor, we move to admit what has

19 previously been marked as Plaintiff's Exhibit 1 into evidence.

20         THE COURT:  It'll be received.

21     (Plaintiff's Exhibit No. 1 was admitted into evidence.)

22 BY MS. MILES:

23 Q.   Looking at this exhibit, did any prison officials respond?

24 A.   Yes.

25 Q.   Who?

A. Wright - Direct Examination

1  A.    Ms. Vines responded, the unit manager of WRB at the time.

2  Q.    What was her response?

3  A.    The only holy days that will be celebrated are those that

4  are approved and interest in them is made known to the

5  Religious Services staff.  She went along with the policy.

6  Q.    And can you tell the Court what step in the grievance

7  process was this?

8  A.    I believe this is step two.

9  Q.    Did you appeal the response?

10  A.    Yes, ma'am.

11  Q.    And what happened once you appealed?

12  A.    It says there's no evidence of staff indifference.  The

13  grievance considered resolved at that level.

14  Q.    And did another staff member respond?

15  A.    I don't see -- I don't -- yes, Mr. Joyner.

16  Q.    After you appealed, did the grievance resolve your

17  problem?

18  A.    No.

19  Q.    Can you tell the Court what you do in preparation for

20  celebration of holy days?

21  A.    Well, you -- in New York -- I'm saying, in New York, it's

22  already a set menu, so --

23        MS. GRANDE:  Your Honor, this has already been

24  covered.  It's cumulative and --

25        THE COURT:  Just focus.  He's already told us about

1  this.

2  BY MS. MILES:

3  Q.    Do you fast, Mr. Wright?

4  A.    Yeah, you fast.  You fast that day.

5  Q.    And how long do you fast?

6  A.    I fast all day that day until -- until the feast.

7  Q.    Do all Rastafarians fast in preparation of holy days?

8  A.    Yes.

9  Q.    When you meet on Tuesdays for group services, does that

10  meeting serve as a substitute means for celebrating any of your

11  holy days?

12  A.    Yes.  You talk about it, you talk about the holiday or the

13  holy day that day.

14  Q.    Mr. Wright, we talked about November 2nd being

15  Transfiguration Day.  Are you able to celebrate with a feast

16  that day in Central Prison?

17  A.    No.

18  Q.    Are you able to celebrate with a feast that day in Tabor?

19  A.    No.

20  Q.    How does that make you feel?

21  A.    It overwhelms me.  It make me really upset, but it really

22  makes me upset and I can't function, you know, it makes me

23  really angry.

24  Q.    And how does not gathering and celebrating with a

25  religious meal affect your ultimate religious practice?

1  A.   Well, we have tenets of the faith and tenets calls for us

2  to breaking of bread and stuff like that.  By this not

3  happening, like it makes me feel like I'm not even Rastafarian.

4  Q.   How about on November 7th, that's another meal --

5  A.   October 7th.

6  Q.   October 7th.  I'm sorry.  Is that another day of the meal?

7  A.   Yes, that's King's Day.

8  Q.   Are you able to celebrate with a feast in Central Prison?

9  A.   No.

10  Q.   Were you able to celebrate with a feast at Tabor?

11  A.   No.

12  Q.   How does not gathering and celebrating with a meal make

13  you feel?

14  A.   It makes me angry.

15  Q.   How does it affect your religious practice?

16  A.   Well, the church tells us Babylon comes in all types of

17  form and fashion, so by them not allowing it, and I know it's

18  right and holy, it makes me mad because you walk around and see

19  your fellow brethren and we know this day is holy to us and we

20  can't -- there's nothing we can do about it, so -- but write

21  and complain and file suits about it.

22  Q.   Mr. Wright, you're -- the prison gives you your dietary

23  restrictions based off of your religious needs, correct?

24  A.   Yes.

25  Q.   Does the dietary restrictions or substitution serve as a

1  substitute means for celebrating these holy days?

2  A.   No, because -- you talking about the vegan diet and stuff

3  like that?

4  Q.   Yeah?

5  A.   No, because that right there is personal right there,

6  that's personal right there, that's your personal oath you

7  make.  And individually person, as long as it's not pork or

8  something like that, you're not obligated to --

9  Q.   Mr. Wright, on July 23rd, are you able to celebrate with

10  the meal that day?

11  A.   No.

12  Q.   Are you able to gather communally?

13  A.   No.

14  Q.   How does that make you feel?

15  A.   Makes me upset.

16  Q.   How does that affect your religious practice?

17  A.   It strains it.  It strains it.

18  Q.   What about on May 5th, Fasika, are you able to gather with

19  other Rastafarians on this day?

20  A.   No.

21  Q.   Are you provided a religious meal?

22  A.   No.

23  Q.   How does not gathering and celebrating with a meal affect

24  your religious practice?

25  A.   That one right there is very dismal because those -- that

1    was -- that was a time of a physical war and this is like a

2    mental war right now you trying to overcome.  You know, you try

3    to.  It hurts me.  It makes me real upset.

4    Q.   Mr. Wright, does May 5th commemorate any sacraments within

5    the Rastafarian faith?

6    A.   Passover.

7    Q.   Are you able to commemorate your sacrament without

8    celebrating?

9    A.   No.

10   Q.   Mr. Wright, do you expect Central Prison or any other

11   prison facility to fully fund the celebration of holy days with

12   a meal?

13   A.   No.

14   Q.   How do you expect to fund these celebrations?

15   A.   Through fundraisers and donations.

16   Q.   And have you suggested these fundraisers or donations?

17   A.   Yes.  I spoke to other chaplains about it.  They send me

18   to a -- they told me to write a guy named Reagan that was in

19   CP.  He comes to the canteen and he's over at the canteen, he

20   comes to the canteen.  I used to speak to him and he says he's

21   going to look into it.  I was -- I was next door to the social

22   warden of programs and I used to talk to him about it, but it

23   seemed like it never really -- it never went nowhere.

24   Q.   Mr. Wright, have you ever seen flyers for advertising

25   special meals?

1  A.   Yes.

2           MS. MILES:  Your Honor, may I show this witness what

3  has been marked as Plaintiff's Exhibit 3?

4           THE COURT:  Yes.

5  BY MS. MILES:

6  Q.   Mr. Wright, have you seen this flyer before?

7  A.   Yes, ma'am.

8  Q.   Where?

9  A.   They give to you to hang up in front of the canteen.

10 Q.   And when did you see this flyer?

11 A.   June of this year.

12 Q.   Can you describe to the Court what this flyer is for?

13 A.    It's a fundraiser to generate funds for the committee.

14          MS. MILES:  Your Honor, we move to admit what has

15 previously been marked as Plaintiff's Exhibit 3 into evidence.

16          THE COURT:  It'll be received.

17      (Plaintiff's Exhibit No. 3 was admitted into evidence.)

18 BY MS. MILES:

19 Q.   Mr. Wright, have you ever participated in this fundraiser?

20 A.   Yes, I was on the rec committee so I passed it out and

21 stuff like that.

22 Q.   Can you describe to the Court how the fundraiser works?

23 A.   You have the rec guy, Mr. Stevenson, he go out to various

24 establishments out in the streets and then I guess he come in

25 with a deal and he'll put it up for sale.

1  Q.   Mr. Wright, are you aware of other groups or religious

2  groups who raised funds for special meals?

3  A.   You have Muslim service and Native America service, they

4  raise funds.

5  Q.   Are you familiar with the Offender Service Club?

6  A.   Who?

7  Q.   The Offender Service Club.

8  A.   I don't know.

9  Q.   Mr. Wright, what is it like not celebrating holy days with

10 a meal?

11            MS. GRANDE:  Your Honor --

12            THE COURT:  It's covered.  You told us about each

13 one.

14            MS. MILES:  No further questions, Your Honor.

15            THE COURT:  Cross-examination?

16            MS. GRANDE:  Yes, sir, Your Honor.

17                        CROSS-EXAMINATION

18 BY MS. GRANDE:

19 Q.   Mr. Wright, I'd like to go through your history just

20 briefly.  Where were you housed in New York?

21 A.   Where was I housed?

22 Q.   Yep.

23 A.   I was at Bare Hill, I was at Walk Hill, I was at --

24 Q.   How long were you incarcerated in New York?

25 A.   The last seven years.

1  Q.   So Bare Hill, Walk Hill?

2  A.   Yes.

3  Q.   Okay.

4  A.   Watertown.

5  Q.   So 2003 until when?

6  A.   2003 until 2005, and then I went to Walk Hill.

7  Q.   Okay.

8  A.   I stayed there from 2005 until -- I stayed there until

9  the -- until I got my GED.  Once I got me GED, I went to

10  Watertown.  From Watertown, I went to Gouverneur.

11  Q.   How many years would you say, seven years?

12  A.   Yes.

13  Q.   How long were you out before you came to North Carolina?

14  A.   Well, I came to North Carolina I think November, 2007 and

15  then I went -- I went back to New York, and then I came back

16  down in 2008.

17  Q.   So when were you released from prison in New York?

18  A.   I was released last August 1st, 2008.

19       THE COURT:  You got revoked, is that why you had to

20  go back to New York?

21       THE WITNESS:  Uhm-uhm.

22  BY MS. GRANDE:

23  Q.   You came back down to North Carolina after doing your time

24  in 2008.  What month, do you know?

25  A.   I came back -- I came back to North Carolina June, 2009.

1  Q.    Okay.  When were you arrested for murder?

2  A.    October, 2009.

3  Q.    So is it safe to say you were in and out of prison and

4  were only out for three months before you committed a murder

5  here in North Carolina?

6  A.    I was convicted of murder, allegedly, yes.  I was only out

7  for three months?  No, I was out longer than three months.

8  Q.    You were only out three months?

9  A.    I was out longer than three months.

10  Q.    You were released in June and you were convicted in

11  October.

12  A.    You said I -- I told you I came down to North Carolina in

13  June and I was convicted in October -- I was arrested in

14  October.

15  Q.    Okay.  When you were at Bare Hill in 2003 or Walk Hill or

16  Watertown or Gouverneur, was Chaplain Severin or Abuna Foxe

17  working there?

18  A.    Yeah, they come to the facilities.

19  Q.    They were both there?

20  A.    They coming to various facilities.  They have been there

21  when I was there.

22  Q.    Were you Rastafarian before you went to prison in New

23  York?

24  A.    The last time?

25  Q.    Before 2003.

1  A.   2003, no.

2  Q.   No.  So you had never attended Rastafarian churches,

3  tabernacles in the community before 2003?

4  A.   No.

5  Q.   You have no other experience with different means of

6  Rastafarian?

7  A.   I have experience with them.  You have different

8  literature that comes around that you would read and if it's

9  good, it's good; if it's not, it's not.

10 Q.   And I believe you testified that Abuna Foxe baptized you;

11 is that correct?

12 A.   Yeah, he was there.

13 Q.   Who created the church Ba Beta Kristiyan?

14 A.   Abuna Foxe.

15 Q.   So it's his own church?

16 A.   It's a Rastafarian church.

17 Q.   But he created the church?

18 A.   Yeah, yes.

19 Q.   And Chaplain Severin also belongs to the same church?

20 A.   Yes.

21 Q.   When you were incarcerated at Bare Hill or in New York

22 period, did you learn the tenets of the Ba Beta Kristiyan

23 church?

24 A.   Yeah.

25 Q.   Did you learn them exclusively?

1  A.    Yes.

2  Q.    Did you learn the tenets of the Niyabinghi?

3  A.    Niyabinghi?

4  Q.    Yes.

5  A.    Niyabinghi is not in the tenets of Ba Beta Kristiyan.

6  Niyabinghi is a sect that you -- one of the first sects.

7  Q.    It's the first one, correct?

8  A.    Yes.

9  Q.    So Ba Beta Kristiyan is another sect, correct?

10  A.    Well --

11  Q.    Except for Ba Beta Kristiyan, you all believe you're the

12  only sect?

13  A.    No, no.  See, Emperor Selassie I celebrated us to

14  modernize and centralize, so to steal away from different

15  mansions to bring the organization together, which is Imperial

16  Ethiopian World Federation umbrella.  So we -- Niyabinghi was

17  established in the '30s, late '30s until now.  A lot of that

18  literature is old literature and we wouldn't use everything

19  that's inside the literature because if we do that, at that

20  time it was a lot of things happening back then, so you have to

21  update the literature.

22  Q.    Okay.  So I want to be clear.  Is Ba Beta Kristiyan, in

23  your opinion, is it an Ethiopian Orthodox church or is it a

24  Rastafarian church or is it both?

25  A.    It's Ethiopian Orthodox church, yes, I believe so.

1  Q.   You believe it's Ethiopian Orthodox?

2  A.   Yes.

3  Q.   Is Ethiopian Orthodox a Christian church?

4  A.   I can't -- I'm not there yet with that right there.  I

5  can't go into that.

6  Q.   Can it be both Ethiopian Orthodox and Rastafarian?

7  A.   I can't answer that for you.

8  Q.   So is Ba Beta Kristiyan Rastafarian or is it Ethiopian

9  Orthodox?

10 A.   It's a Rastafarian church.

11 Q.   Okay.  Would you say that Ba Beta Kristiyan requires

12 different things than generally accepted Rastafarian practices?

13 A.   No, they all do.

14 Q.   I'm sorry?

15 A.   They all practice the same.

16 Q.   So all Rastafarians are required to be baptized; yes or

17 no?

18 A.   You're not going to force me to answer the way you want me

19 to --

20      THE COURT:  Do you know?

21      THE WITNESS:  Yeah.  I can go into it a little bit.

22 I can't --

23      THE COURT:  Just start with yes or no.  Sir, it's a

24 yes or no and then you can tell me why.  But do you know?  If

25 you don't know, there are other people here who are experts.

```
1              THE WITNESS:  I'm going to let Mr. Severin answer.

2              THE COURT:  Okay.  That's fine.

3              Next question.

4    BY MS. GRANDE:

5    Q.    Do all Rastafarian require sacraments?

6    A.    I'm going to let Mr. Severin answer that one.

7    Q.    What about diet, do all Rastafarians require a special

8    diet?

9    A.    No.

10   Q.    Do you require a special diet?

11   A.    For medical reasons, yes.

12   Q.    What about religious reasons?

13   A.    I eat fish, I eat chicken, so...

14   Q.    Don't most Rastafarians believe you cannot consume animals

15   that walk?

16   A.    No, no.

17   Q.    So are most -- in your experience as a faith helper, are

18   most Rastafarians vegetarians or vegans?

19   A.    We have some are and some don't.

20   Q.    But you are not?

21   A.    No, I'm not a vegan.

22   Q.    Is it not a tenet of general Rastafarian beliefs?

23   A.    No.

24   Q.    It's not a religiously mandated diet?

25   A.    No.  That's not practice, no.
```

A. Wright - Cross-Examination

1  Q.   Again, you've only ever studied Ba Beta Kristiyan tenets

2  and practices, correct?

3  A.   It's all --

4  Q.   Yes or no?

5  A.   I keep telling you, you're not going to have to make me

6  answer the way you want me to answer.  It's all embedded in

7  together.  It's not that I want to be bias of just seeing Ba

8  Beta Kristiyan.

9       You have a history of the Rastafarian movement that

10  required -- Ba Beta Kristiyan is more up-to-date literature,

11  but we like to call it how the darkness came to light, so back

12  then a lot of versions didn't know -- didn't know that time

13  period they had to eat certain things because they didn't have

14  refrigeration like that in certain areas, so they had to eat it

15  like that.  Now it's more modernized.  You have refrigeration

16  so you can preserve things.

17  Q.   Do you believe that Chaplain Severin and Abuna Foxe are

18  the only religious experts, Rastafarian experts?

19  A.   Do I believe?

20  Q.   Yeah.

21  A.   No.  That would be bias for me to say they're the only.

22  Q.   So why did you previously just testify that Niyabinghi

23  cannot set the preferences for all Rastafarians?

24  A.   Well, I'm going to say, first of all, you wouldn't have a

25  Niyabinghi sit up here and testify for this anyway, so you have

1    to go to an expert that is going to be willing to shed light on
2    it.  Niyabinghi won't going to sit here and testify for you.
3    They not going to do that.
4         We not supposed to -- Niyabinghi is not supposed to be in
5    a setting like this.  So the church is more modernized.  They
6    feel that in order for us to grow, you have to deal with
7    environments like this.
8    Q.    Do traditional Rastafarians use titles like clergy,
9    levite, deacon, priest?
10   A.    Yes.  That's traditions of old, of course.
11   Q.    Does Niyabinghi use those terms?
12   A.    See, you don't want to downplay Niyabinghi because that's
13   the stepping stone of Rastafarian movement, but Niyabinghi
14   still practicing in the bushes so it's not modernized.  So I
15   can't really -- and I haven't seen any literature as far as
16   saying a priest, I believe they say priest -- you believe they
17   say priest, but...
18   Q.    Does Ba Beta Kristiyan exist anywhere outside of New York?
19   A.    Yes.
20   Q.    Is there a mansion in North Carolina?
21   A.    No, there's no mansion in North Carolina.
22   Q.    What is the religious significance associated with the
23   food that you're wanting to consume on holy days?
24   A.    You have Passover, you have breaking of bread, so that's
25   one of the tenets of the church.

1  Q.   Where is it written?

2  A.   Where is it written?  It's inside the church codes.  I got

3  it in my paperwork.

4  Q.   Is it in a Bible or in a book?

5  A.   I believe it's tooken out of the Bible, yes.

6  Q.   Is it only contained in a document written by Abuna Foxe?

7  A.   See, everything that Abuna Foxe established comes out of

8  the Bible anyway.

9  Q.   So everything Abuna Foxe has written or established is a

10 direct commandment from God?

11 A.   Of course.

12 Q.   Does Abuna Foxe, to your knowledge, do the commandments

13 that he set forth for the Ba Beta Kristiyan, do they require

14 things that are outside or not traditional to the traditional

15 Rastafarian practices?

16 A.   Is it outside?  I don't know your line of questioning,

17 what you're...

18 Q.   Are they in addition to what's generally accepted for

19 Rastafarians?

20 A.   Niyabinghi acknowledge it, if that's what you're trying to

21 say.

22 Q.   I'm sorry?

23 A.   Niyabinghi acknowledge it.

24 Q.   Acknowledge what?

25 A.   The holy days and holidays.

1  Q.    What about feasts?

2  A.    Yes, they have feasts.  In their paperwork, 2006, their

3  policy, it talks about 13 days of a feast.

4  Q.    Are the feasts --

5  A.    All Rastafarian practice it.

6  Q.    Are the feasts required as a tenet of the faith?

7  A.    Yes.

8  Q.    What do they signify?

9  A.    Breaking of bread.

10  Q.    Celebration?

11  A.    Yes.  Celebration, feast, yes.

12  Q.    Is it analogous to an Islam and Ramadan or Eid al-Fitr?

13  A.    I'm not a priest to speak about that.

14  Q.    Is it a receipt of a gift from God?

15  A.    I'll allow the priest to speak about that.

16  Q.    Is it a receipt of a slice of Heaven?

17  A.    I'll let the priest speak to that.

18  Q.    Can you tell me if you ever met Mr. Lassiter?

19  A.    Yes, I met Mr. Lassiter.

20  Q.    Ever spoken to him?

21  A.    Yes.

22  Q.    Ever asked him anything about Rastafarian groups?

23  A.    Yes.

24  Q.    When did you meet with him?

25  A.    When he was the warden at CP.

1  Q.    What conversation did you have with him?

2  A.    I remember I -- I had asked him -- he -- I don't remember

3  saying -- but I always -- both of them, as far as them, they --

4  they try to accommodate.  They try to.  I believe it was either

5  Mr. Joyner or Mr. Lassiter authorized a holiday that wasn't a

6  holiday.  See, I try to -- Marcus Garvey's birthday, they

7  opened the door for Marcus Garvey's birthday and one of them

8  authorized it.

9  Q.    What did Mr. Lassiter do to impede your religious rights?

10 A.    I believe he told them to do some research with it.

11 Q.    How did he personally violate your religious rights?

12 A.    Well, he signed a grievance or something.  I believe he

13 did a grievance.

14 Q.    So signing a grievance was the amount of his involvement?

15 A.    Yeah, I believe he did a grievance or something.

16 Q.    Okay.  But he never personally told you anything that

17 violated your religious rights?

18 A.    The lawyer tells me I have to put him inside that lawsuit

19 because he was the head of the facility at that time.

20 Q.    So he's only named because of his title?

21 A.    Basically, yes.

22 Q.    What about Mr. Joyner, is he only named because of his

23 title?

24 A.    Mr. Joyner, he responded to a grievance, and --

25 Q.    Let's look at that grievance.  I'm going to show you

1  what's been marked as Defendant's Exhibit No. 14.  I think it's
2  the same grievance that your lawyer showed to you; is that
3  correct?
4  A.    You got to pull it up because that is somebody else's
5  name.
6  Q.    Does it say Anthony Wright?
7  A.    Yes.
8  Q.    That's your handwriting right there?
9  A.    Yes.
10 Q.    Is that what you're talking about?
11 A.    Yes.
12 Q.    And do you know whose initials those are besides
13 Mr. Joyner's name?
14 A.    CB Joyner.
15 Q.    The scribble that's to the right of his name, do you know
16 whose -- what initials those are?
17 A.    I don't know what that is.
18 Q.    Do you know whether this is actually Mr. Joyner's
19 signature or not?
20 A.    That's his name.
21 Q.    Okay.  Would you be surprised to know that Mr. Joyner did
22 not sign this document?
23 A.    Well, I don't know.  It come from his name, that's who was
24 the head of the facility right there at that time.
25 Q.    But this is the extent of his involvement you're

1  testifying to, correct?

2  A.  Yes.

3  Q.  So his only action that he took that violated your

4  religious rights is this signature right here that you do --

5  you may or may not know whether it's his or not?

6  A.  Well, somebody forged his name?

7  Q.  Or someone signed on his behalf?

8  A.  If that's what happened, yes.  He was the head of the

9  facility.

10  Q.  Do you understand that in a 1983 action you're required to

11  have defendants who are personally involved in the deprivation

12  of your rights?

13  A.  He's personally involved.  He responded to a grievance.

14  Q.  That he had an intent to deprive you of your religious

15  rights.

16  A.  He governed the facility.  He's the head of the facility.

17  Q.  What actions did he take that signified his intent?

18  A.  Not giving me my right to practice my religion.

19  Q.  To violate your right to practice your religion.

20      What actions did he take?

21  A.  He denied me what -- he denied that grievance, don't I

22  have to go through administrative remedy?

23  Q.  What about the same question for Chaplain Brown, have you

24  ever met her in person?

25  A.  I never met Chaplain Brown.

1  Q.   What actions did she take to violate your religious

2  rights?

3  A.   Chaplain Brown, everything that goes through religious

4  service has to go through Chaplain Brown.  So Chaplain Brown, I

5  believe she has next-to-the-last say in the matter, so...

6  Q.   What actions did she take to violate your beliefs?

7  A.   She was the overseer of the chaplaincy.

8  Q.   How did she intentionally deprive you of your religious

9  rights?

10 A.   She told them not to deal with New York City.  She told

11 them --

12 Q.   How do you know that?

13 A.   Because her staff told me this.

14 Q.   Who?

15 A.   Chaplain Speer, for one; Chaplain Stratton told me that,

16 too.  She told me to find a church inside North Carolina,

17 that's what she told me.

18 Q.   Were you able to do that?

19 A.   She told them to find a church in North Carolina.  She

20 didn't tell me to search for it.

21 Q.   Were they able to do that, to your knowledge?

22 A.   Well, I --

23 Q.   Was that because one doesn't exist in North Carolina?

24 A.   Yes.  I knew they was never going to be able to find a

25 church in North Carolina.

1 Q. So in your plan about these feasts, if you want to have

2 members of your sect bring in feast meals, volunteers, where do

3 you propose we get the volunteers from?

4 A. Well, it was never --

5 Q. I'm asking you a question. Where do we get volunteers

6 from if there are no Ba Beta Kristiyan mansions in North

7 Carolina?

8 A. You didn't have to -- didn't have to follow or be a part

9 of Ba Beta Kristiyan to find a faith -- find an overseer to

10 come inside. You didn't have to. They had it before.

11 Q. They didn't have to be members of the Rastafarian or the

12 Ba Beta Kristiyan community?

13 A. As long as they was Rastafarian and they was coming in --

14 Q. Is it because other Rastafarians don't recognize these

15 feast meals so they wouldn't bring them to you?

16 A. No, that's not what was -- that wasn't the case.

17 Q. Okay. And when you were a faith helper at Central Prison,

18 were you allowed to attend weekly services?

19 A. Yes.

20 Q. I believe you testified that during your Tuesday services

21 you would discuss whatever that particular week's holy day or

22 holiday may be, correct?

23 A. If it was coming up --

24 Q. If it was coming up or it had already passed?

25 A. -- I would tell them that they know there's a holiday

1  coming.

2  Q.    And you would discuss it?

3  A.    No, we wouldn't discuss it.

4  Q.    Would you engage in --

5  A.    That day -- we have to discuss it on the day that it

6  comes.  We will say that it was coming up and --

7  Q.    I believe you already testified that it was a substitute

8  for the actual corporate services.  You said yes, we discuss

9  it.

10 A.    We discuss all -- we discuss everything in the Rastafarian

11 circle, but --

12 Q.    Your lawyer asked you, do groups serve as a substitute for

13 holy days and you said, yes, we talk about it.

14 A.    No, it's not a substitute for that.  We don't never have

15 substitute for those days, never, because those day have to be

16 on the same day that it is.

17 Q.    Okay.  Do you go to the chow hall every day?

18 A.    Yeah, I go to chow hall every day.

19 Q.    And what is stopping you from having a communal meal with

20 other general population inmates in the chow hall?

21 A.    Them cuffs that they put on me if I try to do that.

22 Q.    You're not allowed to sit at a table with other

23 Rastafarian inmates and eat?

24 A.    No, no, not as far as organized like that, we can't do

25 that.  It has to be --

1 Q.   You can't all sit at the same table?

2 A.   We can sit at the same table, yeah.  We don't come out to

3 chow together like that.

4 Q.   Would that satisfy the purposes of breaking the bread or

5 eating together?

6 A.   No, no, it wouldn't satisfy.  No, no.

7 Q.   Have you ever tried?

8 A.   Why would I try?  That's not a requirement for us to do

9 inside together like --

10 Q.   It's not a requirement for you to eat together?

11 A.   It's supposed to be a church setting.  That's not a church

12 setting.

13 Q.   Is there any other group that has a church setting feast

14 meal?  Do they all eat in the chow hall?

15 A.   Some of them eat -- some of them eat in the gym.  But I'm

16 talking about as far as corporate the church supposed to come

17 together.

18 Q.   I'm asking about the feast meals.

19 A.   Not for me to organize outside of that church.  If I go

20 try that, they going to lock me up.

21 Q.   So on November the 2nd, you say you're required to have a

22 feast meal?

23 A.   Yes.

24 Q.   You go to the chow hall on November 2nd?

25 A.   No, I will fast that day.  Me personally, I'm going to

1  fast until nighttime.

2  Q.    Okay.  What about the following day, November 3rd?

3  A.    Then I go to mess hall lunchtime -- dinnertime.

4  Q.    And you can sit and eat with other Rastafarians there?

5  A.    They don't --

6  Q.    Yes or no?

7  A.    No, no.  They don't come call us out like that.

8  Q.    Are there other members of your group, your Rastafarian

9  group that would be eating in the mess hall at the same time as

10 you?

11 A.    A lot of times, yes.

12 Q.    And you can sit with them?

13 A.    No, I can't sit with them.

14 Q.    What's prohibiting you from sitting with them?

15 A.    Because it's the order they call chow and whoever gets

16 down there, it's not -- you don't come to chow like that

17 together.  The order is they call the second floor, they call

18 the third floor, so we don't organize in the first place, we

19 don't organize like that.

20 Q.    Are there other Rastafarians on your floor?

21 A.    Nah, I don't -- I'm not in CP no more anyway; but at that

22 time, there was none on my side.  They was all on the third

23 floor.

24 Q.    Why aren't you the faith helper anymore?

25 A.    Why?

1  Q.   Yeah.

2  A.   Because I was moved to Tabor City, and I was --

3  Q.   Is it because you incurred a disciplinary infraction?

4  A.   They destroyed my literature; and, yeah, it was, they

5  threw it out though.

6  Q.   And you disobeyed orders?

7  A.   I appealed it and they threw it out.

8  Q.   When did the dismissal come back?

9  A.   Yesterday, ma'am.

10  Q.   Okay.  So is it possible now for you to reapply to serve

11  as a faith helper at Tabor?

12  A.   It's possible, but would it be wise for me to do it at

13  Tabor is another question.

14  Q.   Why would it not be wise for you to do it at Tabor?

15  A.   Because I was sent to Tabor as a punishment, so --

16  Q.   Did you or did you not tell Mr. Atkins that you wished to

17  go to Tabor or that you wanted to be promoted and transferred

18  from CP?

19  A.   No, no.  I specifically put inside my complaint, could I

20  be -- could I stay at Central Prison until this case is over

21  with.

22  Q.   So during -- when you were working at the canteen and

23  prior to the time that Mr. Atkins retired, you did or you did

24  not tell him that you wanted to be transferred away from

25  Central Prison?

1          MS. MILES:  Objection, Your Honor.  Asked and

2    answered.

3          THE COURT:  Next question.

4          THE WITNESS:  No.

5    BY MS. GRANDE:

6    Q.   Were you, in fact, promoted in custody when you were

7    transferred to Tabor?

8    A.   Yes.  I was promoted and usually when you're promoted they

9    ask you what facility do you want to go to.

10   Q.   So you were going to be transferred from Central Prison

11   regardless due to the fact that you were promoted to medium?

12   A.   Yes, in September.

13   Q.   Okay.  So you weren't transferred in retaliation; you were

14   transferred because you were promoted?

15   A.   I was transferred in retaliation, yes.  I was transferred

16   because of retaliation, yes.

17   Q.   Is it true that you pressured Vernon Platt to give up his

18   position as faith helper?

19         MS. MILES:  Objection.

20         THE WITNESS:  No.

21         THE COURT:  He said no.  Next question.  Let's stay

22   focused here.

23   BY MS. GRANDE:

24   Q.   I believe you testified that you can't pay attention to

25   people who walk around with crowns because they don't count as

1  Rastafarians; is that right?

2  A.    Yes.

3  Q.    So who counts as Rastafarians?

4  A.    The ones who come to services.  I can't judge on that, but

5  as far as the ones who come to service because everybody have

6  these crowns on and you don't know who is who.  So when you

7  come inside the circle, those are the ones that we identify

8  with, that I would be around.

9  Q.    So can you tell me, based on your experience as a faith

10  helper, do inmates -- are there more Rastafarians that declare

11  to be Rastafarians just to wear crowns or dreadlocks?

12  A.    I don't know their personal reasons, but what I feel is

13  that due to the temperature they keep this to keep their head

14  warm.

15  Q.    So, for example, at Tabor there are 160 declared

16  Rastafarians.  To your knowledge, are there 160 Rastafarians

17  wishing to practice at Tabor?

18  A.    If they was to open up the Rastafarian community and you

19  see who comes up inside there, that's how I personally identify

20  who is a Rastafarian, because you have to come to service in

21  order for me to identify who you are.

22  Q.    What about at Central Prison, how many Rastafarians do you

23  think were declared?

24  A.    At any given time you might have about -- at the most I

25  ever seen come up is about 11.

1  Q.    That come to service?

2  A.    Yes.

3  Q.    But would it surprise you to learn that there's more than

4  100 declared?

5  A.    So that makes it more easier for me to say that it

6  wouldn't be that expensive for the feast, would it?

7  Q.    You're saying because there's only 11 that attend?

8  A.    Yes.

9  Q.    But wouldn't the feast have to be open to all declared

10  members of the Rastafarian group?

11  A.    If they chose to participate, and that's not the case.  I

12  believe that wouldn't be the case.

13  Q.    But you don't know?

14  A.    I don't know.

15  Q.    And you're not involved in the purchasing or the process

16  or the planning for the finances of the groups, correct?

17  A.    No.

18  Q.    And do you know what the purpose of the Zakat fund is?

19  A.    Well, from my understanding is that --

20  Q.    It's a tenet of the Rastafarian faith to do community good

21  works, correct?

22  A.    Yes.  From my understanding that --

23  Q.    Excuse me.  It's the --

24         THE COURT:  Ms. Grande, you asked him a question, you

25  didn't give him a chance to answer the question about the Zakat

A. Wright - Cross-Examination

1  fund, and then he started to answer and then you asked him

2  another question and then you asked him another question.

3          The process is if you want an answer to your

4  question, ask it, let him answer.  Once he answers, ask him

5  another question, but don't interrupt him.

6          Now, let's get the record at least clear and also be

7  a lot more helpful for the court reporter.

8          Ask a question, if you want to ask it, and then let

9  him answer it.

10          Next question.

11  BY MS. GRANDE:

12  Q.   Do you know what the purpose of the Zakat fund is, Mr.

13  Wright?

14  A.   I didn't even know about the fund -- yes, I did.  I knew

15  that they purchased certain things for us, but I didn't know to

16  the extent what it is.

17  Q.   So you have no idea how it is administered or collected,

18  correct?

19  A.   No.

20  Q.   Okay.  And I believe that pizza flyer that you testified

21  about that you were part of some committee -- what committee

22  were you on?

23  A.   I was rec committee.

24  Q.   I'm sorry?

25  A.   Rec committee.

1  Q.    Red?

2  A.    Rec committee.

3  Q.    Rec.  What does that mean?

4  A.    They have funds, they have sales and stuff to generate

5  money for certain festivities.

6          THE COURT:  Is "rec" short for recreation?

7          THE WITNESS:  Yes.

8  BY MS. GRANDE:

9  Q.    Were the proceeds of that sale given to a charitable

10 organization?

11 A.    Yes, they just started doing that.

12 Q.    And it says that on the flyer, right?

13 A.    They just started doing it, yes.

14 Q.    So the proceeds from the sale of those pizzas was not for

15 inmate's own benefit, right?

16 A.    I don't know to the extent what they do with everything of

17 it, so I don't know.

18 Q.    I mean, it says it on the flyer, correct?

19 A.    It says one thing, but there's a lot of other stuff was

20 going on with that that I didn't know, so --

21 Q.    Okay.

22 A.    -- I can't fully say.

23 Q.    I'm going to show you what's been marked as Defendant's

24 Exhibit No. 12.  Is this your handwriting?

25 A.    Yes.

A. Wright - Cross-Examination

1  Q.    Okay.  And what's the purpose of this grievance?

2  A.    This was that -- I was -- I believe it was -- I want to

3  say this is when Speer was head of chaplain.

4        They used to say that they can't do certain things within

5  the Rastafarian circle; that they couldn't extend the time and

6  certain things like that, and I was trying to show them that

7  they was favoritism towards different groups.  Like Sunday they

8  allow the facility to -- they allow the Christian church to

9  prepare for -- to get their Gospel stuff together and then they

10 have their worship service.  So I believe it was in the matter

11 of trying to get like get 15 extra minutes for one day or

12 something like that.

13 Q.    And --

14 A.    And Mr. Lassiter -- I remember, Mr. Lassiter, he was

15 trying to tell us that they was -- I think they had some

16 Catholic service or something in that nature, but he was trying

17 to tell me that that doesn't apply to -- as the Christian

18 service, the Gospel church.

19 Q.    And you agreed with his response, right?

20 A.    I don't remember that one.

21 Q.    Did you check "yes," agree?

22 A.    Yeah, I probably did because it was --

23 Q.    So they resolved your grievance for you and they answered

24 your question, right?

25 A.    He resolved that grievance right there.  I'm not -- I want

1  to be clear that it's not -- none of this is personal toward

2  Mr. Lassiter or Ms. Stratton, none of this is personal.

3      As me being a Rastafarian, we try to shed light on certain

4  things that's not right, that's all I try to do.  And when

5  something hinders me from doing that, it stirs me up where I

6  can't practice my faith because that's part of my religion.  So

7  there's nothing personal toward none of it.

8  Q.   But you named them in a lawsuit.

9  A.   Of course, because you're not allowing me to -- that's

10  what the book told me to do.  I followed it to the T.  It told

11  me that I have to follow my remedies, and I followed my

12  remedies.  That's why we here today.

13  Q.   And you've requested money from them as well?

14  A.   Well --

15  Q.   But you're saying that it's nothing personal?

16  A.   The book told me what to do.  I didn't -- I learned as I

17  was going along with the book.  So it told me -- I truly wasn't

18  understood of what capacity or official, so I just put both.

19  It's not -- it's not nothing personal.

20      Honestly, all I really want is to be able to practice my

21  religion.  That's all I want.  That's what this is all about.

22  It was never about no funds or nothing like that, but I just

23  put -- the more I put in there, the better off I'd be.

24      I didn't even figure it would go this long.  I just

25  figured they were going to see that I was telling the truth and

A. Wright - Cross-Examination

1  that was that.

2      You think I honestly want to be here going against this?

3  I still want to practice my religion to the T, what it tells me

4  I'm required to do.

5  Q.  Your version of Rastafarian?

6  A.  No, it's not my version.

7  Q.  Ba Beta Kristiyan's version?

8  A.  Of course.

9  Q.  What Abuna Foxe has written?

10  A.  Do you know what Ethiopian World Federation is?  Do you

11  understand it?  I feel like that's what the problem is,

12  nobody's taken time to really research it or go into it.  They

13  not doing it.

14          THE COURT:  Next question.

15  BY MS. GRANDE:

16  Q.  Let's look at what's been marked as Defendant's

17  Exhibit 13.  Is this your handwriting again?

18  A.  Yes, ma'am.

19  Q.  Did you fill this out?

20  A.  Yes.

21  Q.  Okay.  And here, did they explain to you what you were

22  permitted to have or not have, what practices you were

23  permitted to engage in or not engage in?

24  A.  They said, according to their paperwork, that's what I was

25  entitled to have and I appealed it.

1   Q.   And then you agreed?

2   A.   I didn't agree.

3   Q.   Did you check box 32, agree with grievance response?

4   A.   No, I didn't agree on -- I didn't agree on that right

5   there.

6   Q.   So that's not your signature?

7   A.   It may be my signature.  Then Mr. Joyner didn't sign his

8   so how could I check that?  That's my signature right there.  I

9   don't remember checking no grievance.

10  Q.   Okay.

11  A.   That's not the core of the grievance of this case.

12  Q.   Let's look at what you had submitted previously to

13  Chaplain Brown.  I apologize.

14       It's Defendant's Exhibit No. 11.  This is your DC-572; is

15  that right?

16  A.   Yes.

17  Q.   And here where you're requesting what religion you want

18  recognized you write Rastafarian?

19  A.   Yes.

20  Q.   Not Ba Beta Kristiyan, not Ethiopian World Federation, not

21  Ethiopian Orthodox; Rastafarian, right?

22  A.   Yes, but Mr. Speer told me that being -- he pulled me --

23  being the fact that it's already recognized that that

24  wouldn't -- I will have to -- he told me I have to do something

25  else, but I may have -- I really didn't understand how to put

1  it down on this paper, so it might have been me speeding to do

2  it.

3  Q.   So the Rastafarian religion where you write "Rastafarian,"

4  does that encompass all mansions of Rastafarianism?

5  A.   Does it -- huh?

6  Q.   Does it encompass all four mansions of Rastafarianism?

7  A.   There's more than four mansions of Rastafarian.

8  Q.   How many is there?

9  A.   I don't know the exact number, but I know it's over 10.

10  Q.   Is there a separate policy for every mansion of

11  Rastafarian?

12  A.   No, not governing around those holidays.

13  Q.   Do you believe there should be a separate policy for every

14  mansion?

15  A.   No, not governing around those holidays.  Those holidays

16  are the core holidays of all the mansions of Rastafarian.

17  Q.   So all Rastafarians celebrate Ethiopian Christmas?

18  A.   All Rastafarian.

19  Q.   And all Rastafarians celebrate Fasika?  Or Constitution

20  Day?

21  A.   All Rastafarian, yes.

22  Q.   Aren't those less important than other Rastafarian

23  holidays?

24  A.   It has a significant meaning.  I'm not going to say it's

25  less important.  It has a significant meaning --

1  Q.   But for Ba Beta Kristiyans, those are important holidays,
2  you say, correct?
3  A.   They Rastafarian holidays.
4  Q.   Okay.  And for regular Rastafarians or let's say
5  Niyabinghi Rastafarians, are those important holidays?
6  A.   Yes, it is.
7  Q.   Would you be surprised to learn that New York doesn't --
8  no longer recognizes November 7th?
9  A.   They never recognized November 7.
10 Q.   October 7th.  I apologize.
11 A.   October 7th is King's Day.  It's King's Day.  They going
12 to acknowledge it.  That's King's Day.
13 Q.   If you're saying that New York recognizes all the holidays
14 that you need recognized, is that the policies as they existed
15 when Abuna Foxe was in charge or the policies as they exist
16 now?
17 A.   The policies still exist today.
18 Q.   And do you know whether they still recognize all the
19 holidays you're seeking here?
20 A.   I didn't hear what you said.
21 Q.   Does New York still have the holidays, every one that you
22 have requested here today?
23 A.   Yes.
24 Q.   Have you ever attended a Niyabinghi mansion tabernacle
25 celebration?

1  A.    No.

2  Q.    Are you knowledgeable about what they require and what

3  they teach?

4  A.    Yes, you'll get some literature on it.

5  Q.    What about the Bobo Ashanti or the 12 Tribes?

6  A.    Yes, you will get a little bit of literature on it.  I

7  never went to -- no.

8  Q.    So you don't know what they require either?

9  A.    Yes, you will get literature on it.

10  Q.    Where do you get literature on it from?

11  A.    It'll be floating around somewhere.  You'll get ahold of

12  it.

13  Q.    Have you read it?

14  A.    Yes, I read it.  I have some in my property here.

15  Q.    Did you attend religious services every week when you were

16  at Central Prison?

17  A.    If I didn't go, they weren't open.

18  Q.    And did some of those services that you attended occur on

19  the holy days that you have listed that you want recognized?

20  A.    Never.

21  Q.    Never?

22  A.    I don't even remember.

23  Q.    I'd like to show you what's been marked as Defendant's

24  Exhibit No. 29.  This is on January the 5th.  Is there a

25  holiday near January 5th?

1  A.   No, no holiday.

2  Q.   What about January the 7th?

3  A.   No, no holiday on January 7th.

4  Q.   I believe you listed January 7th is Christmas.

5  A.   Yes -- yeah.  January 7th, yes, it is.

6  Q.   So did you celebrate Christmas on January the 5th instead?

7  A.   You can't -- everything I --

8  Q.   You can't celebrate it on a different day?

9  A.   You have to be on exact days, no.

10 Q.   Let's go on down to May the 5th, you went to chapel or --

11 or you had celebration on May 3rd, is that sufficient for May

12 5th?

13 A.   No.

14 Q.   What about the 16th, is that another holy day that you

15 requested?

16 A.   No.

17 Q.   Is there one near the 16th?

18 A.   Is one near?

19 Q.   Uhm-uhm.

20 A.   Well, they have a day on there that's Marcus Garvey's

21 birthday is a holiday.

22 Q.   Did you or did you not show up for services on the 16th?

23 A.   Well, I don't -- to this right here it says canceled.  I

24 don't know whether or not I had inventory that day or something

25 that day.

1  Q.   Right.  But you were the faith leader --

2  A.   Yes.

3  Q.   -- and you didn't come to services that day?

4  A.   I could have had -- they probably were doing inventory

5  with my canteen.  Sometimes I can't go.

6  Q.   So what about on the 23rd, did you show up for services?

7  Could you celebrate on the 23rd?

8  A.   No, you can't celebrate on 8/23.

9  Q.   On August 23rd, you can't celebrate Marcus Garvey's

10  birthday?

11  A.   No.

12  Q.   You listed September the 11th.  Did you celebrate on

13  September 13th?

14  A.   Ethiopian New Year's is on September 11th.

15  Q.   You went to services on the 13th.  Could you have

16  celebrated on the 13th?

17  A.   No, I wouldn't celebrate it on the 13th.

18  Q.   What about on October 4th, could you have celebrated a

19  holiday that was coming around on October 7th?

20  A.   No, no.

21  Q.   All right.  What about for November 2nd, could you

22  celebrate the day before, November 1st?

23  A.   No, no.

24  Q.   Okay.  But you attended services on all these days?

25  A.   Yes.

1  Q.    And you could have had your ritual, praying?

2  A.    There's no substituting that.  It's the day that it

3  occurs, not the day before or day after.

4  Q.    Okay.  Do you know whether the Islamic faith ever has

5  their actual feast or their ceremonies on Eid al-Adha or Eid

6  al-Fitr?

7  A.    No.  I don't follow their -- I'm Rastafarian.

8  Q.    Is it possible that some days they have it the day before

9  or the day after?

10            MS. MILES:  Objection.

11            THE COURT:  He said he doesn't know.

12            Next question.

13  BY MS. GRANDE:

14  Q.    Do you know whether Green Corn is required by the tenets

15  of the American Indian faith?

16  A.    I know they supposed to have a Green Corn.  I don't -- I

17  never seen no policy pertaining to them.  I have no concern

18  pertaining to them.

19  Q.    Do you know whether Eid al-Fitr or Eid al-Adha is required

20  by the tenets of the Islamic faith?

21  A.    I know that it's required.

22  Q.    Do you know whether the Seder plate is required for Jewish

23  inmates?

24  A.    That's new to me from today.

25  Q.    Did you ever correspond directly with Chaplain Brown or

1  any other DPS officials?

2  A.    Yeah.  I think Ms. Devan came to us -- came inside the

3  facility one time and I think she wrote me, too, I believe so.

4  But Ms. Brown, I think we corresponded like I think like twice

5  and then she stopped.

6  Q.    Is this a letter that you wrote to a DPS official?

7  A.    Yeah, Mr. McGovern.

8  Q.    And in here don't you say that Chaplain Stratton tries to

9  help you?

10 A.    Could you back up?  What date was that, please?  Is that

11 2013?

12 Q.    Uhm-uhm.

13 A.    Well, I don't think Ms. Stratton was in her position that

14 she is now, so she's to oversee the Rastafarian.

15 Q.    Is it possible for Ms. Stratton to both violate your

16 rights and try to help you?

17 A.    Well, I knew her hands was tied.  I knew that she --

18 Q.    So why have you named her in this lawsuit?

19 A.    Because you have to go through your chain of command.

20 That's the whole thing, you have to go through that.  That's

21 not something -- you know that, you're the lawyer.

22 Q.    How did she ever personally infringe on your --

23 A.    Because she denied -- when I requested it, she denied.  So

24 I know that she --

25 Q.    But here you said she tried to help --

1  A.   July 23rd, they were supposed allow us to have that and

2  she didn't allow us to have that.  So certain things that --

3  Q.   So she did some things that you wanted, but didn't do

4  other things?

5  A.   When she became the head person, that's when everything

6  started going downhill with it.  When she was under Mr. Speer

7  she tried to do the best she could do.  But once she got into

8  Mr. Speer's position she just totally -- I'm not going to say

9  totally because Mr. Atkins -- she was doing a lot of things.

10  I'm not going to say that she -- she didn't help me out, she

11  did.  I'm not going to -- she help me out the best she could

12  help me out.

13            MS. GRANDE:  I have nothing further, Your Honor.

14            THE COURT:  Thank you.

15            Anything else?

16                    REDIRECT EXAMINATION

17  BY MS. MILES:

18  Q.   Mr. Wright, to your knowledge, are nonmembers present

19  during the commemoration of Muslim holy days?

20  A.   No, no.

21  Q.   Are they present during the meals?

22  A.   No, no.

23  Q.   And to your knowledge, do the defendants set the policy on

24  how Rastafarians practice?

25  A.   Yes, they set the policy.

1  Q.  And are you able to practice your Rastafarian faith?

2  A.  No.  I might have come together for service; but as far as

3  the feasts and stuff like that, no.

4  Q.  Is Ba Beta Kristiyan Church of Haile Selassie a

5  Rastafarian church or is it a Christian church?

6  A.  It's a Rastafarian church.

7  Q.  Does your faith require that meals be provided on

8  celebration of holy days?

9  A.  Yes.

10       MS. MILES:  No further questions, Your Honor.

11       THE COURT:  Thank you.

12       Anything else?

13       MS. GRANDE:  No, Your Honor.

14       THE COURT:  Thank you, Mr. Wright.  Please watch your

15  step stepping down.

16       How many more witnesses does the plaintiff have?

17       MS. MILES:  The plaintiff has one more witness.

18       THE COURT:  Is that Mr. Severin?

19       MS. MILES:  Yes.

20       THE COURT:  How many witnesses do you have, Ms.

21  Grande?

22       MS. GRANDE:  I believe that I have four.

23       THE COURT:  I know your list --

24       MS. GRANDE:  I believe I've got four.

25       THE COURT:  All right.  Let's take a recess until

1  12:30.

2      (The proceedings were recessed at 12:00 p.m. and reconvened

3  at 12:30 p.m.)

4              THE COURT:  The plaintiff may call its next witness.

5              MS. MILES:  The plaintiff calls Ralph Severin.

6

7                          RALPH SEVERIN,

8              having been affirmed, testified as follows:

9              THE COURT:  You may examine the witness.

10

11                        DIRECT EXAMINATION

12  BY MS. MILES:

13  Q.    Can you state your full name for the Court.

14  A.    Ralph B. Severin.

15  Q.    What is your current occupation?

16  A.    I work with the Ba Beta Kristiyan Haile Selassie I.

17  Q.    How long have you been employed there?

18  A.    Wow, that's a long time.  Over 20 years.

19  Q.    Are you a Rastafarian?

20  A.    Yes, I am.

21  Q.    How long have you been a practicing Rastafarian?

22  A.    Practicing Rastafarian, maybe around 22 years, 23 years.

23  Q.    When were you baptized?

24  A.    I was baptized in the Church of Haile Selassie I 1996,

25  April.

1  Q.    What position do you currently serve in the church?

2  A.    I am senior levite, or what they call arch levite, yes.

3  Q.    Can you tell the Court what a levite is?

4  A.    Levite would be what you would consider in the Christian

5  church like a deacon.  It's an assistant to the priest, they do

6  all the priestly roles of that nature.

7  Q.    How long have you been a senior levite?

8  A.    Oh, wow, I've probably been the senior levite for maybe

9  the past 11 years.  I think around 11 years.

10  Q.    When were you ordained as a levite?

11  A.    1998.

12  Q.    Can you tell the Court, how does one become a levite?

13  A.    Well, after being baptized in the church, one would put in

14  a request letter.  After the letter is reviewed by the clergy,

15  then the person would begin their studies and they would begin

16  as a novice levite.  They wouldn't be considered a full-fledged

17  levite until after a period of time of study.  So until that

18  time, they would be considered novice.

19  Q.    Did you attend seminary school?

20  A.    At the church, yes.

21  Q.    How long did you have to study the faith in order to

22  become ordained?

23  A.    I studied for two, two years.  So it only took me about

24  two years, but that's because of the knowledge that each

25  individual would possess.  So it may take someone a little bit

1  longer, but it took me two years.

2  Q.    Do you continue to study the faith?

3  A.    Yes.

4  Q.    And what exactly do you study?

5  A.    Well, in studying the faith we study the religious

6  doctrine as far as spiritually, we study history, we study

7  politics.  Basically, everything.  There isn't something that

8  we don't study; science, biology, but all of it relevant to the

9  religious practice and the religious philosophy.

10 Q.    Mr. Severin, did you receive any certifications?

11 A.    I was baptized and got a baptism certificate, and then I

12 got my ordination papers when I was ordained.

13 Q.    As a levite, can you describe for the Court a little bit

14 more what are some of your responsibilities?  Do you teach

15 classes?

16 A.    Yes.  Well, that comes as part of the training also; but,

17 yeah, I teach classes, I hold religious services.

18      So let's say like every last Friday of the month we have

19 something that we call Rastalogy classes, so I would be

20 required or one of the other levites would be required to teach

21 class about the religious doctrine.

22      I also assist in the services -- if I'm not leading

23 service, then I assist in the services.

24 Q.    And when you teach your classes, who do you teach?

25 A.    We teach the Rastafarian members of the church.  We teach

1  those who are visitors, we teach those who are in search of

2  knowledge.  So it's open to the public.  It's open to the

3  public.

4  Q.    How often are the classes?

5  A.    The Rastalogy class is held once a month.  We have other

6  classes that we do during the month, some of them are taught

7  by, let's say, the female -- like the women of the church and

8  then some are done by the levites.

9  Q.    How often would you say that you specifically teach a

10  class?

11  A.    Myself, I teach class at least -- wow.  I know at least

12  one a week because part of my responsibility as a senior levite

13  is to actually teach the other clergy, so the novice levites

14  and levites that are not at a certain status.  So I'm required

15  to teach them also and that is every Wednesday.

16  Q.    And when you're preparing for classes, how do you prepare?

17  A.    A lot of study, research, going into books.  So I do it

18  just like I would do any other class.  Just a lot of research,

19  getting my information together and then find a way to present

20  it that is understandable.

21  Q.    You mentioned earlier that one of your responsibilities is

22  to perform religious services.

23  A.    Yes.

24  Q.    How often do you perform services?

25  A.    We have services once a week, every Sunday.

1 Q.   How often do you specifically perform a service?

2 A.    It depends.  Because I'm a levite and I'm not the only

3 levite in the church, we have rotation.  So let's say next

4 month is September, actually is my month -- so for the duration

5 of September, I would be leading the services.

6 Q.   What, if any, volunteer work have you done as a

7 Rastafarian?

8 A.   I work -- well, I did two-and-a-half years volunteer work

9 in the Department of Corrections.  That was part of my

10 requirement and my training within the Church of Haile Selassie

11 I when I was a novice levite.

12 Q.   And what type of work -- you said it was with the

13 Department of Corrections.  What type of volunteer work did you

14 perform?

15 A.   I basically worked as a volunteer chaplain.  So mostly all

16 of the responsibilities of the chaplain.  As far as teaching

17 classes and doing religious services with the Rastafarian

18 inmates, yeah, that's basically what I did.

19 Q.   Did you ever become fully employed by the Department?

20 A.   Yes.

21 Q.   When did you begin working with the New York Department of

22 Corrections?

23 A.   I began in January of 2000 as an employee.

24 Q.   And when did you end your employment there?

25 A.   June of 2011.

1  Q.   Can you tell the Court why your employment ended?

2  A.   I would say it was a conflict of interest with one of the

3  supervisors that was there, yeah.

4  Q.   While you were employed with the New York Department

5  Corrections, what was your position?

6  A.   I was a regional chaplain.

7  Q.   Was this a full-time or part-time position?

8  A.   I was hired part-time.  Yeah, I was hired part-time, but I

9  worked full-time hours.  Sorry.

10 Q.   As a regional chaplain, how many facilities were you in

11 charge of?

12 A.   I was required to -- let me see.  In charge?  I was

13 required to visit all facilities for the State of New York.  I

14 was given at least maybe -- maybe three or four general

15 facilities that I was responsible for; but in all, I really was

16 responsible for every prison.

17 Q.   Do you have an estimate of how many prisons?

18 A.   About, I think, 70.

19 Q.   And how often did you go inside of the prison?

20 A.   I was there three times a week.

21 Q.   And what was your job responsibilities?

22 A.   As chaplain I was responsible for teaching classes, I was

23 responsible for conducting services.  I was also the liaison,

24 you could say, in a sense, between the administration and the

25 inmate population.  I worked directly with administration in

1  helping to set up policies, set up programs for the
2  Rastafarians inside of the State facilities.
3  Q.   You mentioned that you taught classes.  How often did you
4  teach classes in the prison?
5  A.   In the prison, at least two to three times.  It all
6  depended on where we were going and how long the trip took, but
7  any time we visited a prison, we usually held a class and we
8  usually had religious services after.
9  Q.   You said two to three times.  Was this a week, a month?
10 A.   This is a week.  I would go in every Tuesday, Thursday and
11 Friday.  Monday was my day to work in the office to get things
12 prepared as far as sending out e-mails or calling facilities to
13 arrange visits, and then Wednesday was my only day off in the
14 week.
15 Q.   You said you performed services at the prison as well?
16 A.   Yes.
17 Q.   How often did you perform services?
18 A.   About three times a week with the visits.  That would vary
19 at times, only, like I said, because of what time we might get
20 there.  Sometime it would vary.  Like I would plan, let's say,
21 Tuesday to go to a prison, we're going to do class in the
22 morning and then services in the afternoon.  But maybe because
23 of, you know, how the class went in the morning time we would
24 leave off the services and continue the classes in the
25 afternoon because a lot of the inmates, you know, some of them

1  were Rastafarian, some of them were curious about what

2  Rastafarianism is, so we would extend the class into the

3  afternoon session, so we might not have the services as far as

4  the religious service in the afternoon.  So it varied, but at

5  least two to three times.

6  Q.   I want to go back to the classes that you taught.  What

7  did you discuss with the inmates?

8  A.   We taught them about the history of Rasta, His inception,

9  how it started.  We talk about the history of Ethiopia.  We

10  give them knowledge about Haile Selassie I, his divinity, why

11  we say he's God.  We also teach them about, you know, basically

12  themselves as human beings and try to find ways to educate them

13  to help them acclimate back into society once they come out.

14  Q.   Mr. Severin, as the regional chaplain, did you have any

15  opportunity to work with other facilities outside of New York

16  State prison?

17  A.   Yes.  Because of the program that we did have set up in

18  New York State we were requested by other prisons, federal

19  prisons, some in Jersey, some in Pennsylvania, to come and do

20  services and classes with the Rastafarians that were there

21  incarcerated in the federal prison system.

22         MS. MILES:  Your Honor, we ask that Mr. Severin be

23  qualified as an expert in the study and practice of

24  Rastafarianism.

25         THE COURT:  All right.

1  BY MS. MILES:

2  Q.   Mr. Severin, can you tell the Court the basic tenets of

3  the Rastafarian faith?

4  A.   Well, Haile Selassie I is God, first thing.  We believe

5  that His Majesty is a direct descendent from King David and

6  King Solomon, which is proven and not disputed through the

7  union of King Solomon and Queen of Sheba, which produced

8  Menelik I, which was the first Solomonic Emperor of Ethiopia.

9      We also believe that Rastafarians grow their locks and

10  their beard in accordance to the Scripture, on Numbers, Chapter

11  6, Verses 1, 5 and Verse 8 as a vow to God, and this is why we

12  don't shave.  These are some of the basic tenets.

13  Q.   What's the significance or importance of the tenets?

14  A.   These are the guidelines, the rules, the basic pillars of

15  all faith, not just Rastafarian, any faith that have tenets is

16  the foundation, the things that you don't vary around.  So it

17  is basically the fundamentals of all practice in Rastafarians.

18  Q.   Mr. Severin, how many sacraments do Rastafarians follow?

19  A.   We follow seven sacraments.

20  Q.   What are they?

21  A.   Baptism, penance, function of the sick, matrimony,

22  breaking of bread, drinking of wine, holy order, which is to

23  serve, and her as a life given force.

24  Q.   What's the significance of the sacraments?

25  A.   The sacraments, again, are pillars.  We use them as ways

1  for the followers of the faith to practice their faith without

2  varying outside of the laws of the Scriptures or the traditions

3  of Ethiopia.

4  Q.   Can you tell the Court what a sect or mansion is?

5  A.   That's a terminology, "mansions," that comes from the

6  Scriptures that says in my Father's house there are many

7  mansions.

8       The Rastafarians take that to say that in God's house

9  there are different fractions of Rastafarians.  So you have the

10 Niyabinghi sect, you have the Bobo Ashanti sect, you have the

11 Ba Beta Kristiyan sect, you have House of Dread sect, you have

12 12 Tribes sect, and a few other ones that have popped up over

13 the years.  But the mansions are sects, just to say the

14 different -- just like you have Christianity, but you have one

15 is a Catholic, one is a Protestant, one is a Seventh Day

16 Adventist, but yet they all say Jesus Christ.  So all of us say

17 Haile Selassie I, but there are differences within, you know,

18 tenets or, you know, practice.  So that's what the mansions

19 are.

20 Q.   You stated that Ba Beta Kristiyan Church of Haile Selassie

21 is one of the sects.  Does Ba Beta Kristiyan Church of Haile

22 Selassie have any associations with Christian beliefs?

23 A.   No.  We are not Christian.

24 Q.   Is the Niyabinghi order a sect that you named?

25 A.   Yes.

1  Q.    Is it the oldest sect in the Rastafarian faith?

2  A.    Yes.  It is the very first sect before the inception of --

3  before the creation of the Niyabinghi, anyone who was part of

4  the faith was just known as Rastafarian.  That was it.

5       The Niyabinghi didn't come about until later on.

6  Rastafarianism started back in the very, very early '30s,

7  probably 1930 itself.  The Niyabinghi didn't come in until

8  later on.  They didn't come in at the beginning, no.  But they

9  are the oldest sect, you could say.

10 Q.    Is there one sect that would be viewed as the model sect

11 to follow?

12 A.    No.

13 Q.    Does each sect follow the basic tenets of the Rastafarian

14 faith that you discussed earlier?

15 A.    Yes.

16 Q.    And do all sects celebrate holy days?

17 A.    Yes.

18 Q.    Does each sect celebrate holidays?

19 A.    Yes.

20 Q.    Does each sect celebrate holy days with some element of

21 feast or meal?

22 A.    Yes.

23 Q.    Mr. Severin, what's the difference between celebrating a

24 holy day and celebrating a holiday within the Rastafarian

25 faith?

1  A.   Holy days are very special because they mark special

2  events that happen within the development of Haile Selassie I.

3  We look at his growth and development as a child to adulthood.

4  And the holy days that are specified mark certain things that

5  happened within his evolution to become God.

6       The holidays are more secular in a sense, I want to say,

7  is not to take away from its significance also, but the

8  holidays are like Ethiopian Christmas.  We observe it because

9  we show our -- what is the word I'm looking for -- our

10 solidarity to Ethiopia as descendents of Ethiopia, but we

11 observe it only.  We don't really like celebrate it so much.

12      Constitution Day is more national, but we do observe it as

13 a holy -- as a holiday, you know, and then New Year's, also.

14      So the difference would be more that the holy days

15 surround Haile Selassie I as a central figure of our faith and

16 things that happen with him directly.  The holidays are a

17 little bit more like spread out.

18 Q.   And how many holy days are there?

19 A.   There are four holy -- holy days, yes.

20 Q.   What are they?

21 A.   You have May 5th, you have July 23rd, you have

22 November 2nd and October 7th.

23 Q.   And on November 2nd, that's Transfiguration Day, correct?

24 A.   Yes.

25 Q.   What is the importance of this day?

1  A.   Transfiguration Day -- well, amongst all Rastafarian they

2  celebrate November 2nd.  Some call it Constitution -- I mean,

3  not Constitution, Coronation Day, where they say he was

4  coronated and became Haile Selassie I.  It's actually his

5  transfiguration.

6      If you look at the word transfiguration and how it's used

7  religiously, it talks about a transformation or change

8  internally and spiritually for the individual.  When you read

9  the Scripture they talk about even Jesus Christ transfigurated.

10     November 2nd, 1930, is when Ras Tafari ascended the

11  Imperial thrown and became Emperor, changing from Ras Tafari

12  Negus Ras Tafari to Haile Selassie I, which we consider a

13  transfiguration.  So it is when he ascended the thrown.  Also,

14  when you look at Ethiopian history with titles, Emperor equals

15  God, so this is the significance of November 2nd.

16  Q.   And how does Ba Beta Kristiyan Church of Haile Selassie I

17  commemorate this day?

18  A.   Are you talking on outside or inside the facility?

19  Q.   Outside.

20  A.   Outside we have religious worship service first on the day

21  where the faith will come and we have religious services.

22  Afterwards, we have a communal meal, music, you know, to

23  celebrate the day.  So this is how we celebrate November 2nd.

24  Q.   What type of food is provided after the service?

25  A.   We have like goats, chicken, fish, rice, salad.

1  Basically, like an Afro-Caribbean meal, so, yeah, this is the

2  kind of food we eat.

3  Q.    Does the food have any religious significance?

4  A.    Some of the food.  I wouldn't say every single piece have

5  religious significance, but some of it does, yes.  Rice always

6  represents longevity, prosperity.  The goat actually represents

7  sacrificial ram that was required by Moses and Abraham,

8  sacrifice unto the Lord God, if you read the Scriptures.  So

9  usually we have goat to represent that also.

10  Q.    On October 7th, that's Negus Day?

11  A.    Yes.

12  Q.    What's the importance of that day?

13  A.    Negus is a title in Ethiopian which means king.  When you

14  do a study of these words you find that Christ, which they say

15  Jesus was Christ, also means king.  So Negus Day is the date

16  that Ras Tafari became King or Christ of Ethiopia and that

17  is -- that is why we celebrate it.  It is also the day when he

18  became King or Negus, he affirmed his position, I guess you

19  could say, without challenge that he would become the next

20  Emperor of Ethiopia.

21  Q.    And how is this day commemorated?

22  A.    Same thing.  We have religious worship service and then we

23  would have a communal meal and festivities.

24  Q.    And what type of food would be served?

25  A.    Generally, it's the same menu.  In the facilities we

1  change the menu a little bit, but it's generally the same menu.

2  Q.   And does the meal provided serve the same religious

3  significance that you discussed earlier?

4  A.   Yes, uhm-uhm.

5  Q.   On July 23rd do you celebrate the Second Advent of the

6  Cosmic Christ?

7  A.   Yes.

8  Q.   What is the importance of this day?

9  A.   This is the day that Tafari was given unto us fulfilling

10  Isaiah 9, Verse 6, unto us a child is born, unto us a son is

11  given.  This is the birth of Tafari.  Tafari means creator.

12  Tafari is the name that Haile Selassie I had as a child.

13       So this is the day that we say that the Almighty gave us a

14  savior.  So we celebrate it like -- like you could say in a

15  sense like how Christians celebrate Christmas as the birth of

16  their Christ.  So we look at July 23rd as the birth of our

17  Christ, which was Tafari.

18  Q.   And how is this day commemorated?

19  A.   Same thing again.  We have religious worship service and

20  then after the religious worship service, we have festivities,

21  meal and festivities.

22  Q.   Does the meal serve the same religious significance?

23  A.   Uhm-uhm.

24  Q.   On May 3rd you celebrate Fasika?

25  A.   Yes.

1 Q.   What does this day signify in the Rastafarian faith?

2 A.   Fasika is a day that we use to commemorate Ethiopia's two

3 victories over Italy, at least two times in history you could

4 find, 1896, which was the Battle of Adwa where the Italians

5 came into Ethiopian to take over Ethiopia in a campaign to,

6 quote, civilize them.  Although, Ethiopia is a monarchy and was

7 civilized a long time ago.  So Menelik II and Ras Makonnen

8 defeated them, that's the first victory.

9      Also, 1935 to 1941 Ethiopian was attacked again by

10 Mussolini and his fascist regime and they came into Ethiopia

11 with the same campaign, to take over and to civilize the

12 people.  So Haile Selassie I defeated them May 5th, 1941.

13      So we look at this day not only as Liberation Day, which

14 most of the other Rastafarians would celebrate it as Liberation

15 Day, we give it more of a religious significance by calling it

16 Fasika, because Fasika is a Amharic word which in Ethiopian

17 language means Passover and it represents our Passover, our

18 coming out of a state of darkness into a state of light, coming

19 out of oppression from outside aggressor into our victory.  So

20 May 5th represents our Passover.

21 Q.   How is this day commemorated?

22 A.   Same thing.  Again, we have religious worship service and

23 we have a meal.  Special in this meal more than any of the

24 other ones where we talk about the breaking of bread and

25 drinking of wine.  This is to commemorate, again, like

1  Abraham's meeting with Melchizedek and breaking of bread,

2  drinking wine because of his victory over oppressors and then

3  again Joshua the Christ sitting down with his 12 Disciples at

4  the Last Supper where they broke bread and drank wine at that

5  occasion also.  So that is something that is added.

6       And we do do the same thing in a sense; but that one, May

7  5th, is significant in that it gave all of us a second chance

8  in life, you know.  So this is why we do the breaking of bread

9  and drinking of wine at that particular feast or celebration.

10 Q.   Mr. Severin, are these four holy days specific to all

11 Rastafarians or to Ba Beta Kristiyan?

12 A.   Well, all Rastafarians celebrate them.  It is just that

13 not all of the Rastafarian houses or sects may use the exact

14 same terminology.  Like I said, November 2nd is usually seen as

15 Coronation Day.  We call it Transfiguration, but it's

16 celebrated throughout all of the Rastafarian houses.

17      May 5th is Liberation Day, to let's say, the Niyabinghi,

18 but to us it's Fasika, but it's the same day and has the same

19 religious significance.  It's just the name, you know, may be a

20 little bit different because of the different house.

21 Q.   So would it be safe to say that based off of the different

22 sects, the only difference in celebrating the holy day is maybe

23 the doctrinal teaching and the name?

24 A.   Yes.

25 Q.   What impact does vegetarianism have on the Rastafarian

1    faith?

2    A.    Well, vegetarianism is something that is practiced by the

3    Rastafarians, it's true, but not by all.  It is not the all in

4    all that makes a person a Rastafarian.  You have many

5    Rastafarians, including myself, that do eat meat.  The only

6    thing is that if you are going to eat meat, you must follow

7    dietary laws prescribed by the Scripture, which says that we

8    eat no kind of pork or swine, eat no kind of shellfish like

9    clams or lobster or shrimp.

10        You know, you're not supposed to eat animals that die of

11   natural causes or things of that nature because you don't know

12   what kind of disease might be there.

13        Vegetarianism for a long time was seen as maybe the

14   standard of Rasta and that was more perpetuated because of

15   Reggae music and because of what may have been popular at the

16   time.

17        Again, Rastafarianism started in the very early '30s.  So

18   throughout like the years, especially with the inception of

19   Reggae music in the '60s, it was only certain sects of Rastas

20   that voices were being heard because of the Reggae music.

21   Niyabinghi being one of them who had the artist and then Bobo

22   Ashanti and 12 Tribe.  We don't have artists that sing Reggae

23   songs and nothing like that.

24        But vegetarianism is something that is practiced within

25   the Rastafarian faith.  It is not a tenet in the -- not

1  something that you have to practice, so some are; some aren't.

2  Q.   Do Rastafarians fast in preparation of holy days?

3  A.   Yes.

4  Q.   Why?

5  A.   Fasting brings about a form of cleansing of the body.  It

6  also brings cleansing to the spiritual self of a person and

7  also helps to build a sort of discipline within themselves

8  also.

9  Q.   How long do Rastafarians usually fast?

10  A.   It depends on the holy day.  Like, let's say, for Fasika

11  we would fast for, let's say, like I think it's like three

12  weeks you would do fasting.  And fasting for us doesn't mean

13  that you don't eat anything.  It just means that you eat

14  lightly or you eat at a certain time of the day.

15       But let's say for New Year's, which is a holiday, but we

16  still do fasting for that.  We would fast for seven days, so it

17  varies.  And then -- sorry.  I just wanted to say that anyone

18  who is a practicing Rastafarian can fast longer if they

19  individually choose to do so.

20  Q.   Okay.  Do all Rastafarians and Ba Beta Kristiyan Church of

21  Haile Selassie celebrate these holy days?

22  A.   Yes.

23  Q.   Do they gather communally?

24  A.   Yes.

25  Q.   Do they all participate in the meal afterwards?

1  A.   Yes.

2  Q.   When you worked as a regional chaplain, did the

3  Rastafarian inmates celebrate holy days?

4  A.   Yes.

5  Q.   Were they celebrated statewide by all inmates?

6  A.   Yes.

7       MS. MILES:  Your Honor, I would like to show the

8  witness what has been marked as Plaintiff's Exhibit 11,

9  page 15.

10       THE COURT:  All right.

11 BY MS. MILES:

12 Q.   This is page 15 of Exhibit 11.  Mr. Severin, have you seen

13 this document before?

14 A.   Yes.

15 Q.   Where have you seen this document?

16 A.   Working with the Department of Corrections, New York

17 State, as a chaplain.

18 Q.   What is this document of?

19 A.   This is the Rastafarian dietary regulations that was

20 approved by the State and put together by the church for the

21 Rastafarian holy days as far as foods that can be consumed.

22 Q.   And who authorized this document?

23 A.   This document was put together by Abuna Foxe, the senior

24 chaplain of our group, and by the State of New York Department

25 of Corrections.

1  Q.    Does this document accurately depict the dietary

2  regulation for incarcerated Rastafarians while celebrating holy

3  days in New York?

4  A.    Yes.

5          MS. MILES:  Your Honor, at this time we move to admit

6  only page 15 of what has previously been marked as Exhibit 11

7  into evidence.

8          THE COURT:  I'll receive it.  He relied on this as

9  part of his expert testimony?

10          MS. MILES:  Yes, Your Honor.

11          THE COURT:  That's fine.

12      (Plaintiff's Exhibit No. 11 - page 15 - was admitted into

13  evidence.)

14  BY MS. MILES:

15  Q.    Mr. Severin, how did this document aid in the institution

16  in New York allowing inmates to celebrate holy days with a

17  feast or meal?

18  A.    Well, it helped.  I mean, having the holy days of itself

19  was good, you know, because it's part of the faith.  This

20  document actually laid out a meal that would satisfy both the

21  vegetarian Rastafarian and the non-vegetarian Rastafarian so

22  that there would be no conflicts or anything of that nature.

23      It aided because, you know, the things that are there are

24  more reflective of their religious and cultural belief and it

25  helped to bring about a sense of tranquility and peace in the

1  prison because for a long time the Rastafarian faith was not

2  being recognized even as a religion and a lot of the things

3  that the Rastafarians were asking for were being denied because

4  there was no evidence or proof that it was even a religion.

5      So when the Church of Haile Selassie I came, it came with

6  these, it was to legitimize our faith and give all the

7  Rastafarians within the State of New York a sense of

8  legitimacy.

9      You know, I mean, it would -- I don't know how a person

10  would feel if you belong to a faith and you are surrounded by

11  everyone else who get to practice and celebrate and then you

12  don't get to because you don't have paperwork on it, you know?

13  Q.   And how were the holy days that we discussed earlier

14  celebrated in the facilities?

15  A.   In the facility how we would do it -- they didn't do it

16  exactly how we do it outside.  I mean, we had more of the

17  privilege and the ability to celebrate everything on the same

18  day.

19      In the facilities sometimes they were not able to, let's

20  say -- what is the first one, May 5th?  So let's say May

21  5th fell on a Wednesday.  So the facility may allow the inmates

22  now to gather, congregate and have a service, but the actual

23  event with festivities now they would do on another date, which

24  usually was the Saturday after.  So if it was on a Wednesday,

25  May 5th, and the Saturday, which would be like the 8th, then

1 they would have their celebration, you know, where they could

2 have their communal meal or what have you.

3     If it was allowable by the facility independent, they may

4 have May 5th celebration on May 5th.  So it varied, but we

5 celebrated with worship service or some sort of gathering with

6 them and then we would have a festivity.

7 Q.   And where did the food come from?

8 A.   The food mainly came from outside vendors.  Some of the

9 food that was given as far as maybe seasonings and stuff like

10 that was provided by the facilities themselves.

11 Q.   How was the food purchased?

12 A.   The food was purchased basically by money that was in the

13 inmate accounts.  The facilities would set up fundraisers or we

14 would have ongoing fundraisers for the Rastafarians.  So they

15 would sell items inside of the facility and use that money to

16 purchase food for the celebrations.

17     They also took donations from other faith groups or other

18 inmates or sometimes if they could get donations from the

19 outside.

20 Q.   Was the celebration -- were they able to celebrate

21 communally or did they have to --

22 A.   No, they celebrated communally.

23 Q.   Was staff present during religious holy days?

24 A.   Yes.

25 Q.   Were they present during the festivities?

1  A.   Yes.

2  Q.   How many guards, would you say?

3  A.   It depended on the size of the festivities.  We had two of

4  the listed festivals here as what we call in-house events and

5  then we had two that we celebrated as family-day events.

6       So the two that were in-house were just the inmates, maybe

7  the chaplain, and then whatever security staff would be there.

8       The family-day events were events where the inmates

9  actually invited their families from outside to come and

10 celebrate the holy day with them.  So they would invite their

11 wives or their children or whoever is significant to them.

12      So in that you could have maybe 25 guards, you might have

13 a hundred, it depends on how many people are actually going to

14 attend.  So...

15 Q.   And how many chaplains attended the services?

16 A.   Well, there was only six of us hired by the State.  So it

17 depended -- we never -- we never were able to go together to

18 one facility for the celebration.  So at least one chaplain at

19 six different facilities.

20      Where we couldn't be, we would have chaplains that we

21 worked with and even though they were probably outside of our

22 faith, whether it be a Muslim chaplain or a Christian chaplain,

23 because we work together, sometimes they would attend the

24 celebrations also to represent and, you know, as, I guess, just

25 to celebrate with us so, you know.

1  Q.   Do you know of any guidelines implemented to prevent

2  violence during the celebration of holy days?

3  A.   Say again.

4  Q.   Do you know of any guidelines that were implemented to

5  prevent any violence from the inmates during the celebration of

6  the holy days?

7  A.   Guidelines?  I guess the regular security measures.  The

8  inmates would always be frisked and checked; the families the

9  same way.

10      We never really thought about anything happening

11 violently.  I mean, this is a religious holy day celebration.

12 So in my 11 years working with the State, I never witnessed nor

13 have I ever heard of anything that happened violently in any of

14 our events.  So that was never an issue.

15      But I would just say that the basic security measures of

16 the facility was sufficient enough to make sure that things

17 didn't get violent.

18 Q.   As a regional chaplain, did you ever work with the

19 officers to ensure that security measures were properly in

20 place?

21 A.   Oh, of course.  Of course.  I worked a lot with, like I

22 said, administration, security, so, yeah.  We just made sure,

23 if anything, there wouldn't be certain violations when the

24 inmates would get searched or their families coming into the

25 facilities so that they wouldn't feel disrespected.

1  Q.   Were the policies and procedures followed in New York the

2  same policies and procedures for Rastafarians implemented in

3  the federal prisons that you assisted?

4  A.   Yes.

5  Q.   Mr. Severin, did you know Mr. Wright personally?

6  A.   Yes.  I know Mr. Wright, yes.

7  Q.   What was your opinion of him?

8  A.   Curious.  He wanted to know a lot about the faith.

9  Especially because he, like a lot of the inmates that did come

10 to us, some of them have a Caribbean background, some of them

11 kind of, sort of, maybe know what Rasta is because of Reggae

12 music, Bob Marley, what have you.

13      But one thing about him, he was very curious, very

14 inquisitive and because of that we actually entrusted him to be

15 a facilitator for us.

16      This is part of the reason why -- I heard him when he was

17 speaking he said he had to get his GED.  One of our

18 requirements was that anyone who was going to work with us and

19 work as a facilitator had to have their GED.  We didn't want to

20 work with people who didn't see the value of education.  So we

21 wanted to work with inmates who wanted to make a change in

22 their own life.  So part of our requirements is that if you're

23 going to work with us, you have to get your GED.

24      So Mr. Wright, I thought he was, you know, a good

25 candidate for a facilitator because he had genuine love for the

1  faith and for education.

2  Q.   And did your personal relationship with Mr. Wright affect

3  your testimony here today?

4  A.   No, because I don't see my relationship with him as so

5  personal.  I mean, I knew him, but I knew him in the facility.

6  I didn't have a personal relationship with him outside of the

7  facility.  So I think we had a good working relationship as his

8  chaplain and as one of the facilitators for our program.

9  Q.   Mr. Severin, what is your opinion on Mr. Wright's

10  inability to celebrate holy days with a meal?

11  A.   I think that is injustice.  I think that he, as a

12  Rastafarian, should get the full benefits of what it is that

13  he's asking for, especially because he is a Rastafarian and

14  practicing Rastafarian.

15       A lot of the elements that may be trying to stop him from

16  doing that are not considering his feelings as a practicing

17  member of his faith, you know, being denied to fully express

18  himself as a Rastafarian, and I look at it more, you know, than

19  just infringement on his rights, but then for all of the

20  Rastafarians who are incarcerated in North Carolina because

21  it's not only him being denied; it's all of them.

22       So I think that if he would not win this case, it would be

23  a detriment to all Rastafarians in North Carolina.

24  Q.   Mr. Severin, did you review portions of North Carolina

25  Department of Public Safety's Religious Practices Manual in

1  preparation of your testimony?

2  A.   Some of it, yes, I did.

3  Q.   Do you recall what portions you reviewed?

4  A.   I'd have to see the document again.  There were so many

5  different little parts of it that I didn't -- I didn't agree

6  with as far as practices and procedures, but I thought it was

7  not cohesive.  I thought that it was very fragmented in the

8  sense that you saw elements of let's say Niyabinghi in it and

9  you saw elements of Bobo Ashanti in it, and you see little

10  elements of 12 Tribe; but even some of these elements that were

11  there are conflicts even with those houses.  So it seemed more

12  like a free-for-all.  It didn't seem uniform to me.

13  Q.   Did you review the portions regarding Rastafarian policy?

14  A.   Uhm-uhm, yes.

15  Q.   And in your review of that document, did that help form

16  your opinion here today?

17  A.   Yes.

18          MS. MILES:  No further questions.

19          THE COURT:  Thank you.

20          Ms. Grande?

21                     CROSS-EXAMINATION

22  BY MS. GRANDE:

23  Q.   Mr. Severin, can you tell me, when was Ba Beta Kristiyan

24  founded?

25  A.   It was founded in 1987.

1  Q.   By who?

2  A.   It was founded by Abuna Ammanuel Foxe.

3  Q.   Is the term Abuna an Ethiopian Orthodox term?

4  A.   It's an Ethiopian title, yes.

5  Q.   Is Ba Beta Kristiyan an Ethiopian Orthodox church or a

6  Rastafarian church?

7  A.   It's a Rastafarian church.

8  Q.   Does it borrow many tenets or beliefs or practices from

9  the Ethiopian Orthodox groups?

10 A.   No.

11 Q.   Okay.  And you said that you were baptized as a

12 Rastafarian in 1966?

13 A.   No.  I said 1996.

14 Q.   1996.

15 A.   Yeah.  I wasn't born in 1966.

16 Q.   I apologize.  Okay.  So 1996.  By Mr. Foxe?

17 A.   Yes.

18 Q.   So have you ever practiced Rastafarianism outside of Ba

19 Beta Kristiyan mansion?

20 A.   Yes.

21 Q.   And what other mansions do you have experience with?

22 A.   Niyabinghi and 12 Tribe.

23 Q.   Okay.  Do Niyabinghi, to your knowledge, celebrate

24 sacraments?

25 A.   Sacraments, yes.

1  Q.   Do they celebrate baptisms?

2  A.   Initiation, yes.

3  Q.   Baptisms?

4  A.   Same thing, so I would say yes.

5  Q.   Do they celebrate -- do they use terminology like levite

6  and deacon?

7  A.   Not levite and deacon, no.  Priest, yes.

8  Q.   Do they use the term clergy?

9  A.   No, I don't believe so.

10 Q.   Can you tell me what the term anaphora means?

11 A.   Anaphora is part of liturgy.  Liturgy is what is read

12 during religious worship services so --

13 Q.   Do Niyabinghi and 12 Tribes use that or Bobo Ashanti?

14 A.   Bobo Ashanti uses a form of liturgy, yes.

15 Q.   Do Niyabinghi and 12 Tribes?

16 A.   Niyabinghi uses the Scripture as their literature.  12

17 Tribe is more of a cultural set of Rastafarian.

18 Q.   So there are some differences?

19 A.   There are a lot of differences, yes.

20 Q.   So can you explain for me what the origin and the source

21 of the holy dates that the Ba Beta Kristiyan sect or mansion

22 recognize?  Where do they come from?

23 A.   Where did the holy days come from?

24 Q.   Yes.

25 A.   Again, all of these are surrounding events that signified

1  evolution of Emperor Haile Selassie I.  So these things are

2  things that are historical.

3  Q.   Who selected them, Abuna Foxe?

4  A.   They were selected -- no.  That was before even the Church

5  of Haile Selassie I ever came.

6      Like you asked me before is Niyabinghi the oldest sect.  I

7  said it's probably the oldest sect.  November 2nd was

8  celebrated by them before the Church of Haile Selassie I came

9  into inception.

10     Abuna Ammanuel Foxe is a Niyabinghi.  He came from that

11  order, so a lot of his teachings come from that order; but, you

12  know, again, there was evolution and he founded this church,

13  which is Ba Beta Kristiyan Haile Selassie I.  But it's just an

14  extension from his experience as a Niyabinghi.

15  Q.   So why did he found -- what's your understanding of why

16  the church was founded to be separate from Niyabinghi?

17  A.   Because there was a need for growth and development and in

18  order for the Rastafarians to have legitimate and recognized

19  way of worship and --

20  Q.   So he wanted a different way of worship than Niyabinghi

21  permitted?

22  A.   No, not necessarily different.  Legitimate.

23  Q.   Legitimate?

24  A.   Yes, something that could be recognized by all other faith

25  groups, by governments, by even a setting like this, that we

1  would have a documented way of worshiping, not just, you know,

2  in the bush beating drums and reading the Bible, but you have a

3  documented way of worship with anaphora, with liturgy --

4  Q.   Is Ba Beta Kristiyan --

5  A.   -- to read and learn.

6        THE COURT:  Ms. Grande, let him finish his answer.

7        MS. GRANDE:  I apologize, Your Honor.

8  BY MS. GRANDE:

9  Q.   Are you completed?

10  A.   Yes, I am.

11  Q.   Is Ba Beta Kristiyan the only form of Rastafarianism, is

12  it the truest form, in your opinion?

13  A.   In my opinion, I would say it's one of the truest forms,

14  yes.  Is it the only form?  No.  But the truest form, I would

15  say yes.

16  Q.   Is Mr. Foxe the only Rastafarian expert?

17  A.   I would not say that, no.

18  Q.   I'm going to show you what I marked as Defendant's

19  Exhibit 61.

20        MS. GRANDE:  Your Honor, may I approach or would you

21  like a hard copy?

22        THE COURT:  If I don't have one in my notebook, I'd

23  like a hard copy at some point.

24        MS. GRANDE:  May I approach?

25        THE COURT:  You may.

1  BY MS. GRANDE:

2  Q.    I'm going to ask you to take a look at this.  Is this the

3  letterhead from Ba Beta Kristiyan Haile Selassie?

4  A.    It seems to be, yes.

5  Q.    Is that Mr. Foxe's signature?

6  A.    That does not look like Abuna Foxe's signature, no.

7  Although, it's put there.

8  Q.    Does the writing on the second page of the envelope appear

9  to be his handwriting?

10  A.    Yes, it could be.

11  Q.    So here where Mr. Foxe states that, "I believe I am the

12  only Rasta expert in North America," would you agree with that

13  statement; yes or no?

14          MS. MILES:  Objection, Your Honor.

15          THE COURT:  He can answer.

16          THE WITNESS:  If this is what he stated, I would

17  agree with him.

18  BY MS. GRANDE:

19  Q.    So you agree that he's the only Rasta expert in North

20  America?

21  A.    Expert, yes.

22  Q.    But you just testified that he is not the only expert.

23  A.    I only say that because I'm here also.

24  Q.    So you and he are the only two Rastafarian experts --

25  A.    No, not me and him, no.  But he is an expert.  Is he the

1  only expert?  I wouldn't say yes, but he is an expert when it

2  come to Rastafarianism.

3  Q.   So you don't agree with this statement that he is the only

4  Rasta expert in North America?

5  A.   Only because I'm here as another expert and we have other

6  experts, meaning that we are very knowledgeable of the faith.

7  Q.   Are Haile Selassie or Ba Beta Kristiyan, levites or

8  members, are they the only experts in Rasta?

9  A.   I believe so.

10  Q.   So Niyabinghi, Bobo Ashanti, 12 Tribes, Ethiopian

11  Orthodox, no other sect or mansion could qualify as an expert

12  in your opinion?

13  A.   No.

14  Q.   Why?

15  A.   They lack the education and they lack the program.  A lot

16  of things that they speak about is from dark and wise sayings.

17  And I say this --

18          THE COURT:  Is from what?

19          THE WITNESS:  Dark and wise sayings.  Meaning from a

20  scriptural point of view.  And this is something I have

21  experienced with the Niyabinghi and with 12 Tribe.  Not so much

22  with Bobo Ashanti, because I don't have too much exposure with

23  them.

24          But in talking and reasoning and trying to find

25  growth and development within the Niyabinghi order or let's say

1  the Bobo Ashanti, 12 Tribe, I don't see growth and development.

2  BY MS. GRANDE:

3  Q.  So this is your own opinion, though?

4  A.  Well, you're asking me my opinion.

5  Q.  That's correct.  I mean, there are people out there who

6  would recognize individuals from the Niyabinghi as experts,

7  correct?

8  A.  I don't know.  Possibly.

9  Q.  Okay.  And back in 2011 and 2012 in addition to this

10  correspondence from Mr. Foxe, did you ever correspond with

11  Chaplain Brown?

12  A.  No.

13  Q.  You never wrote any letters to Chaplain Brown or made any

14  phone calls?

15  A.  To my recollection, no.  If I did --

16  Q.  Did you seek employment in the State of North Carolina?

17  A.  No.

18  Q.  Was your position rebuffed by your -- by Chaplain Brown?

19  A.  Say that again?

20  Q.  Did Chaplain Brown rebuff any attempts at employment you

21  may have made of her?

22  A.  Chaplain Brown, I never made attempts so she couldn't have

23  rebuffed anything.  I don't believe I ever try to become part

24  of --

25  Q.  I'd like to show you what's been marked as Defendant's

1 Exhibit No. 64.

2          MS. GRANDE:  Your Honor, may I approach again?

3          THE COURT:  You may.

4 BY MS. GRANDE:

5 Q.   Is this a letter you wrote to Ms. Brown?

6 A.   What year was that?

7          THE COURT:  September 5th, 2007.

8          THE WITNESS:  2007, possibly.  I was employed by the

9 State of New York, so I probably did write this in response to

10 a letter that was sent to me by the Rastafarian inmates in

11 North Carolina.  2007.

12 BY MS. GRANDE:

13 Q.   Were you seeking employment with the State of North

14 Carolina?

15 A.   I don't think so.  I don't think so.  2007 I was employed

16 by New York State.

17 Q.   You were employed by New York State as a Rastafarian

18 chaplain, correct?

19 A.   Uhm-uhm.

20 Q.   So you didn't supervise any services that were provided to

21 you by -- or provided by, let's say, Islamic inmates, correct?

22 A.   No.

23 Q.   So when you state your position as a regional chaplain

24 over all facilities, you only administered to Rastafarian

25 inmates?

1 A.    Yes.

2 Q.    So your only experience and your only knowledge of

3 practices are in regards to Rastafarian inmates, correct?

4 A.    Yes.

5 Q.    Is it true that yourself and Mr. Foxe used your positions

6 as chaplains within the State of New York to proselytize to

7 inmates?

8 A.    What is proselytize?

9 Q.    Carry the message of the Church of Haile Selassie or Ba

10 Beta Kristiyan to inmates.

11 A.    We carried a religious program that was approved by the

12 State.

13 Q.    It was authored by Mr. Foxe?

14 A.    A lot of it, yes.

15 Q.    And the document that you looked at that was page 15 of

16 your expert report, that's a 2007 policy, is it not?

17 A.    Yes.

18 Q.    And that's when Mr. Foxe was still employed in New York,

19 correct?

20 A.    Yes.

21 Q.    And when you were still employed in New York, correct?

22 A.    Yes.

23 Q.    Can you tell me the circumstances of your departure from

24 New York?

25 A.    As I stated earlier, it was a conflict of interest between

1  myself and a supervisor in Albany.

2  Q.   Were you and Mr. Foxe and the other Rastafarian chaplains

3  all, in fact, terminated at the same time?

4  A.   No, we weren't terminated.  Mr. Foxe retired after serving

5  20 years as a chaplain.  The rest of us resigned.  None of us

6  were terminated.

7  Q.   Were you requested to resign?

8  A.   No.

9  Q.   Okay.  Do you know whether all of the policies implemented

10 by Mr. Foxe still exist in New York today?

11 A.   As far as I know, yes.

12 Q.   Are you aware of a lawsuit by an inmate named Powelett

13 (phonetic) that occurred in 2015?

14 A.   Powelett, no.

15 Q.   Are you aware that the District Court in New York has

16 determined that New York's Rastafarians policies are

17 inappropriately skewed toward the Church of Haile Selassie?

18 A.   If it's after 2011, I don't know.

19 Q.   Did Mr. Foxe and yourself write or implement policies and

20 practices that carried forth the message of Ba Beta Kristiyan

21 Haile Selassie?

22 A.   Yes.

23 Q.   To the exclusion of Bobo Ashanti, 12 Tribes, Niyabinghi

24 and other mansions of Rastafarians?

25 A.   Not to the exclusion, no.  We wrote policies based on the

1  church --

2  Q.   Do they require things --

3  A.   -- because -- see, that's the thing, working for the State

4  of New York we were the only Rastafarian group or sect that was

5  actually given entry.  Although, the Bobo Ashanti, the

6  Niyabinghi, 12 Tribe when requested to come into the State of

7  New York to give their services, they adamantly refused to.

8  And that is, again, part of the -- how the church of Haile

9  Selassie I even came into the State Service in New York, which

10  happened in 1991.

11      It was the Rastafarian inmates who actually sued the State

12  and it was taken to the Supreme Court, where the Bobo Ashanti,

13  12 Tribe, and Niyabinghi were all asked to come into the State

14  Service and represent the Rastafarians, and they did not want

15  to.

16      The Niyabinghi said they don't want to work with inmates,

17  and the other sects said that they don't want to work with the

18  incarceration system.

19      So Haile Selassie I was the only one given entry because

20  we were the only ones that were willing to work with the

21  Rastafarian inmates and fulfill their requests.

22  Q.   And no one is disputing that.

23      So, therefore, the practices and the policies that were

24  implemented by Mr. Foxe are tailored to meet the needs and the

25  tenets and the practices of Ba Beta Kristiyan and Haile

1  Selassie?

2  A.   Well, they are the tenets.  It's not tailored to fit.  It

3  is the policy.

4  Q.   They were written according to the tenets?

5  A.   Yes.

6  Q.   And those tenets were established by Mr. Foxe when he

7  established Ba Beta Kristiyan Haile Selassie?

8  A.   Some of them, yes.

9  Q.   Is it true or not true that the majority of Rastafarian

10 people, members, subscribe to a vegetarian or vegan diet and

11 don't eat animals that walk?

12 A.   Are you talking inside the facility or just in general?

13 Q.   I'm talking in general, Niyabinghi, Bobo Ashanti, 12

14 Tribes, any Rastafarian sect.

15 A.   That is up to the individual.

16 Q.   Is it true that those sects do not follow these specific

17 dietary guidelines that are set out in this 2007 policy?

18 A.   Not all of them.

19 Q.   Okay.  Is it true that they do not celebrate breaking of

20 the bread, drinking wine and feasting as described in your

21 expert report?

22 A.   It depends.

23 Q.   Is it true that they do not celebrate Passover?

24 A.   They do.  They do celebrate; but as I said earlier --

25 Q.   In the manner that you described.

1  A.   -- May 5th for us we call Fasika.  That's Liberation Day,
2  but they still celebrate the day and the significance of the
3  day is still the same.
4  Q.   So you're saying that Niyabinghi, 12 Tribes celebrates May
5  5th in the same significance as Ba Beta --
6  A.   Yes, because it's about liberation, it's about the two
7  victories.  So what the celebration is about is the same.  How
8  we go about celebrating it may be a little bit different.
9  Q.   The practice.
10 A.   Right, exactly, the practice.  But the celebration as a
11 holy day is universal within the Rastafarian sects.
12 Q.   Could you tell me what the religious significance of the
13 food that you set forth is?
14 A.   The religious significance?  Well, when we look at the
15 Scriptures, they tell you that you must celebrate God with a
16 solemn meal, a solemn feast, so the religious significance is
17 to fulfill that requirement.
18      As I said, goat as a sacrificial animal, you know,
19 breaking of bread, drinking of wine.  Rice has a significance
20 also.  So there are religious parts to it.
21 Q.   So for example, if you have a Rastafarian who is a vegan
22 or vegetarian, are they required to consume goat?
23 A.   No, they don't have to, because in our menu --
24 Q.   Is that a violation of the tenets of their faith?
25 A.   No.  As part of our menu, we have --

1  Q.    So they are not required --

2  A.    We have all kind of food there.  We don't tell a person

3  that they have to be vegetarian and we never told a person that

4  they have to eat meat.

5        We just let them know that saying that all Rastafarians

6  have to be strictly vegetarians is not true.  And what you're

7  saying to me is almost as if all Rastafarians of all faith

8  groups or sects are vegetarian, except for Ba Beta Kristiyan,

9  which is not true.  12 Tribes is not vegetarian.  They don't

10 follow vegetarian diet.

11 Q.    What I am asking is:  How could prisons in North Carolina

12 possibly implement the guidelines that you've set forth when

13 the majority of our inmate population that is Rastafarian are

14 vegan or vegetarian?

15 A.    I don't know what the population is in North Carolina.

16 All I'm saying is that saying that all Rastafarians are

17 vegetarians is wrong.  So you would have to set up some sort of

18 menu that would be more reflective to --

19 Q.    That would be accommodating to all inmates, correct?

20 A.    This is why the Church of Haile Selassie I has the menu it

21 has also because it accommodates for all.

22        We don't force a person to eat goat.  There's vegetables

23 and other things on the menu that they could choose to eat

24 without violating their oath of being a vegetarian, but for the

25 person who is a non-vegetarian who would like to take part is

1  there also for them.

2  Q.   Do you believe that Haile Selassie is the only church

3  that's received the Royal Charter from His Imperial Majesty,

4  Haile Selassie I, to organize Rastafarians worldwide and is the

5  only legal church to represent Haile Selassie?

6  A.   Yes.

7  Q.   Is that to the exclusion of Niyabinghi, 12 Tribes, Bobo

8  Ashanti, any other sect?

9  A.   Yes.

10 Q.   Wouldn't you say that's an exclusionary view of

11 Rastafarian?

12 A.   No, that's a fact.  It's not exclusionary, because you

13 asked me if they are exclusive because of certain reasons and

14 one of them is that they did -- the Church of Haile Selassie

15 receive the Royal Charter that came from Haile Selassie, which

16 is Haile Selassie I's son.  Niyabinghi, 12 Tribe, Bobo Ashanti

17 cannot make that claim that they got Royal Charter.  The Church

18 of Haile Selassie I Royal Charter is in alignment with Crown

19 Council, which is the Government of Haile Selassie I in exile.

20      So we are the only, I guess, mansion that has this

21 documentation.  It's not to be exclusionary or to exclude

22 anyone.  It's just -- that's the facts.

23 Q.   So how could an inmate who is a member of the Niyabinghi

24 practice within Rastafarian principles that have been tailored

25 to meet Ba Beta Kristiyan or Haile Selassie tenets?

1  A.   Well, I never had a problem with that when I was working

2  for the State.  We had many Rastafarians who had their

3  different views as far as, let's say, like you said,

4  Niyabinghi.

5       Like I said, we had classes and we had religious services.

6  All classes, irrespective of whatever your belief was, as a

7  Rasta, was spoken to the Rastafarian to come and get education.

8       Religious services was open to all Rastafarians if they

9  wanted to come and participate.  If they did not want to come

10  participate, then they weren't required to come.  They weren't

11  forced to.

12  Q.   Can you tell me what the community's view of the Ba Beta

13  Kristiyan Church is in terms of the Orthodoxy or the elders of

14  the Niyabinghi or the 12 Tribes or the Bobo Ashanti?

15  A.   Some of them were more partial to maybe Niyabinghi or 12

16  Tribes; but in general, all of the Rastafarians came to the

17  church because it was the only recognized entity within the

18  facilities.  It's not like we had other chaplains that

19  represented the other houses.  So it was only the Church of

20  Haile Selassie I.

21  Q.   So is the church exclusively grown in the inmate

22  population in New York?

23  A.   Say that again.

24  Q.   Is it exclusively grown in the inmate population in New

25  York?

1  A.   Church of Haile Selassie I inside the prison system?

2  Q.   And outside the prison system.

3  A.   No, you can't say it was only grown through the inmates,

4  but I had never been incarcerated and I'm a member, so it

5  wasn't tailored just for that purpose.

6  Q.   But you were brought in by Abuna Foxe, correct?

7  A.   No.  I was baptized by him.  I didn't go to the church

8  because of him.  And when I first went to the church, he wasn't

9  even there.  He was in Jamaica.

10      I went to the Church of Haile Selassie I because of my

11 dissatisfaction with the 12 Tribe and Niyabinghi, and that was

12 a lot to do with education and my striving to understand my

13 faith and the education behind it.  So when I found the Church

14 of Haile Selassie I is where I found education.

15 Q.   Would you say that the Church of Haile Selassie is a

16 reversion back that towards more Ethiopian Orthodox beliefs or

17 tenets?

18 A.   No.

19 Q.   Okay.  What day is typically Sabbath Day for Ba Beta

20 Kristiyan?

21 A.   We celebrate the Sabbath from Friday to Sunday.

22 Q.   And Niyabinghi, what day is Sabbath?

23 A.   I believe they hold Sabbath on Saturday.

24 Q.   Do Niyabinghi require dreadlocks?

25 A.   Yes.

1  Q.   Does Ba Beta Kristiyan require dreadlocks?

2  A.   Yes.

3  Q.   What about the prayer cap or the crown, are

4  there differences --

5  A.   Prayer cap -- yes, there is differences.  But in general

6  we wear it to cover our locks.

7  Q.   What about the items needed for worship, are they

8  different, bells, roses, mats, liturgy books?

9  A.   Uhm-uhm, yes.

10  Q.   Those are all different?

11  A.   Yes.

12  Q.   Is there a reason that April the 21st is not included as a

13  holy day in the Church of Haile Selassie?

14  A.   April 21st, what do they have?  I don't know who

15  celebrates that.

16  Q.   The visitation of --

17  A.   Haile Selassie I Jamaica?

18  Q.   Yes.

19  A.   1966.

20  Q.   Is that not a key holy day?

21  A.   Not for Ba Beta Kristiyan.

22  Q.   For Niyabinghi?

23  A.   Niyabinghi, possibly.

24  Q.   So, there again, there are differences?

25  A.   I stated that before, yes, there are differences.

1  Q.   And would you agree with your experience as a prison

2  chaplain that it is in the State's best interest to administer

3  a policy that is of commonly accepted tenets, holy days,

4  practices?

5  A.   It should be.  And this is why for the State of New York,

6  although Ba Beta Kristiyan Haile Selassie I, the four major

7  holy days that are celebrated in the facility is celebrated by

8  the Niyabinghi also and is celebrated by 12 Tribe also and Bobo

9  Ashanti and --

10  Q.   Would you agree -- I apologize.

11  A.   Yeah.  November 2nd is something that's universally

12  celebrated by all Rastafarians, regardless of the sect.  May

13  5th, July 23rd and October 7.  So all Rastafarians celebrate

14  these days irrespective if they are Niyabinghi, 12 Tribe, Bobo

15  Ashanti, Ba Beta Kristiyan.

16  Q.   Can you tell me what the difference is between having an

17  element of food as part of a celebration or an opportunity for

18  fellowship within a church versus the food being actually

19  required to consume certain types of food or a certain meal in

20  procession?  Are those two things different in your mind?

21  A.   A required meal?  You have to state that again, please.

22  Q.   Are the meals that you described required in the sense the

23  same as, let's say, a Seder plate for a Jewish individual or

24  required --

25  A.   Some items, yes.  It could vary, and we never put to

1  strict adherence in the facilities only because it was about

2  availability, also sometimes when they had to purchase foods

3  for the celebrations.

4  Q.   So if it can vary, how is it required?

5  A.   It is required that they have a meal.  It's required that

6  they get together and have worship service.  But let's say for

7  November 2nd, like I said, we require that they eat goat, but

8  if circumstances arise that they couldn't get goat, we wouldn't

9  try to like sue them or anything like that.  We work with the

10 facility, you know, because it's really the inmates that we're

11 looking out for.

12     So we could make certain variances not because it's not a

13 requirement, but, you know, it doesn't have to become a thing

14 of punishment or lawsuits.

15 Q.   So there is no adverse consequences, no, you know -- would

16 they be violating any laws or tenets, suffering adverse

17 consequences if someone were to not participate in a corporate

18 ceremony or not participate in a feast?

19 A.   You're talking about the inmate?

20 Q.   Correct.

21 A.   Yes.  No, there wouldn't be any penalties towards these

22 people, because, again, having them celebrate and having them

23 come together, that was more of an individual choice.

24     Whenever we would have these celebrations now, we would

25 have the celebrations for those who were practicing

1  Rastafarians, meaning that they actually did go to classes,

2  they went to services on a regular basis.

3      Some inmates wanted these holy days just because they

4  wanted a meal.  And, you know, they didn't practice their

5  faith, but when it came to festivity time, that's when they

6  became the greatest Rastafarian ever.

7      So -- but if a person was a practicing Rastafarian and

8  decided that he couldn't or didn't want to, we wouldn't punish

9  them by putting them in a box or anything like that, no.

10 Q.   And would you agree that there are more community

11 resources available in New York to support these feasts than

12 there are in North Carolina?

13 A.   That, I wouldn't know.

14 Q.   Is there a larger inmate population that is Rastafarian in

15 New York than there is in North Carolina?

16 A.   I don't know, because I don't know the population here.

17          MS. GRANDE:  I don't have anything further.

18          THE COURT:  Thank you.

19          Anything else?

20                    REDIRECT EXAMINATION

21 BY MS. MILES:

22 Q.   Mr. Severin, in New York, before the Rastafarian dietary

23 program was implemented, who approves the program?

24 A.   The State of New York.

25 Q.   And in the New York prisons were some of the inmates there

1  vegetarians?

2  A.    Yes.

3  Q.    And how were they accommodated?

4  A.    As I said, in the menu we didn't only have meat, we had

5  other things on the menu.  So it was a matter of choosing what

6  they wanted to eat.

7       One thing I could say with the holy days is that May 5th

8  and October 7th were celebrations where we really didn't have

9  meat on the menu.  So for them, that was always like a big

10 hoorah, so, you know, for the festivities where we did have

11 meat.  Other things were made for them, like on that menu I

12 don't think you saw a thing that they call ital stew.  It's a

13 stew, but it's only made with vegetables and those things, so

14 to -- let's say for the vegetarians we would have ital stew,

15 even though it's not on the State's menu.

16      The facilities now, once we would get everything

17 organized, they would say that, okay -- if we asked them, okay,

18 well, you know, you have some inmates that are Rastafarian,

19 they are not going to eat meat, we want something that has

20 enough protein for them, this and that, blah, blah.  So we

21 would make ital stew and that would be put on the menu to help

22 them out.  We did whatever we could to help them.

23 Q.    And would the vegetarians still be able to commemorate the

24 sixth sacrament, breaking of bread and wine, even though they

25 did not eat meat?

1  A.    Yes, because on May 5th when we actually break bread and

2  drink wine, we actually make cornbread, that is something that

3  they actually make, they make cornbread and they would order

4  Kedem grape juice, which is a Kosher nonalcoholic grape juice.

5      So even as a vegetarian they would participate in that

6  because everyone would get some cornbread.  It was something

7  that we cook to give to all of the inmates so that they all

8  actually ate pieces of cornbread and drank some of the Kedem

9  grape juice, symbolically, again, representing that same

10  meeting with Abraham and Melchizedek.  So this is something

11  that we did with them, yes.

12  Q.    And just to clarify.  The holy days that we discussed,

13  four of them, they are celebrated by all Rastafarians

14  regardless of the sect?

15  A.    Yes.

16  Q.    With a meal?

17  A.    That I know of, yes; and from my experience, yes.

18          MS. MILES:  Nothing further.

19          THE COURT:  Thank you.

20          Anything else, Ms. Grande?

21          MS. GRANDE:  Just briefly.

22                    RECROSS-EXAMINATION

23  BY MS. GRANDE:

24  Q.    Traditionally, along those same lines, the four holy days

25  that you say are celebrated in all sects, are they celebrated

1  in places like Ethiopia and Jamaica?

2  A.    In Jamaica, yes.  In Ethiopia, yes.

3  Q.    Could they afford out in the community in Ethiopia to set

4  forth or to serve the food in the community?

5  A.    Say again.

6  Q.    Would they be -- would they have the finances in a place

7  like Jamaica or Ethiopia to serve the menu that you've set out

8  here?

9  A.    You talking in Jamaica facility -- prison facility or --

10  Q.    No, out in the public.

11  A.    Oh, of course.

12  Q.    Would it not be cost productive to serve ceremony

13  participants all of these foods --

14  A.    Say again.

15  Q.    -- in places like Jamaica?

16  A.    Say again?  I didn't hear the question.

17         MS. GRANDE:  I'll withdraw the question.

18  BY MS. GRANDE:

19  Q.    The portion of the policy that indicates that all of the

20  food needs to be prepared by a baptized member, was that

21  followed in New York?

22  A.    Yes.

23  Q.    And let's say in North Carolina Mr. Wright may be the only

24  baptized Ba Beta Kristiyan member.  How would we carry forth

25  with implementing this policy as written to prepare all the

1  food?

2  A.    Well, I mean, North Carolina would be a little different.

3  Like you said, he may be the only one here in the whole state,

4  but even working in New York State there would be times where

5  we would go to our certain prison where we may only have two

6  people who are baptized in the church and that facility may

7  have 150 registered Rastafarians.  We wouldn't require that two

8  people cook for 150 people.  So we would take people that are

9  part of the faith group; people who actually participate, come

10 to class, come to services that may -- even if they are not

11 baptized, but they actually are practicing their faith.  So we

12 would make provisions for them to cook the meal.

13 Q.    So it could deviate?

14 A.    It did deviate under circumstances.

15 Q.    What is the purpose of having the food prepared by a

16 baptized member?  Why is that a requirement?

17 A.    Because there are rules and regulations, laws and --

18 Q.    Who wrote the rules --

19 A.    -- and practices that we know that these people won't

20 participate in.  And that's --

21 Q.    What are the rules, regulations and laws that you're

22 referring to?

23 A.    Well, let's see, like a person may have a cut.  You know,

24 I don't know if someone who is just anybody would just go in

25 the kitchen and cook.  A person who is a practicing Rastafarian

1  and baptized, I know they wouldn't go in the kitchen and cook.

2  Q.   Were these rules, regulations and laws basically the

3  personal preferences of Abuna Foxe?

4  A.   No, this is generally throughout the Rastafarian faith

5  group.

6  Q.   What's the significance of baptism?

7  A.   Baptism is initiation.  So just like any initiation is to

8  become part of something; that is the ultimate way in showing

9  your participation and to gain entry into something.  So

10 baptism is the same thing.  Once a person feels that, yes, they

11 believe in this faith, they would get baptized in it.

12 Q.   But only Ba Beta Kristiyan requires baptism?

13 A.   No.

14 Q.   What other sect require baptism?

15 A.   I know that Bobo Ashanti does a form of baptism also.  To

16 become a Bobo Ashanti or to become a Bobo Ashanti priest,

17 because they have priests also, you have to be baptized to

18 become part of that order.

19           MS. GRANDE:  I don't have anything further.

20           THE COURT:  Thank you.  Thank you, sir.  Please watch

21 your step stepping down.

22           Any other evidence from the plaintiff?

23           MS. MILES:  No, Your Honor.

24           THE COURT:  Anything from the defense?

25           MS. GRANDE:  Your Honor, at this time I would move,

pursuant to Rule 52, to dismiss plaintiff's claims against
Mr. Lassiter, Mr. Joyner, Ms. Stratton and Ms. Brown based upon
his testimony that none of them personally or intentionally
deprived him of any religious rights.

If I can approach with the Court's copy of the
motion?

THE COURT: You may.

MS. GRANDE: He failed to present sufficient evidence
for the Court to conclude that they acted in the subjective
intent pursuant to *Lovelace*. They also failed to present
evidence that the claims against Mr. Speer, Ms. Stratton in
their official capacities continue against him today as he's
now housed at Tabor Correctional.

Those claims should be moot as they are incapable of
carrying out any injunctive relief against him, and I'd request
that you make a judgment on the partial findings as of the
evidence that has been presented to this point.

THE COURT: I'll hear from the plaintiff.

MS. MILES: Your Honor, plaintiff testified --
plaintiff and Ms. Dunston testified that the defendant's
policies are system-wide policies. They have memoranda that is
issued throughout all 56 facilities that establishes procedures
for how religious groups, including Rastafarians, are to
celebrate holy days.

Mr. Wright has clearly stated that under RLUIPA he

1  has a significant religious belief and that his religious

2  practice as a Rastafarian is substantially burdened by

3  defendant's policies in that he's unable to celebrate holy days

4  with a feast.

5          THE COURT:  I'll take it under advisement.

6          The defense may call its first witness.

7          MS. GRANDE:  Your Honor, at this time the defense

8  will call Dr. Charles Price.

9

10                        CHARLES PRICE,

11          having been duly sworn, testified as follows:

12                     DIRECT EXAMINATION

13  BY MS. GRANDE:

14  Q.   Good afternoon, Dr. Price.  Could you please tell me where

15  you are employed.

16  A.   I'm currently employed by the University of North Carolina

17  at Chapel Hill.

18  Q.   And what's your position at the University of North

19  Carolina at Chapel Hill?

20  A.   I am a faculty member in the Department of Anthropology.

21  Q.   And what's your primary study area?

22  A.   I focus on social movements, race, and identity.

23  Q.   Okay.  Does that include Rastafarian?

24  A.   Yes.

25  Q.   How many years of experience would you say that you have

1 studying Rastafarian groups?

2 A.    As a scholar?

3 Q.    Yes.

4 A.    More than 20.

5 Q.    And personally?

6 A.    I carried the faith for over 30 years.

7 Q.    Are you -- meaning you're a member of the Rastafarian

8 faith, correct?

9 A.    Yes.

10 Q.    Are you still --

11 A.    Let me clarify.  Member, there's no membership.

12 Q.    A practicing Rasta?

13 A.    Yeah, no membership.  It's not something you join.

14 Q.    Okay.  What's your primary research area within the

15 Rastafarian movement or culture?  Have you been published at

16 all in the matter?

17 A.    So what I've done my best to do is to really focus on

18 documenting the past, the history, the evolution and the change

19 over time.

20 Q.    Have you written and been published on the subject of

21 Rastafari?

22 A.    Yes, I published several books.  I'm currently writing a

23 book on the history and evolution of the Rasta people.  I

24 published scholarly articles, I have written for different

25 community groups, and I have worked with writing pieces for

1  many Rasta groups.

2  Q.    Have you been consulted previously as an expert in the

3  area of Rastafarianism?

4  A.    Not for court, but I have consulted with, for instance,

5  Jesuits International and part of what Jesuits International

6  wanted to do is train its chaplains in an understanding of what

7  are the holy days and religious practices of Rastafarian.

8  Q.    The purpose of that training for its chaplains, would that

9  be to the chaplains to then serve in some capacity to

10  Rastafari?

11  A.    Exactly.

12  Q.    And where would those Rastafarians be located?

13  A.    Would be incarcerated in prisons and jails across the

14  United States.

15  Q.    Do you also serve as a volunteer personally for any

16  organizations as a Rastafarian resource?

17  A.    Yes.  Right now I'm a volunteer with the brothers at

18  Butner Federal Correctional Facility in Butner, North Carolina.

19  Q.    Now, tracing back --

20        MS. GRANDE:  Your Honor, at this time I would seek to

21  have Dr. Price recognized as an expert in the area of

22  Rastafarianism.

23        THE COURT:  The Court will recognize him as an

24  expert.

25  BY MS. GRANDE:

1  Q.   Dr. Price, could you explain to us, briefly as you can,

2  the history, the origins of the Rastafarian movement and where

3  it originated from and -- throughout the past few decades as

4  it's progressed to today?

5  A.   Sure.  So on November 2nd, 1930, King Ras Tafari was

6  coronated as Emperor of Ethiopia and many Jamaicans and many

7  people around the world, many members of the African class were

8  recognized in the coronation that the Emperor represented many

9  of the prophecies in the Old Testament and the New Testament,

10  but in particular, the Book of Revelations.

11       So by 1933, there were individuals who were organizing and

12  beginning to preach this new faith called Rastafari.  One of

13  the founders, one of the leaders, but not the only one by any

14  stretch of the imagination, was Leonard Howell.

15       So one way to think about this is to think about

16  Rastafarian people as generations.  So that first generation

17  would last roughly for about 20 years.  So you have men like

18  Howell, you have men like Hibbert, Brother Brown and so on who

19  built faith communities.

20       Then around the '40s, toward the end of the 1940s, you

21  have a second generation that came into the faith who

22  challenged some of the tenets of the elders of that first

23  generation.  So you get some significant changes in Rastafari

24  orthodoxy around this time, late 1940, coming into the 1950s,

25  okay?  And one of the significant changes was the emergence of

 1  what we now call the Niyabinghi order.  So that order -- the

 2  challenge to the first generation, but certainly over the

 3  course of the development of that second generation became in a

 4  sense the orthodoxy, the faith.

 5       Now, over time --

 6            THE COURT:  How do you spell Niyabinghi?

 7            THE WITNESS:  N-Y-A-B-I-N-G-H-I.  There are many

 8  different ways, but you can look it up.

 9            THE COURT:  I take your word for it.

10  BY MS. GRANDE:

11  Q.   Is it also referred to Iyabinghi the N?

12  A.   Yes, that's a whole other story.

13       But the important point to make here is that with any

14  faith community what you expect over time is for that community

15  to become more diverse in its beliefs and practices; but at the

16  same time over that period of time, we have some conventions

17  that we might call orthodoxy, that these are the things that

18  the majority of the community hold in common.

19       So the fact that we have these different houses and

20  mansions is not unusual and we're able to accommodate all of

21  that.

22       But in my view, the Niyabinghi is the standard bearer for

23  the faith.  Not to say that there is not deviations from that

24  standard, but from my point of view, they are the standard

25  bearers of the faith.

1  Q.   Would it be, let's say, similar to within Protestant,

2  Christian, you got Methodist, Baptist, Presbyterians, different

3  versions of beliefs and different churches?

4  A.   Yes.

5  Q.   Do all of the different orders or tribes or mansions

6  recognize some common belief system?

7  A.   Yes, for sure.

8  Q.   And what is that common belief system?

9  A.   So I would say that all of us agree that Haile Selassie is

10  divine.  I would say that the majority of us hold that His

11  Majesty represents the redemption of people of the African

12  diaspora, and I would say that the majority, perhaps not all,

13  hold that repatriations is a must; that is the ability of

14  African-decedent people to return to Africa if they so desire.

15  Q.   Are there some practices that may vary between the

16  different sects or tribes or mansions within the Rastafarian

17  culture?

18  A.   There are practices that differ, yes.

19  Q.   And can you explain to me where in relation to

20  Rastafarianism the Ethiopian Orthodox church stands?

21  A.   Oh, boy.  That is a complex one, but I'll try to keep it

22  simple.

23       The Ethiopian Orthodox church is a very ancient Christian

24  church, we're talking somewhere dating back to around 4 A.D.

25       Now, in 1966, when His Imperial Majesty visited Jamaica,

1  one of the things that he promised is that he would have a

2  branch of the Ethiopian Orthodox church installed in Jamaica.

3  I can't remember exactly what year, but certainly by 1970, '71,

4  somewhere thereabouts, there was an operating branch of the

5  Ethiopian Orthodox church in Kingston, Jamaica.

6  Q.   And was there conflict between the Rastafarians as they

7  were already established in Jamaica and the new Ethiopian

8  Orthodox church?

9  A.   My understanding, given the elders that I have talked to

10  who are familiar with the church and who have joined the

11  church, is that the -- for lack of a better word -- the clergy

12  of the Orthodox church were not very happy about having to

13  administer to the Rasta people.  And there was a lot of back

14  and forth, a lot of conflict, fighting, if you will, over how

15  to resolve this.  And so the church reached an accommodation in

16  that they would recognize certain practices of the Rasta people

17  in Jamaica, but they refused to recognize His Imperial Majesty

18  as divine.

19      So, for instance, if you go to the church this very day,

20  you would see, for instance, that they use the Niyabinghi

21  drums, but at the same time they speak of Christ and not His

22  Imperial Majesty.

23          THE COURT:  What's the relationship between Ethiopia

24  and Jamaica?

25          THE WITNESS:  That's another complicated question.

1  During the time of slavery, Europeans gave the name Ethiopian

2  to all Africans.  So if you go look -- if you look at some

3  historical documents you'll see roughly until about 1830

4  African-descended people were commonly referred to as

5  Ethiopians, so it's synonymous in one sense with Ethiopia.  On

6  the other hand, His Imperial Majesty traces his lineage all the

7  way back to Israel, Jerusalem, and so there is a connection.

8  BY MS. GRANDE:

9  Q.    Would it be fair to say that as slavery progressed,

10 African people were brought to Jamaica to the, quote, New

11 World, did they bring some of the Ethiopian beliefs, traditions

12 with them?  What was the process of --

13 A.    So that's on the Biblical side.  On the more political

14 side, during -- during the -- so I told you that these

15 Jamaicans recognize His Majesty as divine as early as 1933,

16 correct?

17      Then we have an invasion of Ethiopia by Italy, 1935.  And

18 throughout the African diaspora, African-descended people

19 rallied to support Ethiopia, not just in Jamaica, but across

20 the diaspora.  And His Majesty was so thankful and grateful for

21 that support that he set aside a portion of land in Ethiopia

22 for all the people of the diaspora to repatriate to if they so

23 desire.  He also set up an organization, Ethiopian World

24 Federation, to help make that repatriation possible, but also

25 as a way to raise money to support the war effort in Ethiopia.

1    So I don't want to go into a history lesson about this,

2  but the relationships between Ethiopia and Jamaica are

3  longstanding and complicated.

4  Q.    Okay.  Would you state whether the traditions, as they are

5  currently recognized, let's say by the Niyabinghi, do they

6  originate from Ethiopia or do they originate from Jamaica?

7  A.    Jamaica.

8  Q.    So within Rastafarian culture are the traditions more

9  traditionally stemming or originating from practices that were

10  developed in Jamaica?

11  A.    Could you say that again so I'm clear?

12  Q.    Are the traditions that are practiced by Rastafarians in

13  America today, are they traditions that originated in Ethiopia

14  or that originated in Jamaica?

15  A.    Jamaica.

16  Q.    In Jamaica are all -- how many sects or mansions are

17  recognized that you know of, or commonly practiced?

18  A.    So, again, these are really complicated questions that

19  I'll do my best to simplify.

20    It's not uncommon for an individual to decide that he or

21  she wants to establish his own Rasta community; that's not

22  uncommon.  They come and go.  But what has been endurable are

23  some of the houses and mansions that you all mentioned earlier,

24  the Bobo Ashanti, more recently the 12 Tribes, Ethiopian

25  Orthodox.  Some of these other houses I'm less familiar with.

1  I know that they exist; but generally speaking, these are the
2  major faith, Rasta faith communities.
3  Q.   Okay.  Is one particular sect recognized as an arch type
4  or a standard by which generally or common practices could be
5  derived from?
6  A.   I would say without a doubt that that is the Niyabinghi
7  order.
8  Q.   And again, that's the oldest and most traditional order?
9  A.   It's the oldest, it's the most traditional.  It has been
10  the forerunner in setting many of the rituals, the practice and
11  even the doctrine itself.
12  Q.   Is that the form that is most commonly practiced in
13  Jamaica?
14  A.   I don't know if I can say it is the most commonly
15  practiced, but I would say it's the most widely recognized.
16  Q.   Okay.  For purposes of evaluating or looking at the Ba
17  Beta Kristiyan mansion or sect, were you able to review any
18  materials, did you come to any conclusions about the status of
19  the house or the mansion or how it's regarded within the
20  Rastafarian community?
21  A.   I read all of the documents that you provided, all of the
22  evidence that you provided.  It's not my position to offer an
23  opinion on their practice because as a Rasta it's not up to me
24  to judge who is Rasta and who is not, but what I will tell you
25  is that many of the practices that they adhere to are not

1 familiar to me.

2 Q.   Okay.  Do they fall outside of what would traditionally be

3 seen in practices for Niyabinghi, 12 Tribes, Bobo Ashanti?

4 A.   I'll answer you with an example, okay?  If I were to show

5 up at a Niyabinghi gathering or at a Bobo Ashanti camp with a

6 bottle of wine, I would be run off.

7 Q.   Okay.  Within the Niyabinghi or any sect that you are

8 familiar with, is there a tradition of breaking bread or

9 sharing of wine which is deemed a sacrament or required?

10 A.   I am not aware of wine as a sacrament, but bread is a

11 metaphor for community.  So any type of sharing could be

12 construed as breaking bread.

13 Q.   Would the gathering itself be breaking bread, the communal

14 time together?

15 A.   I don't quite understand that.

16 Q.   Is there an actual significance placed to the foodstuff to

17 the feast itself?

18 A.   There is no feast for Niyabinghi.  What we are responsible

19 for is provisioning the community during the course of the

20 gathering.  The gathering may last anywhere from three to five

21 to 10 days.  So it's our responsibility to provision the

22 participants at the gathering.

23 Q.   So again, this would be out in the community, correct?

24 A.   Yes.

25 Q.   And a feast may or may not be provided by a group or tribe

1   or camp?

2   A.    They don't use the word "feast."

3   Q.    A meal, a food?

4   A.    Provisions.

5   Q.    Provisions.  As a matter of convenience?

6   A.    As a matter of convenience?

7   Q.    Sustenance?

8   A.    Yes.  Convenience, yes.

9   Q.    Fellowship?

10  A.    Fellowship, yes.

11  Q.    Is there a religious significance to the consumption of

12  that food communally?

13  A.    I would say that the significance is simply the communal

14  provision of the food; in other words, taking care of the

15  community.  Is it part of the ritual?  No.  But it's a part of

16  the responsibility of the conveners.  So if I agree to overtake

17  a Niyabinghi gathering, it's part of my responsibility to make

18  sure the community is taken care of, to provision them and we

19  would do that communally.  But that's more of a responsibility

20  than some religious dictate.  Does that make sense?

21  Q.    That's correct.  I just want to make sure that I'm

22  clarifying for my understanding.

23        The term "feast" would not ever be used?

24  A.    That is not a term that I'm familiar with.

25  Q.    Okay.  Would there be a diet that was set out -- I'm going

1  to show you what's been marked as page 15 from Plaintiff's

2  Exhibit No. 11.  These foods, would there be a diet plan or

3  menu or anything that is set forth in this form or a fashion

4  that are required to be consumed by members?

5  A.    No requirements, no menu.  We work with what's available,

6  what participants are able to provide.

7  Q.    In your experience, is there any requirement that food be

8  prepared by a baptized member?

9  A.    No.

10  Q.    Is there such thing as a baptism?

11  A.    I am not baptized, and --

12  Q.    Is there a sacrament of baptism?

13  A.    In the Ethiopian Orthodox church, yes.

14  Q.    Are there sacraments in the Niyabinghi?

15  A.    I don't quite understand what sacrament means.  The only

16  sacrament that I'm really aware of would, of course, be the

17  herbs.  I don't quite understand the idea of sacrament.

18  Q.    You were here and heard Mr. Severin testify that there are

19  seven sacraments within Ba Beta Kristiyan.  Are there seven

20  sacraments that are required within Niyabinghi?

21  A.    Can anyone repeat them for me, the seven sacraments?

22  Q.    Marriage -- sorry.  I can go back.  Baptism.

23  A.    No.  Marriage, no.

24  Q.    Anointing of the sick, matrimony, baptism, penance,

25  breaking of the bread and wine, ordination of ministers.

1   A.    Those are unfamiliar to me.

2   Q.    Are those sacraments -- so if they are unfamiliar to you,

3   would it be fair to say that they are not requirements within

4   Niyabinghi?

5   A.    Yeah.  They're  not requirements in Niyabinghi, no.

6   Q.    To your knowledge, are they requirements within any other

7   sect other than Ba Beta Kristiyan or within Ethiopian Orthodox?

8   A.    I'm not aware, no.  I can't say that with confidence, no.

9   Q.    In your review of Ba Beta Kristiyan, were you able to make

10  a determination of any other notable differences between their

11  views and what is traditionally accepted amongst Rastafarian?

12  A.    The baptism, the idea of a church, the idea of an

13  established order, hierarchal order, a titled order, the

14  emphasis on wine, just a few that came to mind.  And the other

15  is Reggae music.

16  Q.    What is the significance of Reggae music within

17  Niyabinghi?  Is there a significance?

18  A.    Well, you have to understand that we have our own music

19  and that we call Niyabinghi music, and that would be our

20  equivalent of our spiritual music.  There may be Rastas or

21  Niyabinghi, Bobo Ashanti who perform Reggae, but we have our

22  own spiritual music, and that music includes drumming and

23  chanting; not quiet prayer.

24  Q.    Okay.  In your service to Jesuits International or to

25  Butner, have you ever recommended a specific diet for

1  consumption on holy days?

2  A.   So on diet what I suggest is that they recognize what we

3  call an ital or natural diet.  That would entail pretty much a

4  plant-based diet.

5  Q.   And based on your --

6  A.   Fishes that are scaled are acceptable as a part of that

7  diet but not required.  So really what you have is a continuum

8  from people who want a plant-based diet to those who consume

9  some flesh in the form of scaled fish.

10  Q.   I'm going to show you what's been marked as Defendant's

11  Exhibit No. 2 and ask whether the diet that's provided by the

12  North Carolina Department of Public Safety that's described

13  here in Subsection C is sufficient?

14  A.   I would agree with this.

15          THE COURT:  Is that on page 1?

16          MS. GRANDE:  It is on page 1.

17          THE WITNESS:  And I would add that any predatory

18  fish, unscaled fish.

19  BY MS. GRANDE:

20  Q.   Do you agree or disagree with the characterization that

21  Abuna Foxe is the only Rastafarian expert in North America?

22  A.   I would say that any Rasta who carries conviction in his

23  or her faith is an expert.  In other words, there is no

24  monopoly on expertise.

25  Q.   Exactly.

1    Is there a monopoly on established practices or tradition;

2    in other words, can any Rastafari worship in a manner that is

3    acceptable to themselves?

4    A.   I'm not quite sure I understand your question, but what I

5    would say is that based on my experience, every Rasta has the

6    opportunity to live up to his or her potential, to fulfill his

7    or her potential in the faith.

8    Q.   And are many of the practices largely individualized?  Are

9    there many requirements?

10   A.   There are established -- what I would call established

11   codes of conduct and an expectation of self-discipline.  So

12   it's not my responsibility so much to call out others but to be

13   responsible for my own conduct.

14       Now, of course, others will show their disapproval when I

15   do certain things that they don't approve of; but for the most

16   part, each person is responsible for his or her discipline.

17   Q.   In your opinion, would inmates within DPS's custody, are

18   they required to observe holy days or holidays with a communal

19   feast consuming the foods that were set out in the dietary

20   menu?

21   A.   I don't know exactly about DPS, so maybe you can ask me

22   the question differently.

23   Q.   Would inmates within North Carolina prisons, in order to

24   celebrate holy days or holidays, are they required to consume

25   the foods that were set forth on the menu or the diet plan that

1  was submitted by Mr. Severin?

2  A.   No.  Not to my awareness, no.  What is important, though,

3  is that the brothers and sisters have the opportunity to gather

4  communally.  That is important.  That is central.

5  Q.   In your opinion, does the weekly service -- weekly

6  gathering tailored to meet and discuss and perform the rituals

7  for the holy days, the communal gatherings, is that sufficient?

8  A.   The communal gatherings -- these are separate things,

9  right?

10  Q.   Correct.

11  A.   The communal gatherings, the weekly meetings and what

12  else?

13  Q.   Would that be sufficient for the holidays or holy days?

14  A.   I'm not quite sure I understand that question.  So I'll

15  rephrase it.

16      So I think it's vital that the brothers and sisters are

17  able to meet regularly, to meet communally, and to be able to

18  freely practice, acknowledge those holy days.

19  Q.   Now, for the -- getting to the holy days, are there holy

20  days that have been set forth that are either not recognized or

21  not as prominent within Niyabinghi that are being discussed

22  here today such as Passover or Fasika?

23  A.   My whole view of the policy in general is there's a good

24  bit of misinformation in there, so I will just share with you

25  what my view is.

1    My view is, is that there are three indisputable Rastafari

2  holy days; in other words, these are days that all different

3  houses and mansions would agree upon.  We would agree on

4  November 2nd, July 23 and April 21.

5    If you were to widen that just a bit, we would include

6  September 11 and January 7 as holy days.

7  Q.   Okay.

8  A.   But I think that there is indisputable agreement on the

9  first three that I mentioned.  But what you will find is

10 disagreement once you move past those three on what constitutes

11 a holy day.  And what constitutes a holy day changes over time,

12 and I can assure you that many more days will be added as time

13 passes.

14          THE COURT:  Tell me what April 21st is again.

15          THE WITNESS:  So on April 21, 1966 -- actually, it

16 was the week, but we recognize that particular day, Haile

17 Selassie visited Jamaica; but in particular, he met with the

18 Rastafari people in King's House in Jamaica.  So in other

19 words, it was a sign of His Majesty sitting with his flock in

20 public view.  It was the equivalent of Christ lifting up the

21 lowest and sitting with them.

22 BY MS. GRANDE:

23 Q.   Does it hold any significance or does it say anything to

24 you that April 21st has been omitted by the Ba Beta Kristiyan

25 group?

1  A.   Well, there's any number of reasons why that could have

2  happened and how that happened -- I have no idea how that

3  happened, but if it were me that would be a primary holy day,

4  if it were up to me.  If it were a based and established

5  tradition, that would be included.

6  Q.   Do you have any idea or any speculation as to why

7  April 21st would be left out of their holy days?

8  A.   I have no idea, and I prefer not to speculate, but it

9  immediately caught my attention.  So it probably boils down to

10  who was involved in the early discussions about what are the

11  significant holy days and how to prioritize what days are

12  recognized within the institution.

13  Q.   Any significance that you know of to May the 5th or

14  October the 7th to elevate them to the level of a holy day, in

15  your opinion?

16  A.   In my opinion, those are important days for Rasta people.

17  I would not put them on the same plane as holy days.

18  Q.   Based on your review of the policies that apply to North

19  Carolina inmates and the items they are allowed to possess, is

20  there anything lacking; crowns, medallions, flags?

21  A.   I'm sorry.  I cut you off.

22  Q.   I apologize.  The personal items that they're allowed to

23  possess, is there anything lacking that you see in the way of

24  food or provisions that they are not permitted to have?

25  A.   One of the things that I noticed is that they -- I may be

1  wrong, but I didn't see that the brothers have access to

2  musical instruments, the drum in particular.

3  Q.   As far as headwear, medallions, flags, those are all

4  sufficient that you reviewed?

5  A.   Let's say adequate.

6  Q.   DVDs, literature, attars, chant music, are those all

7  adequate --

8  A.   The adequacy is the word I want to use, but I'm not quite

9  sure in what sense you mean it.

10 Q.   In your opinion, is there any substantial burden placed

11 upon the inmates that are practicing Rastafarians within North

12 Carolina by the policy as it stands?

13 A.   No, I do not see that.

14 Q.   Okay.  In your opinion --

15 A.   With the exception of the drums.

16 Q.   In your opinion, is there any substantial burden placed on

17 Mr. Wright by his inability to have communal feasts on his

18 preferred holy days as a practicing Rastafarian?

19 A.   I don't know if I can pass judgment on Mr. Wright, but I

20 can say that I would not make the case that a feast is a

21 requirement.

22        MS. GRANDE:  Okay.  I don't have anything further,

23 Your Honor.

24        THE COURT:  Okay.  Cross-examination.

25                    CROSS-EXAMINATION

1  BY MS. MILES:

2  Q.   Dr. Price, what sect do you ascribe to?

3  A.   I am of the Niyabinghi order.

4  Q.   And you testified earlier that it's not your job to decide

5  who is and who is not a Rastafarian, correct?

6  A.   I said that, yes.

7  Q.   And would you agree that if a specific sect does not

8  follow the Niyabinghi order that does not make them less of a

9  Rastafarian?

10  A.   I would not pass judgment.

11  Q.   You talk about the provisioning of the community being the

12  term used for the meal, correct?

13  A.   Uhm-uhm.

14  Q.   And what was the significance of the provisioning of the

15  community?

16  A.   Can you ask the first part again?  I'm sorry.

17  Q.   What's the significance of the provisioning?

18  A.   If you are going to have people spend three, five, seven

19  days together in a remote area, then you need to be able to

20  provide for that community.  That community needs provisioning.

21  Q.   And by provisioning you mean providing meals, correct?

22  A.   Food, place to rest, fresh water, so on.

23  Q.   So isn't it the practice of the inmates in gathering

24  together and sharing a meal considered provisioning?

25  A.   I wouldn't say that.  I don't understand the comparison.

1  Q.    If an inmate, Mr. Wright, is going to celebrate a
2  Rastafarian holy day, would that be similar to provisioning?
3  A.    One person?
4  Q.    And other Rastafarians under DPS custody.
5  A.    The question is who is providing the support, okay?
6  That's one concern, right?  And I don't think it's fair -- I
7  mean, if you're going to allow the brothers to gather for three
8  days, five days, seven days, 10 days, that's a different
9  question.  So I don't know about the comparison there.  I don't
10 know if the comparison is equivalent.
11 Q.    Do you know Mr. Wright?
12 A.    No.  I don't know him, no.
13 Q.    Did you -- in reviewing of any of the materials, did you
14 know Mr. Wright was baptized in 2003?
15 A.    I read everything in the evidence file.
16 Q.    And are you aware that he has studied the faith since that
17 time?
18 A.    If it's in there, I read it.  I may not be remembering it
19 right now.
20 Q.    Are you aware that he celebrates the holy days that his
21 faith requires, that -- and to eat with these holy days?
22 A.    Okay.
23 Q.    Are you aware of that?
24 A.    Yes.
25 Q.    Would you say that because he celebrates these holy days

1  with a meal that makes him less of a Rastafarian?

2  A.   I wouldn't pass judgment on that.

3  Q.   You mentioned that you read a lot of documents in

4  preparing for your testimony today.

5  A.   Yes.

6  Q.   Did that document include a memoranda in support of

7  defendant's motion for summary judgment?

8  A.   I recall seeing summary judgment so many times that I

9  can't tell you exactly what document you're talking about.

10 Q.   Did you read a document for -- regarding Defendant Brown

11 in the Religious Services Committee --

12 A.   Do you want to show it to me?  I'm not sure what you're

13 asking me.

14          THE COURT:  She's trying to find the document.

15          MS. MILES:  I'll find it for you.

16 BY MS. MILES:

17 Q.   Did you review this affidavit?

18 A.   I can't see the top part.

19 Q.   Can you see it now?

20 A.   What's the date?

21 Q.   The date on it is -- it was filed --

22 A.   Document 45, yes.

23 Q.   Do you remember seeing in that document a portion of the

24 memo that discussed Defendant Brown and a Religious Services

25 Committee research in Rastafarian practices?

1   A.   Vaguely.  Why don't you take me to that.

2   Q.   Paragraph 16, do you recall seeing this portion?

3   A.   Yes.

4   Q.   And isn't it true --

5   A.   Hold on one second.  Hold on one second.  Okay.  Go ahead.

6   Q.   Isn't it true that the committee's research concluded that

7   members of the Rastafarian faith celebrate holy days in a

8   personal or private manner, if at all?

9   A.   Say that again.  Are you asking if that's true?

10  Q.   Isn't it true that that was the committee's conclusion?

11  A.   That's what's in that document, is that what you're

12  saying?

13  Q.   Yes.

14  A.   That's in the document, yes.  Do I agree with it?  No.

15  Q.   You're saying you do not agree with that?

16  A.   Yes.

17  Q.   So isn't it true that Rastafarians do celebrate holy days

18  with some type of corporate ritual?

19  A.   If you go to Document 48, I wrote specifically -- I wrote

20  specifically that Document 48 contained misinformation in that

21  it concluded that Rastafari people do not engage in corporate

22  activity.  That is not true.

23  Q.   So you do agree that they do have some type of corporate

24  ritual?

25  A.   By corporate if you mean communal, yes.

1  Q.   Isn't it true that the celebration of holy days is

2  significant to the Rastafarian community?

3  A.   Of course.

4  Q.   Isn't it true that the celebration of those days affirm

5  the community, the faith and its practices and belief?

6  A.   I agree.

7  Q.   And it's your opinion that Rastafarians are not required

8  to participate in corporate rituals to live the Rastafarian

9  life; is that correct?

10  A.   Say again?

11  Q.   Is it your opinion that Rastafarians are not required to

12  participate in corporate rituals?

13  A.   Let's just go to what I said about self-discipline, right?

14  Each person must judge and take responsibility for how he or

15  she lives the faith, all right?  If you ask me, the communal

16  part is significant and important.  But if another person

17  decides that he or she can embody and carry that faith with

18  conviction independently, then that's his or her choice.

19  Q.   Thank you, Dr. Price.

20       We talked about the difference between Ba Beta Kristiyan

21  Church of Haile Selassie and the Niyabinghi order.  Isn't it

22  true that Ba Beta Kristiyan Church of Haile Selassie do follow

23  some of the same holy days as the Niyabinghi order?

24  A.   Yeah, uhm-uhm.

25  Q.   And in your testimony today you talked about

1  any Rastafarian --

2          THE COURT:  Doctor, those two are the birth of Haile

3  Selassie and Coronation?  Are those the two that --

4          THE WITNESS:  I said three.

5          THE COURT:  Right.  You said three.  You said

6  everybody had three, as I understand it, tell me if I'm

7  following along, the one core belief of all Rastafarians is the

8  divinity of Haile Selassie.

9          THE WITNESS:  Yes.

10         THE COURT:  Beyond that, we have this discipline

11 issue, but you said even among all the mansions, three -- three

12 recognized holy days --

13         THE WITNESS:  I would say there would be no argument

14 over them.

15         THE COURT:  Over three.  But even among those three,

16 the Ba Beta Kristiyan didn't list April 21st.  So that the

17 two -- so we can take that out, back that out and say, well,

18 here's a mansion that doesn't recognize that; that the divinity

19 of Haile Selassie and then recognize two holy days at a minimum

20 among all mansions, the July 23rd, Haile Selassie's birthday

21 and November 2nd, his Coronation.

22         Those would be the two, to your knowledge, that have

23 been studied and --

24         THE WITNESS:  July 23rd and November 2.

25         THE COURT:  Correct.

1            THE WITNESS:  Yes.

2            THE COURT:  Those would be the two that all the

3    mansions would recognize?

4            THE WITNESS:  Yes.

5            MS. MILES:  Thank you, Your Honor.

6    BY MS. MILES:

7    Q.   Just for clarification.  November 2nd and July 23rd are

8    the same holy days listed in DPS's policy, correct?

9    A.   If you want me to go on the record, you probably should

10   show me.

11           THE COURT:  He's looking at Plaintiff's Exhibit 4,

12   page -- whatever that page is, Doctor.  There are two listed.

13           THE WITNESS:  Can you ask the question again?

14   BY MS. MILES:

15   Q.   Is November 2nd and July 23rd listed as holy days in DPS's

16   policy?

17   A.   In Plaintiff's Exhibit 4, yes.

18   Q.   Those are the holy days you said that all mansions, you

19   would agree, celebrate?

20   A.   Yeah, there wouldn't be argument over that.

21   Q.   And you also stated in your testimony earlier that there

22   are some inconsistencies with DPS's policy with regard to the

23   Rastafarians; is that correct?

24   A.   Yes, but that's not unusual.

25           MS. MILES:  No further questions, Your Honor.

1     THE COURT:  Anything else, Ms. Grande?

2                    REDIRECT EXAMINATION

3  BY MS. GRANDE:

4  Q.    Just for clarity sake.  With those holy days, the 23rd and

5  the 2nd, no requirement of consumption of a communal -- of a

6  feast?

7  A.    Can you ask the first part again?  I'm sorry.

8  Q.    On July 23rd and November 2nd, is there a requirement that

9  Rastafarians consume a communal feast?

10 A.    As I said, the word "feast" is not commonly used and

11 "requirement" is not commonly used.

12 Q.    Okay.  And you shared your thoughts about the Rastafarian

13 policy as it exists with prison administration or with DPS

14 separate and aside from your testimony here today?

15 A.    I've offered my opinion, yes.

16 Q.    Yes, correct.

17       As a matter of general -- generalizing, do you see the

18 policy as sufficient or deficient?

19 A.    I see it as adequate.

20          MS. GRANDE:  Nothing further, Your Honor.

21          THE WITNESS:  I would not use the word "sufficient."

22          THE COURT:  Thank you, Doctor.

23          Let's take a recess until 3:10.

24    (The proceedings were recessed at 3:01 p.m. and reconvened

25 at 3:10 p.m.)

1    THE COURT:  The defense can call its next witness.

2    MS. GRANDE:  Your Honor, at this time the defense

3  will call Mr. Speer to the witness stand.

4

5                     RANDALL SPEER,

6    having been duly sworn, testified as follows:

7                 DIRECT EXAMINATION

8  BY MS. GRANDE:

9  Q.   Mr. Speer, can you state your full name for the record for

10 us.

11 A.   Randall J. Speer.

12 Q.   Where do you live, Mr. Speer?

13 A.   Advance, North Carolina.

14 Q.   Did you previously reside in Raleigh or work in Raleigh?

15 A.   I worked in Raleigh, resided in -- lived in Garner.

16 Q.   Did you work for the Department of Correction?

17 A.   Yes.

18 Q.   What did you do?

19 A.   I was a Clinical Chaplain 1 from '92 until I think 2000, I

20 was at Odom, hired at Odom, lateral to Central Prison in May of

21 '95 and promoted to Clinical Chaplain 3 in 2011.

22 Q.   In what year did you stop working for the Department?

23 A.   The end of 2013, last day.

24 Q.   When you worked for the Department, what prison facility

25 or was there a specific prison facility you were assigned to?

1  A.    Yes, Central Prison.

2  Q.    Did you ever meet or encounter Inmate Wright, the

3  plaintiff?

4  A.    Yes, I did.

5  Q.    Okay.  And did you ever have any interactions with him,

6  discussions or conversations that you recall with specificity?

7  A.    Yes.

8  Q.    And what were the substance of those interactions with

9  him?

10  A.    Basically, the Rastafarian faith and his desire to have

11  his version of it recognized and supersede the policy.

12  Q.    At any point did you treat Mr. Wright outside of the scope

13  of the policy that was approved for Rastafarians?

14  A.    What do you mean "treat"?

15  Q.    Did you allow him or permit him any accommodations that

16  were outside of the scope of policy?

17  A.    Oh, no.

18  Q.    Do you have the authority to do that?

19  A.    No, ma'am.

20  Q.    Okay.  Did you ever intentionally deprive him of any

21  religious exercise?

22  A.    No, ma'am.

23  Q.    Did you ever intend to impede his ability to practice his

24  Rastafarian faith --

25  A.    No, sir.

1    Q.    -- or burden it?

2    A.    No.

3    Q.    Did you counsel him in any way on how to seek

4    accommodations?

5    A.    Yes.  He wanted the policy modified, and I explained to

6    him the DC-572 and gave him one and he took it and filled it

7    out, brought it back to me, and I forwarded it to the Director

8    of Religious Services.

9    Q.    All right.  I'm going to show you what's been marked as

10   Defendant's Exhibit No. 11.  Is this the DC-572 that you were

11   referring to?

12   A.    It appears to be, yes.

13   Q.    Is there anywhere on here that would indicate your

14   signature?

15   A.    Shouldn't be.

16   Q.    But this is the document that you would forward to

17   chaplaincy services as you testified?

18   A.    Yes.

19   Q.    And did you alter or change this document in any way?

20   A.    No, ma'am.

21   Q.    Did you ultimately receive any feedback as to whether the

22   accommodations were going to be allowed to Mr. Wright or not?

23   A.    I did receive a letter from Chaplain Brown and talked with

24   Inmate Wright about it; that there were not going to be any

25   modifications to meet what he requested.

1  Q.   Okay.  To your knowledge, based on your understanding of

2  the Rastafarian policy, were there any feast meals that were

3  required for corporate worship or for communal worship purposes

4  on Rastafarian holidays or holy days?

5  A.   No, ma'am.

6  Q.   Okay.  So in your interactions with Mr. Wright, would it

7  be fair to say that you were simply following the Religious

8  Practices Manual?

9  A.   Yes, ma'am.

10       MS. GRANDE:  I don't have anything further for

11  Mr. Speer.

12       THE COURT:  Cross-examination.

13                      CROSS-EXAMINATION

14  BY MS. MILES:

15  Q.   Mr. Speer, you said you were a chaplain at Central Prison;

16  correct?

17  A.   Yes.  Could you speak into the microphone please?

18  Q.   Yes, sir.  Can you hear me now?

19  A.   Okay.

20  Q.   As chaplain, it was your duty to aid in the various

21  religious groups, correct?

22  A.   Yes.

23  Q.   Did you work closely with the faith helpers?

24  A.   Yes.

25  Q.   Mr. Wright was a faith helper at Central Prison, correct?

1  A.   He was.

2  Q.   He was the faith helper for the Rastafarian group?

3  A.   He became that, yes.

4  Q.   And you spoke with Mr. Wright on more than one occasion

5  regarding his religious accommodations, correct?

6  A.   Yes.

7  Q.   Isn't it true that there's a Religious Services Committee?

8  A.   Sure is, yes, ma'am.

9  Q.   And that committee researches the religious

10 accommodations, correct?

11 A.   That's correct.

12 Q.   And based off of the committee's research, they create the

13 policies for the faith group DPS-wide, correct?

14 A.   No.  They recommend a policy that then goes to legal -- or

15 it used to, it went to legal, and I think that may have been

16 all and then it came back down the chain and was distributed

17 through Chaplain Brown's office.

18 Q.   So they recommend whatever their research is?

19 A.   Yes.

20 Q.   And the policies that are created, are they issued in the

21 Religious Practices Manual?

22 A.   Religious Faith Practices Manual, yes.

23 Q.   Are you a part of this -- were you a part of the religious

24 service group?

25 A.   As a chaplain but not as the group that made that policy

1  or recommended policy.
2  Q.    All right.
3  A.    My time of service predates that manual, so at times I did
4  write policy, but not that was statewide; it was only
5  institutional limited.
6  Q.    So you didn't have any influence over the religious
7  policy --
8  A.    No.
9  Q.    -- or accommodations made?
10  A.    No, by that group.  I did have influence over the
11  accommodations made at Central Prison.
12  Q.    I believe you stated that you were never made aware of any
13  authoritative sources for the Rastafarian faith?
14  A.    That's correct.
15  Q.    What type of authoritative resources were you looking for?
16  A.    I was looking for a communal group or gathering to
17  actually go visit it myself and learn more about it.  Those
18  names and resources usually came through the chaplaincy
19  director's office and Rastafarian, like other religions, had
20  piqued my curiosity, so at times I would go and learn more
21  about them by actually sitting in.
22            THE COURT:  You would actually what?
23            THE WITNESS:  Sit in.
24  BY MS. MILES:
25  Q.    Could you have done your own research if you wanted to?

1  A.    I did some, yes.

2  Q.    For the Rastafarian faith?

3  A.    For most of them.

4  Q.    At any point in time when you did your research, could you

5  have discussed with your research -- sorry.  I'll repeat the

6  question.

7        At any time could you have discussed any of the research

8  that you did with the Religious Services Committee?

9  A.    I could have, but it became more of a discussion with

10  other chaplains, as we would say, did you know so and so faith

11  believes such and such and we would banter around at our

12  meetings like this.  It was actually a good learning

13  experience.

14  Q.    When you did your research on the Rastafarian faith, did

15  you make any recommendations to the Religious Services

16  Committee?

17  A.    Not my role.

18  Q.    Were you aware that Mr. Wright is a member of the Ba Beta

19  Kristiyan Church of Haile Selassie I?

20  A.    He made that very clear to me when we met.

21  Q.    Are you aware that that's a recognized sect within the

22  Rastafarian community?

23  A.    Until today, no.

24  Q.    If you had known that that was a recognized sect, would

25  you have spoken with a member of the Ba Beta Kristiyan Church

1  of Haile Selassie?

2  A.    No, because he -- Inmate Wright indicated there was no

3  relationship or services in North Carolina.

4  Q.    But would you agree that Ba Beta Kristiyan Church of Haile

5  Selassie is an authoritative source for the Rastafarian --

6  A.    All authoritative sources for practicing chaplains in the

7  field comes from the director's office.  We don't go out

8  searching for them.  We're dependent on that office to do

9  screening beyond what we're capable of doing.

10  Q.    Isn't it true that there's absolutely no accommodations

11  for Rastafarians to celebrate holy days with a meal in the

12  Religious Practice Manual, as you knew it then?

13  A.    That would be correct.

14  Q.    Isn't it true that memoranda are issued yearly for

15  accommodations for various religious groups to have meal?

16  A.    Correct.

17  Q.    Isn't it true that these memoranda are issued to all 56

18  DPS facilities?

19  A.    I have no knowledge of that, but I would hope so.

20  Q.    So would you agree that the memoranda issued are

21  system-wide policies?

22  A.    System-wide of feasts or observances, yes.

23  Q.    Isn't it true that Muslim celebrate Eid al-Fitr and Eid

24  al-Adha?

25  A.    That's correct, it's a tenets of their faith.

1  Q.   Isn't it true that Muslims are permitted to observe Eid

2  al-Fitr?

3  A.   That's correct.

4  Q.   And isn't it true that the observance includes a prayer

5  service?

6  A.   That's correct.

7  Q.   And isn't it true that both Muslim holy days include some

8  element of a meal or a feast?

9  A.   That's correct.

10 Q.   Isn't it true that memoranda issued for the Muslim feast

11 outline the dates of each celebration?

12 A.   Correct.

13 Q.   And it also includes how the meals are to be provided,

14 correct?

15 A.   Yes.

16 Q.   Isn't it true that only the Muslim inmates attend the

17 observance meal?

18 A.   Much to their chagrin, yes.

19 Q.   Isn't it true that volunteers are permitted to provide the

20 meals and attend the observance?

21 A.   Yes.

22 Q.   Isn't it true that when volunteers are unavailable, the

23 inmates are permitted to raise funds in order to provide for

24 the meals?

25 A.   Outside of the Muslims, I don't remember any group raising

1  funds to have a feast or meal.

2       Now, the American Indians, they did not have a fund when I

3  was there that I recall, but to get around the policy, what

4  they did was have fellow American Indians send money to

5  someone's family to buy all that in a way that complies with

6  policy to bring to the institution.

7  Q.   And for the Muslim inmates, the funds that they use, was

8  that known as the Zakat fund?

9  A.   Yes, it is, which is a pillar of their faith.  It's a

10 basic tenet.

11 Q.   Isn't it true that when neither the volunteers or the

12 Zakat fund was able to provide meals for the Muslim inmates,

13 the food service staff would provide the Muslim inmates with a

14 regular tray?

15 A.   Yes.  Early on, I'm talking in the late '90s, sometimes

16 they would enhance that tray with just some extra cake that

17 wasn't on the normal menu.

18 Q.   And were the Muslim inmates, when they were provided their

19 regular food tray, did they still gather in the dining hall?

20 A.   The ones that were in population, yes.

21 Q.   And these procedures are outlined in the annual memoranda

22 that was issued, correct?

23 A.   Yes.

24 Q.   And you mentioned the American Indian faith.  Isn't it

25 true that they observed the Green Corn festival?

1  A.   They do.

2  Q.   Isn't it true that Green Corn observance includes a meal?

3  A.   Yes, it does.

4  Q.   Isn't it true that the facility chooses the time for the

5  meal?

6  A.   There's a window there where it can be chosen, yes.

7  Q.   Isn't it true that only members of the American Indian

8  faith are permitted to attend the observance meal?

9  A.   Yes.

10 Q.   Isn't it true that volunteers from the American Indian

11 community may provide the food at times?

12 A.   If we had them, and we don't, or we didn't when I was

13 there.

14 Q.   But if they were available, they could provide the food,

15 correct?

16          THE COURT:  They could what?

17          MS. MILES:  They could provide the food.

18          THE WITNESS:  If it complied with the way food had to

19 be wrapped and prepared, yes.

20 BY MS. MILES:

21 Q.   Isn't it true that when volunteers were not able to

22 purchase the food, if they were available, that members of the

23 faith can use their own funds to purchase the food?

24 A.   Only the Muslims?

25 Q.   American Indians.

A. They did not have, when I was there, a communal fund that they can contribute to.

Q. So at the time that you were working at Central Prison, you only knew of the Muslim inmates who were able to contribute to a fund?

A. Yes, Zakat fund.

Q. Were you aware of the Offender Service Club at the time that you worked at Central Prison?

A. I don't remember that.

What is the Offender Service Club?

THE COURT: Well, maybe your lawyer will ask that. The process is the lawyer gets to ask the question. The witness doesn't ask the questions.

THE WITNESS: My apologies, Your Honor.

THE COURT: That's all right. It's a process. Not everyone does this every day like some of us.

Go ahead.

BY MS. MILES:

Q. Mr. Speer, isn't it true that the members of the Jewish faith celebrate Passover?

A. They do.

Q. Isn't it true that the celebration of Passover includes a meal?

A. It does.

Q. Is that meal known as the Seder ritual food?

1  A.   That's one name, yes.  It's -- yes.

2  Q.   And only those inmates registered as Jewish members were

3  able to attend this meal?

4  A.   They are able to receive the meal.  We never had a

5  communal service where they had it together.

6  Q.   Were there policies in place that allowed for members of

7  the Jewish faith to have volunteers bring in a meal?

8  A.   Probably.  I don't remember.  I do remember that the

9  policy is very consistent in that what they allow for one they

10  allow for the others.

11  Q.   Isn't it true that the Moorish Science Temple of America

12  practitioners observed the Prophet Noble Drew Ali's birthday?

13  A.   Absolutely.

14  Q.   And the Moorish American New Year?

15  A.   They do, yes.

16  Q.   And isn't it true that only members of this faith are able

17  to observe the holy days?

18  A.   Yes.

19  Q.   Isn't it true that a meal is provided to commemorate the

20  Prophet's birthday?

21  A.   I believe so.

22  Q.   And to the best of your knowledge, were volunteers able to

23  provide the food for --

24  A.   We had no volunteers.

25  Q.   Would they have been able to provide it if volunteers were

1  available?

2  A.    If it complied with policy.

3  Q.    So you would agree that there are, in fact, policies in

4  place that accommodate other religious groups' celebration of

5  holy days with a meal, correct?

6  A.    Yes.

7  Q.    Isn't it true that Mr. Wright suggested alternative

8  funding for the celebration of the Rastafarian holy days?

9  A.    Not to my recollection, no.

10 Q.    Would you agree that each facility, based off the

11 memoranda that is issued annually for the various religious

12 holy days with the meals, would be fully capable of

13 implementing adequate safety measures during that time?

14 A.    Yes.

15 Q.    What about staffing?

16 A.    I would hope so.

17        MS. MILES:  No further questions.

18        THE COURT:  Thank you.

19                    REDIRECT EXAMINATION

20 BY MS. GRANDE:

21 Q.    Mr. Speer, is it your understanding or based on your

22 knowledge is the consumption of a feast a tenet of the faith

23 for the MSTAs, the American Indians, the Islamic and Jewish

24 communities?

25 A.    Yes, they are.

1    Q.   Are there any other faith groups, such as the Wiccans, the

2    Asatru, the Hebrew Israelites that are provided feast meals

3    where they are not required by the tenets of their faith?

4    A.   No, it's got to be a tenet.

5    Q.   Based on your research or your knowledge of the

6    Rastafarian faith, is there a feast meal or some element of

7    food that is required by the faith?

8    A.   No.

9              MS. GRANDE:  Nothing further.

10             THE COURT:  Thank you.  Did you move to admit Exhibit

11   11?

12             MS. GRANDE:  I can now, Your Honor.  I believe

13   Exhibit No. 11 and No. 4 are exhibits that we have discussed.

14             THE COURT:  Okay.  They'll be received.

15        (Defendant's Exhibit Nos. 4 and 11 were admitted into

16   evidence.)

17             MS. GRANDE:  May Chaplain Speer, even though he's a

18   defendant, be excused?

19             THE COURT:  Any objection?

20             MS. MILES:  No, Your Honor.

21             THE COURT:  You're excused.

22             You may call your next witness.

23             MS. GRANDE:  The defense would call Ms. Stratton.

24                       TERRI STRATTON,

25             having been duly sworn, testified as follows:

1

2          THE COURT:  Good afternoon.

3          You may examine the witness.

4                    DIRECT EXAMINATION

5 BY MS. GRANDE:

6 Q.   Ms. Stratton, can you tell us where you work and what your

7 position is.

8 A.   I'm a Clinical Chaplain 3 at Central Prison.

9 Q.   Does that mean that you're the head chaplain?

10 A.   It does.

11 Q.   Okay.  And how long have you worked at -- for prisons or

12 at Central Prison?

13 A.   I started with the Department in January of 2010.  I was

14 transferred to Central Prison in November of 2011.

15 Q.   Okay.  During your time at Central Prison, would you say

16 that you're familiar with or not familiar with the various

17 inmates faith groups?

18 A.   Yes, I am.

19 Q.   Okay.  Would that include the Rastafarian group?

20 A.   It would, yes.

21 Q.   Did you ever have an occasion or did you have many

22 occasions to interact with the plaintiff, Mr. Wright?

23 A.   I did in the earlier days of my tenure at Central Prison.

24 I was assigned as a supervision chaplain to the Rastafarian

25 group, among some others.

1  Q.   Did Mr. Wright ever make any specific requests of you?

2  A.   He did.  He was asking for CDs or for movies or DVDs, not

3  movies anymore, and certainly the extra added times for the

4  holy days and the holidays and feast meals and such.

5  Q.   Okay.  Did you attempt to accommodate him where you could?

6  A.   I did.

7  Q.   All right.  I'm going to show you what's been marked as

8  Defendant's Exhibit No. 23.  Is this an e-mail from you -- I

9  apologize.

10  A.   Yes.

11  Q.   And what does that e-mail note or request or list?

12  A.   Those are a list of the DVDs that I had ordered at the

13  time for the Rastafarian faith group.

14  Q.   Was that in part based on the request by Mr. Wright?

15  A.   Yes, by title actually.

16        MS. GRANDE:  Your Honor, at this time I move Exhibit

17  23 into evidence.

18        MS. MILES:  Objection, Your Honor.  Relevance.

19        THE COURT:  Overruled.  It'll be received.

20     (Defendant's Exhibit No. 23 was admitted into evidence.)

21  BY MS. GRANDE:

22  Q.   I'm going to show you what's been marked as Exhibit 24.

23  Do you recognize this memo?

24  A.   I do.

25  Q.   Did you have a hand in drafting or writing this memo?

1  A.    I did.  I wrote it.

2  Q.    And what's the purpose of the memo?

3  A.    Mr. Wright had had asked for recognition of one of the

4  holy days and because in the Religious Faith Practice Manual

5  that particular holy day was acknowledged as a holy day, I

6  asked permission for them to be able to gather for an hour and

7  a half to be able to celebrate the holy day.

8  Q.    Again, that was prompted by the request of Mr. Wright; is

9  that correct?

10  A.    Yes, and the group.

11  Q.    Was there any additional request that Mr. Wright made that

12  you were not able to fulfill or provide for?

13  A.    He did ask for food to be part of the celebration, which

14  is absolutely not part of policy, and he wanted other people

15  other than the Rastafarians to be able to be invited as a whole

16  group, and I said no on that.

17  Q.    Okay.  As far as your experience at Central Prison, when

18  is food provided to inmate groups for religious celebrations?

19  A.    Specifically when there's a director's memo that states

20  that food is allowed for a particular holiday or feast day.

21  Q.    Is the food allowed based upon the tenets of the faith?

22  A.    Yes.

23  Q.    To your knowledge, does the Rastafarian faith require

24  food?

25  A.    Not in the minor research that I've done, no.

1  Q.   And according to the Religious Practices Manual, does it

2  require food for holy days or holidays?

3  A.   No.

4  Q.   For -- as far as Mr. Wright's request that other inmates

5  attend the service that you held or permitted, did that signify

6  to you what the intent of his request was?

7  A.   I did question the intent.  Certainly, their worship time,

8  their Tuesday meeting time is open to anybody that -- even if

9  they're just questioning, you know, what Rastafarian is, we

10  allowed them to come in, the general population, to view that

11  service, but this was a specific day to observe a specific holy

12  day for the specific faith group, so I said no.

13  Q.   Okay.  For other faith groups such as Jewish or Islam or

14  American Indian, are other inmates, general population inmates

15  permitted to partake in religious holy day celebrations?

16  A.   Absolutely not.

17  Q.   Could you walk me through what the process is, for

18  example, for setting up the Green Corn celebration?

19  A.   From start to finish, there's a memo that's produced from

20  the director's office that has the outline and the guidelines

21  as to how we are supposed to do it and what we're supposed to

22  do and the dates we're allowed to do it.

23       There's a poster put up for the inmates so they can see

24  that that is coming up.  They have a time frame that they can

25  put a request in to participate in the observance.  Once the

1  deadline is up, then a list is made and a memo is generated
2  from my office to the warden's office for -- or probably the
3  associate warden program's office, depending, for permission to
4  sign off on it.  And once the date is set, then we make
5  arrangements to have a place and a time to do that so it didn't
6  conflict with chow times or count times or some of the other
7  many scheduled events.
8      In the Green Corn feast, then, if there's food, outside
9  food to be brought in, it comes in from the front gate.  It's
10 looked at by custody, make sure everything is within policy and
11 then brought to the chow hall for distribution.
12 Q.   Who actually serves the food?
13 A.   I do.
14 Q.   And are inmates permitted to partake in the preparation of
15 food at all?
16 A.   No, not at all.
17 Q.   What's the purpose behind that restriction?
18 A.   Well, there are certain inmates that can be in the kitchen
19 that are assigned to the kitchen and the kitchen supervisor has
20 the ones that can and cannot handle certain instruments,
21 certain utensils and all that.  And in order not to tie them up
22 for their regular work time and work schedule, then we -- we,
23 along with -- I see we, the chaplains -- along with kitchen
24 supervisors that are custody staff prepare the food so other
25 inmates can't be accused of tampering with food or whatever.

1  Q.   So there are security reasons, custodial reasons for the

2  restrictions on the preparation of food --

3  A.   Yes.

4  Q.   -- who may bring the food in, how it's sealed, not sealed,

5  things like that, correct?

6  A.   Absolutely.

7  Q.   To your knowledge, are American Indians permitted to take

8  up a collection of sorts to pay for the Green Corn celebration?

9  A.   At one time when I first came into the department, family

10  members were allowed to bring food, and I -- I'm not

11  specifically sure of the reason, but because of the opportunity

12  for disease or for some sort of botulism to come in, the

13  homemade food was stopped, so the outside food could come into

14  the prison, but it couldn't come from grandma's kitchen.  She

15  couldn't send in the cornbread and somebody else send in

16  something else.

17      So the policy was changed so the food had to be bought

18  from vendors and those vendors would have to have a grade, you

19  know, a -- I forgot what you call the grade, but they had to be

20  a graded facility so that you knew that the temperatures were

21  correct.

22      So the Indian inmates used to have, or one of the groups,

23  their families would bring in the food.  Then it got where they

24  couldn't do that so the inmates would have their families to

25  send money to somebody that they had chosen on the outside to

1  actually buy the food and bring it in.  Well, that got to be

2  too much for the one particular person that they kept relying

3  on.

4      So at Central Prison we set up a service club for the

5  inmates so that if they chose they could direct their personal

6  money into the fund at the canteen and then that money was used

7  to buy vendor food, like Smithfield Barbecue or something like

8  that that was an approved vendor.  That way it was per policy

9  and they weren't using welfare money.  We couldn't use welfare

10 money to buy food for other religious groups.

11 Q.   So there's a difference between the welfare fund and a

12 service club that may or may not be set up for a particular

13 religious group?

14 A.   Right.

15 Q.   Okay.  And is that practice still in existence today at

16 Central Prison or has that changed as well?

17 A.   No, it's still there.

18 Q.   What is the purpose of the Green Corn celebration, what's

19 your understanding of it?

20 A.   It's -- in layman terms, it's sort of like Thanksgiving.

21 They had a season of growth, a spring of planting and a season

22 of reaping and harvesting, so they celebrate the harvest with

23 the Green Corn feast.

24 Q.   Are they required to consume certain foods?

25 A.   Yes, they're supposed to have corn.

1  Q.   Again, it's your understanding that that's a tenet of that

2  particular faith practice?

3  A.   Yes.

4  Q.   After this August of 2014 accommodation or service that

5  was permitted for Inmate Wright, did he appear to be satisfied

6  with the accommodations that were allowed to him?

7  A.   I'm sorry.  Did he appear to be satisfied or dissatisfied?

8  Q.   Either one.

9  A.   He appeared to be dissatisfied.

10  Q.   Did he voice that to you?

11  A.   Yes.

12  Q.   Okay.  Did you ever --

13         MS. GRANDE:  Your Honor, at this time I move Exhibit

14  24 in evidence.

15         THE COURT:  Let it be received.

16     (Defendant's Exhibit No. 24 was admitted into evidence.)

17  BY MS. GRANDE:

18  Q.   I'd like to show you what's been marked as Exhibit No. 25.

19  Is this an e-mail from you as well?

20  A.   Yes, it is.

21  Q.   Does this e-mail indicate one way or another whether all

22  practicing Rastafarians were Rastafarians which had crowns or

23  didn't have crowns?  What's the purpose of this e-mail?

24  A.   We had noticed -- I was -- my office was in a unit of

25  processors which were brand new inmates that had just received

their charges and convicted and they were moved into the prison

for processing.  And I noticed a large number of the

Rastafarian crowns in the hallway.  So when I looked to see how

many Rastafarian faith practitioners were actually in that

unit, there seemed to be far more crowns than there were people

that were professing to be of that faith group.

So I sent an e-mail to the deputy warden and asked him --

well, I told him, and I wanted to get permission from custody

to actually ask them, you know, to check if they saw somebody

with a crown on if they were Rastafarian; and if they were not,

then that crown was contraband.

Q.   Okay.  In your experience, have you known whether

Rastafarian items such as crowns could be used as contraband or

to conceal contraband?

A.   They have been used to conceal contraband.  It's

relatively easy to hide anything up inside the crown.  And if

they have long hair, if they have the long dreads, it's

relatively easy to hide something in their hair itself.

MS. GRANDE:  Your Honor, at this time I move Exhibit

No. 25 into evidence.

THE COURT:  It'll be received.

(Defendant's Exhibit No. 25 was admitted into evidence.)

BY MS. GRANDE:

Q.   Chaplain Stratton, did you ever intentionally deprive

Inmate Wright or any Rastafarian of the ability to exercise

1  their religion?

2  A.    Absolutely not.

3  Q.    How frequently do the Rastafarians meet?

4  A.    Once a week at our facility.  It's on Tuesdays from 9:30

5  to 10:30.

6  Q.    I'm going to show you what's been marked as Exhibit No.

7  26.  Do you recognize this document?

8  A.    I do.

9  Q.    Okay.  And do you recall if this was ever provided to

10  Inmate Wright?

11  A.    I do not.  I can't say whether it was or wasn't.

12  Q.    Okay.  Do you recall whether you drafted this document or

13  if it was drafted by someone else?

14  A.    I am relatively certain I drafted it for somebody else.

15  Q.    Who was that other person?

16  A.    I don't remember.  I don't remember if -- I don't remember

17  if it was for my supervisor or for -- which would be the

18  associate warden of programs or for the deputy warden.  I don't

19  think we had a warden at that time, but I'm not sure.

20  Q.    What was the purpose of this document?

21  A.    Mr. Wright had expressed his displeasure with the way that

22  I had acted in good faith to try to allow them more time to

23  have a holy day observance, and so he kept - for lack of a

24  better word - hounding and hounding about wanting the holy days

25  and wanting this, and it got to the point where I just had to

1 put my foot down and say this is what the Religious Practices
2 Manual says, this is the policy and this is the way we're going
3 to go.
4 Q.   And that's what you informed him of in that letter?
5 A.   Yes.
6 Q.   And that letter includes that only the dates that were
7 listed in the policy or the Religious Practices Manual were
8 going to be, I guess, recognized, for lack of a better word?
9 A.   Yes.
10 Q.   Okay.  Before writing this letter, did you do any limited
11 amount of research just to consult whether there were
12 additional accommodations that were needed to be given to Mr.
13 Wright?
14 A.   I had done some research but mainly just for my own
15 education what the faith group was, what they believed as basic
16 tenets.  I didn't go deep into research to make any changes
17 because I don't have the authority to do that.
18 Q.   Did you ever review anything that indicated that meals
19 were required or feasts were required?
20 A.   I could not find that, and I did specifically look.
21         MS. GRANDE:  Your Honor, at this time I move Exhibit
22 No. 26 into evidence.
23         THE COURT:  It'll be received.
24     (Defendant's Exhibit No. 26 was admitted into evidence.)
25 BY MS. GRANDE:

1    Q.   Ms. Stratton, I'm going to show you what's been marked as

2    Exhibit No. 27.  Can you tell me what this document is?

3    A.   That's a list of our faith meeting groups at Central

4    Prison.

5    Q.   Okay.  Is this a typical weekly calendar, would you say?

6    A.   It is.

7    Q.   Is this representative of the number of services that are

8    held at Central Prison within a week's period, are there

9    sometimes more, sometimes less?

10   A.   There are sometimes more.  We have a group that comes in

11   in the fall semester that does a two-hour program through Duke

12   Divinity School, through a program that they got that will fall

13   into that calendar that takes up another two hours, usually on

14   Thursdays, but...

15   Q.   Okay.  And would you say -- how many chaplains are

16   required to supervise all of these groups that are listed here?

17   A.   It's one chaplain per program in the Monday through

18   Fridays.  Sometimes on the Saturdays, especially with the

19   Kairos events, it may take two, depending on the numbers.

20   Q.   So in other words, there are chaplains required at the

21   facility seven days a week?

22   A.   No, we're there Monday through Friday every week.  The

23   Saturdays and Sundays are as needed.

24   Q.   Okay.

25            MS. GRANDE:  Your Honor, at this time I move Exhibit

1  27 into evidence.

2          THE COURT:  It'll be received.

3      (Defendant's Exhibit No. 27 was admitted into evidence.)

4  BY MS. GRANDE:

5  Q.   I'm going to show you what's been marked as Defendant's

6  Exhibit No. 28.  Can you tell me what this document is?

7  A.   That's a list of all the programs that are offered at

8  Central Prison through the program department.

9  Q.   When you, as head chaplain, are planning religious

10  services, did you have to take this document into

11  consideration?

12  A.   I do, because depending on vacations or sicknesses or

13  other situations I have to call on case managers or other

14  program staff to help me cover, and I have to make -- I have to

15  have their schedule so that I know where they are.

16          MS. GRANDE:  Your Honor, at this time I would move

17  Exhibit No. 28 into evidence.

18          THE COURT:  It'll be received.

19      (Defendant's Exhibit No. 28 was admitted into evidence.)

20  BY MS. GRANDE:

21  Q.   I'll show you what's been marked as Defendant's Exhibit

22  No. 29.  Can you tell me what this document is?

23  A.   That's the attendance sign-in sheet that we place at the

24  door at the beginning of every worship service or religious

25  gathering of everything that we supervise so that we know who

1  it is, when it is, who's there, what officers are there and

2  then the inmates will sign in.

3  Q.   Does it indicate how many chaplains and how many custody

4  staff were present?

5  A.   Yes.

6  Q.   And how many custody staff were generally present?

7  A.   One to two, depending on the event.

8  Q.   And on this particular day it appears there were two; is

9  that correct?

10  A.   Yes, yes.

11  Q.   And again, how often are Rastafarian services?

12  A.   Once a week.

13  Q.   Okay.  I'm going to slowly go through some of these

14  services.

15       Did you ever have the occasion to serve as the supervisor

16  for these services?

17  A.   I did.  When I first got to Central Prison, that was my

18  assigned area.

19  Q.   Okay.  So for example, here on page 3, what does the

20  notation here mean?

21  A.   It means that because the faith helper wasn't available,

22  then the service was canceled.

23  Q.   So, again, that's not at the discretion of the chaplain

24  who was scheduled to supervise that to cancel services; it's

25  because of the lack of faith helper?

 1  A.   Right.

 2  Q.   So here, for example, is this a service that you

 3  supervised?

 4  A.   Yes.

 5  Q.   And this one as well?

 6  A.   Yes.

 7  Q.   Okay.

 8          MS. GRANDE:  Your Honor, at this time I move Exhibit

 9  29 into evidence.

10          THE COURT:  It'll be received.

11      (Defendant's Exhibit No. 29 was admitted into evidence.)

12  BY MS. GRANDE:

13  Q.   Would you say that Mr. Wright frequently or infrequently

14  attended services?

15  A.   Frequently.

16  Q.   Was his presence required to have the services?

17  A.   Yes.

18  Q.   Because he was the faith helper; is that right?

19  A.   Yes.

20  Q.   Can you explain to us what has been marked as Exhibit

21  No. 30, what this document is?

22  A.   Every month I have to turn in a report to my supervisor

23  for the monthly attendance for the religious programs.  It says

24  "quarterly attendance" at the top, that's a misprint.  But the

25  numbers under inmates is the number of inmates that were in

1  attendance on that particular week for that particular service.

2  For example, the Ta'lim service for unit three on week two,

3  there were 17 inmates present, one custody staff, one chaplain

4  and one volunteer.

5  Q.   What about for Rastafarians, approximately how many

6  inmates generally attended services?

7  A.   In this month I would say the average was four.

8  Q.   What about for the other faith groups, would you say they

9  are larger or smaller than the Rastafarian group?

10 A.   Definitely larger.

11 Q.   Do they demand more resources?

12 A.   Absolutely.

13 Q.   So in other words, are more custody staff, more chaplains

14 and more materials required for groups that are larger in size?

15 A.   Yes, if it's something that's going to be individually

16 handed out, yes.  If it's a DVD or CD or something, no, one per

17 group.

18 Q.   Now, I'd like to scroll through to these inmate numbers.

19 For example, what we -- where we have this, what appears to be

20 the larger numbers in the center of the page here, can you tell

21 me what that is?

22 A.   Across the bottom like above where it says "inmates"?

23 Q.   Yes.

24 A.   That's the total number of inmates that participated in

25 some sort of religious program for that month, 1,054.

1  Q.   What about for custody, what does that number above the

2  custody mean?

3  A.   There's a purple arrow, for some reason, on top of mine.

4  I have no clue what that is.

5  Q.   Sorry.  Okay.

6  A.   That meant there were 80 custody hours.  I'm saying hours

7  because the majority of the programs were one hour in length,

8  so 80 custody hours were necessary to cover for those programs,

9  whether they have four inmates in the program or 25.

10 Q.   What about chaplains?

11 A.   Sixty-nine.

12 Q.   And what about volunteers?

13 A.   Sixty-two.  Sixty-two hours.

14 Q.   And so, again, this is only in the space of one month,

15 correct?

16 A.   That's right.

17 Q.   That custody staff spent 80 hours, chaplains have spent 69

18 hours and over a thousand inmates have come through religious

19 services?

20 A.   Yes, ma'am.

21 Q.   Would you say that the calendar for religious services is

22 full, not full?

23 A.   Yes, very full.

24 Q.   When we go down here to the special groups, can you tell

25 me what these are?

1  A.   Every Sunday we allow one group to come in to do a special

2  program.   Like Favor is a Evangelistic group that comes in and

3  preaches and does music.   So like Favor might be the first

4  Sunday of the month, Gethsemane, I think they're the third

5  Saturday.   The third Saturday of the month Kairos has either a

6  retreat or reunion that is within the program parameters that

7  Kairos International does, they have a monthly reunion or

8  retreat.

9      Kingdom Covenant, Travelin' Lite, Evangelist Ferguson,

10 those are still Sunday afternoon, hour-and-a-half programs that

11 are offered to general population.

12     Central Church is a group that comes in once a quarter, so

13 they may not or may not made the -- like they're not on that

14 one.   And then Kairos, that's a two-times-a-year, four-day

15 event so there you see Kairos day one.   There's another page

16 I'm sure that -- oh, there it is.   How about that?

17     So that particular month, because Kairos was one of the

18 programs that we had, we had a total of -- I can't see the

19 number, but over 2,000 inmates that went through a religious

20 program at one point or the other, 362 hours of custody and/or

21 program staff coverage.

22 Q.   152 chaplaincy hours; is that right?

23 A.   Yes.

24 Q.   36 or 38 of program staff and 590 hours of volunteer

25 services?

1  A.   Now, those numbers for custody, chaplain and volunteers,

2  that right there is per hour.  For a Kairos event it's an

3  eight-hour event per day, so then that had to go back and

4  recalculate.  For those particular four days it might say 76,

5  we'd have to multiply that times eight.  That's an eight-hour

6  day.

7  Q.   And that's where you got the 362?

8  A.   Right.

9  Q.   So needless to say, there's a significant impact for any

10 one particular program or group on these hours and these

11 numbers, operations or logistics here, correct?

12 A.   Yes.

13         MS. GRANDE:  Your Honor, at this time I move Exhibit

14 30 into evidence.

15         THE COURT:  It'll be received.

16    (Defendant's Exhibit No. 30 was admitted into evidence.)

17 BY MS. GRANDE:

18 Q.   Chaplain Stratton, at any time did you act in a manner

19 which you felt was discriminatory towards Rastafarians or

20 towards Inmate Wright?

21 A.   No.

22 Q.   Did you ever intend to prohibit him from being able to

23 practice his faith?

24 A.   No.

25 Q.   Did you have the ability to approve any accommodations

1   such as feasts at Central Prison?

2   A.   No.

3   Q.   Did you take any other actions with regard to Mr. Wright

4   or the subject matter of why we're here today?

5   A.   Help me with the question.

6   Q.   Did you take any other actions, having any other

7   interactions with Mr. Wright other than what we've talked about

8   here today?

9   A.   Oh, no.

10          MS. GRANDE:  I don't have anything further, Your

11   Honor.

12          THE COURT:  Cross-examination.

13                  CROSS-EXAMINATION

14   BY MS. MILES:

15   Q.   Ms. Stratton, are you a part of the Religious Services

16   Committee?

17   A.   No.

18   Q.   You stated that you did your own research on the

19   Rastafarian faith; is that correct?

20   A.   Minimal, yes.

21   Q.   Did your research include internet research?

22   A.   Yes.

23   Q.   Did it include looking through Rastafarian books?

24   A.   Yes, a few.

25   Q.   How about consulting with members of the faith?

1  A.   I didn't know anybody of the faith.

2  Q.   Did your research include speaking with Ba Beta Kristiyan

3  Church of Haile Selassie I?

4  A.   At think at one point Mr. Wright gave me a phone number to

5  try to get in touch with some church in New York, but I was

6  never able to connect with them.

7  Q.   So you did try to contact the church?

8  A.   I did.

9  Q.   But you didn't speak with anyone from the church?

10 A.   No.

11 Q.   Did you report your findings to the research committee?

12 A.   No, that's not -- I did that for educational purposes

13 really; but no, they've got -- they've got their committee that

14 does that, so...

15 Q.   And defendant showed you -- counsel showed you Defendant's

16 Exhibit 26, which was a letter that you drafted, correct?

17 A.   Uhm-uhm.

18 Q.   And you said you didn't recall who you drafted that letter

19 for; is that correct?

20 A.   Right.

21 Q.   And that letter was not signed; is that correct?

22 A.   Yes, it wouldn't have been if I drafted it.  I would have

23 drafted it and sent it to whomever was going to send the letter

24 and they would have finished the signature.

25 Q.   And the person whom you drafted it for did not sign that

1  letter; is that correct?

2  A.   I don't know.  I don't know.  I sent it to wherever I

3  guess I sent it, but I don't know who it was to.

4  Q.   If I showed you that exhibit, would you be able to say

5  whether or not there's a signature on there?

6  A.   Yeah.  If there's a signature, yeah.

7  Q.   Ms. Stratton, do you see a signature anywhere on that

8  letter?

9  A.   No.

10  Q.   So no one signed it, correct?

11  A.   Well, they wouldn't have.  If I drafted the letter, then I

12  would have drafted the letter and then taken it to whomever was

13  going to send it and they would have finished the signature in

14  their office or whatever.

15  Q.   Once it was drafted, did you give the letter to

16  Mr. Wright?

17  A.   No.

18  Q.   Do you know if Mr. Wright received the letter?

19  A.   No, I don't.

20  Q.   So you don't know what happened with the letter after it

21  was drafted?

22  A.   I have no recollection, no.

23  Q.   Ms. Stratton, isn't it true that memoranda is issued for

24  the Jewish practitioners, Muslims, American Indian and

25  members -- those members to celebrate holy days with a meal?

1  A.    Yes.

2  Q.    Isn't it true that these memoranda are a system-wide

3  policy?

4  A.    Yes.

5  Q.    Isn't it true that the Religious Practice Manual is a

6  system-wide policy?

7  A.    Yes.

8  Q.    Isn't it true that the Religious Practices Manual makes no

9  mention of a celebration of holy days with a meal for

10 Rastafarians?

11 A.    That's right.

12          MS. MILES:  No further questions.

13          THE COURT:  Thank you.

14          Anything else, Ms. Grande?

15          MS. GRANDE:  No, sir, Your Honor.

16          THE COURT:  Thank you, ma'am.  Please watch your step

17 stepping down.

18          MS. GRANDE:  Your Honor, may Chaplain Stratton be

19 excused?

20          MS. MILES:  No objection.

21          THE COURT:  You may be excused.

22          Call your next witness.

23          MS. GRANDE:  At this time I call Chaplain Brown.

24

25                    BETTY BROWN,

1      having been duly sworn, testified as follows:

2

3          THE COURT:  Good afternoon, Chaplain.

4          THE WITNESS:  Good afternoon.

5          THE COURT:  You may examine the witness.

6                    DIRECT EXAMINATION

7  BY MS. GRANDE:

8  Q.    Chaplain Brown, can you please state your position and

9  where you work.

10 A.    I'm the chaplaincy services director and I work for DPS

11 prisons at the Randall Building.

12 Q.    And what is the purpose of your position?

13 A.    Well, what I do is I supervise technically chaplains in

14 the field, meaning that I train them when they come on board, I

15 provide training throughout the year.  I also work with

16 policies, work with the community, I do re-entry.  I do a

17 variety of different things as the director of chaplaincy

18 services.

19 Q.    Okay.  And as the director of chaplaincy services, do you

20 develop -- when you say you develop policy, do you develop what

21 is included in the Religious Practices Manual?

22 A.    Yes.

23 Q.    I'm going to show you what's been marked as Exhibit No. 2.

24 Is this the Rastafarian portion of the Religious Services

25 Manual?

1  A.   Yes, it is.

2  Q.   And were you responsible for putting this together?

3  A.   Yes.  I was responsible -- Rastafarian policy was already

4  in place when I was hired, but I am responsible for reviewing

5  it and updating it and making sure that it's reflective and

6  relevant.

7  Q.   And when you did that, did you consult with any outside

8  experts or community resources regarding Rastafarians?

9  A.   I did.  Elder Group (phonetic) is the one that was

10 consulted earlier before I became the director of chaplaincy

11 services, but I consulted with Christopher Liontree, other

12 scholars from when I attended the ARA, so we have a prison

13 section there that scholars would come and talk to us about

14 various faith groups.

15         THE COURT:  Ma'am, what's the ARA?

16         THE WITNESS:  American Religion Academy.

17 BY MS. GRANDE:

18 Q.   Okay.  I'm going to show you what was marked Exhibit No.

19 7.  Is some of this your correspondence with Mr. Liontree?

20 A.   It is, yes.

21 Q.   And where he sent recommendations?

22 A.   Right, we was working on the --

23         MS. MILES:  Objection, Your Honor.  Hearsay.

24         THE COURT:  Overruled.

25         The question goes to her state of mind as well.  Go

1  ahead.  It'll be received.

2  BY MS. GRANDE:

3  Q.   This is your handwriting on the document, "after reviewing

4  and talking"?

5  A.   Yes.

6  Q.   The most important dates are with a star, you included

7  that?

8  A.   Yes.

9  Q.   And anywhere in this information did Mr. Liontree tell you

10  or refer you that feast meals were required for Rastafarians?

11  A.   No.

12       MS. GRANDE:  Your Honor, we move Exhibits 2 and 7

13  into evidence at this time.

14       THE COURT:  It'll be received.

15     (Defendant's Exhibit Nos. 2 and 7 were admitted into

16  evidence.)

17  BY MS. GRANDE:

18  Q.   I'm going to show you what's been marked as Exhibit No. 8.

19       MS. MILES:  Objection, Your Honor.  Hearsay.

20       THE COURT:  Well, your pretrial order had a relevance

21  objection so I'm not going to add to it.  It's overruled.  It's

22  relevant.  It'll be received.

23  BY MS. GRANDE:

24  Q.   Is this an e-mail that you sent to Mr. Liontree?

25  A.   Yes.

1  Q.    Again, this is just a record of your consultation with him

2  about the dates and information included for the Rastafarian

3  policy?

4  A.    Well, this is a letter that he sent to me affirming what

5  we had discussed, yes.

6  Q.    Again, did he ever include any information about a feast

7  that was required for Rastafarian inmates?

8  A.    No.

9  Q.    I'm going to show you what's been marked as Exhibit No. 9.

10 Again, any information about inclusion of a religious feast?

11 A.    No.

12 Q.    Did you make some orders for materials for Rastafarian

13 inmates based upon Mr. Liontree's recommendations?

14 A.    We did, yes.

15 Q.    And here, is this a correspondence that you received from

16 Mr. Liontree?

17 A.    Yes.

18 Q.    Again, any mention of Rastafarian feast?

19 A.    No.

20        MS. GRANDE:  Your Honor, at this time I'd like to

21 move 8, 9 and 10 into evidence.

22        THE COURT:  It'll be received.

23      (Defendant's Exhibit Nos. 8, 9 and 10 were admitted into

24 evidence.)

25 BY MS. GRANDE:

1  Q.   Chaplain Brown, prior to Inmate Wright, have you ever had

2  an inmate request feasts associated with the Rastafarian faith

3  by way of a DC-572?

4  A.   Not to my knowledge, no.

5  Q.   Had you ever received any correspondence from Mr. Severin

6  who testified here today?

7  A.   Yes.

8  Q.   Had you ever spoken with him?

9  A.   Yes.

10  Q.   All right.  I'm going to show you what was marked as

11  Defendant's Exhibit No. 64.  Does this have a stamp from your

12  office on it?

13  A.   Yes.

14  Q.   When does it indicate you received this correspondence?

15  A.   Excuse me?  I didn't hear you.

16  Q.   When does it indicate you received this?

17  A.   September the 10th.

18  Q.   So after you received this letter from Chaplain Severin,

19  did you make contact with him?

20  A.   No, I received a call.

21  Q.   You received a call from him?

22  A.   Yes.

23  Q.   And what transpired during the conversation with

24  Mr. Severin?

25  A.   Well, pretty much we had a conversation in regards to how

1  we were not discriminating in North Carolina policies and as

2  regard to inmates he said that there was inmates, more than

3  plural sound, writing him and that they needed to be here in

4  North Carolina.  And I told him, probably in a more

5  professional way, that we do not need his services here in

6  North Carolina; that our policy is different from New York.

7  Q.   Did you get the impression that he was soliciting you for

8  a job or employment here in North Carolina?

9  A.   I did.

10  Q.   Did you leave the conversation with any impressions of

11  Mr. Severin?

12  A.   Pushy.  I thought he was pushy, for lack of a better word.

13  I'm just going to say pushy and not arrogant.

14  Q.   Any impressions about your position or your -- anything

15  that left you feeling uncomfortable?

16  A.   Well, I felt questioned being a female making the

17  decisions.  I felt questioned, as if I was inadequate to do my

18  job.

19  Q.   And did you alert anyone about the inquiry from

20  Mr. Severin?

21  A.   I talked to my regional chaplains about it, at that time,

22  Chaplain Ackbar (phonetic) and Chaplain Mohammed.

23  Q.   Did you notify his supervisor?

24  A.   What I did was I called Mark, who was my colleague, my

25  counterpart in New York State and shared with him how I was

1 offended that his chaplain, one of his Rastafarian chaplains

2 were calling to communicate with me in the manner that they did

3 and asked him to please, had to be on State time that he was

4 getting paid for, to refrain from calling me in regards to

5 North Carolina policies.

6 Q.   And what did Mark communicate to you?

7 A.   Mark said that he would take care of it and that was the

8 last of it.

9        MS. MILES:  Objection, Your Honor.  Hearsay.

10        THE COURT:  Overruled.

11        MS. GRANDE:  Your Honor, at this time I'd move

12 Exhibit No. 64 in evidence.

13        THE COURT:  It'll be received.

14     (Defendant's Exhibit No. 64 was admitted into evidence.)

15 BY MS. GRANDE:

16 Q.   As far as Exhibit 61, have you ever had any correspondence

17 from Abuna Foxe?

18 A.   I have.

19 Q.   Does this reflect the date that you received this

20 information from Mr. Foxe?

21 A.   Yes.

22 Q.   And what did you do with this letter; did you respond to

23 Mr. Foxe or have any conversations with Mr. Foxe?

24 A.   I did not provide a written request back to Mr. Foxe.  Mr.

25 Foxe called as well.

1  Q.    What was your conversation with him?

2  A.    My conversation with Mr. Foxe was exactly the same with

3  him; that I do not desire to conversate; that I have consulted

4  other Rastafarian experts and practitioners and I thought that

5  our policy reflected the inmates here in North Carolina.

6          MS. GRANDE:  At this time, Your Honor, I move Exhibit

7  No. 61 in evidence.

8          THE COURT:  It'll be received.

9      (Defendant's Exhibit No. 61 was admitted into evidence.)

10  BY MS. GRANDE:

11  Q.    Was it clear to you that Mr. Foxe was seeking employment

12  in North Carolina?

13  A.    I think Mr. Foxe was trying to spread to North Carolina

14  his --

15  Q.    His church?

16  A.    His church, yes.

17  Q.    I'm going to show you what's been marked as Defendant's

18  Exhibit No. 62.  I have a paper copy.

19          MS. GRANDE:  May I approach, Your Honor?

20          THE COURT:  You may.

21  BY MS. GRANDE:

22  Q.    Did you ever inform the Religious Practices Committee of

23  your communications with Mr. Foxe?

24  A.    I did.

25  Q.    What is this document?

1  A.   These are the minutes from the Religious Practices

2  Committee.

3  Q.   All right.  And what does this indicate you communicated

4  to the Religious Practices Committee?

5  A.   What does it indicate?

6  Q.   Uhm-uhm, about Mr. Foxe.

7  A.   Basically, that he had reached out and communicated with

8  me.  He stated that he was the only authorized leader; that I

9  took the position that he was not the only authorized one and

10  shared that information with the committee, so they would be

11  knowledgeable because they go back into the facilities as well.

12         MS. GRANDE:  Your Honor, at this time I would move

13  Exhibit No. 62 into evidence.

14         MS. MILES:  Objection, Your Honor.

15         THE COURT:  Overruled.  It'll be received.

16         MS. LUECKING-SUNMAN:  This wasn't provided to us and

17  it's not on the list of exhibits.

18     (Defendant's Exhibit No. 62 was admitted into evidence.)

19         MS. GRANDE:  Your Honor, this is rebuttal information

20  from how -- what was communicated by their expert, Mr. Severin,

21  when I asked him questions about whether he or Mr. Foxe ever

22  sought employment in North Carolina.

23         MS. LUECKING-SUNMAN:  So I think this could be used

24  as impeachment evidence, Your Honor, but...

25         THE COURT:  I'll allow it as rebuttal.  That's fine.

1  I can assure you the case isn't going to turn on that.  Go

2  ahead.

3  BY MS. GRANDE:

4  Q.   Chaplain Brown, have you ever personally or intentionally

5  sought to deprive Inmate Wright of his ability to exercise his

6  Rastafarian faith?

7  A.   No, ma'am.

8  Q.   Have you ever reviewed any materials that support the

9  position that Rastafarians require feast meals for their holy

10  day exercises?

11  A.   No, ma'am.

12  Q.   Okay.  Do you know of any sects of Rastafarianism that

13  require feast meals?

14  A.   No.

15  Q.   When you were developing policies or practices for

16  inclusion in the Religious Practices Manual and consulting with

17  individuals like Mr. Liontree, are you tailoring the policies

18  or practices to any one particular sect of a religious group?

19  A.   No.  What I believe in is because we have various

20  different sects in different faith groups, I've been trained to

21  take the middle of the road, what they have in common and

22  that's what we utilize and incorporate within our policy.  Try

23  not to lean too far to the left and to the right.

24       When the expert testified from New York, he said it was

25  kind of -- what was the language -- broken up, that's because I

1  didn't go all the way with the Niyabinghi and never went all

2  the way with the Bobo Beta.  So in taking into consideration

3  that bringing together the commonality of the various sects.

4  Q.   Is this true for other religious practices, not just the

5  Rastafarians?

6  A.   All of them.

7  Q.   For example, with the Islamic inmates, are there different

8  policies for Shias And Sunnis?

9  A.   No, ma'am.

10  Q.   For the Protestant inmates, are there different policies

11  for Baptists, Methodists, Presbyterians?

12  A.   No, ma'am.

13  Q.   Okay.  In your opinion, did you develop a practices manual

14  based on the information that was given to you that was

15  sufficient or adequate to meet the needs of the Rastafarian

16  inmates?

17  A.   I believe I did.  I believe we did.

18  Q.   Again, do you have the ability to implement changes to the

19  policies or the practices or are those required to be approved

20  by anybody else?

21  A.   Any changes I have to send up the chain of command for

22  review.

23  Q.   I'm going to show you what's been marked as Defendant's

24  Exhibit No. 22.  Is this correspondence that you had with

25  Mr. Wright?

1  A.    Yes.

2  Q.    Okay.  And in this letter, did you deprive him of any

3  ability to practice his religion?

4  A.    No.

5  Q.    Okay.

6        MS. GRANDE:  I'd like to move Exhibit 22 into

7  evidence.

8        THE COURT:  It'll be received.

9     (Defendant's Exhibit No. 22 was admitted into evidence.)

10  BY MS. GRANDE:

11  Q.    Exhibit No. 18, is this correspondence that you had with

12  Mr. Wright?

13  A.    Yes.

14  Q.    And did you, in this document, deprive Mr. Wright of any

15  ability to practice his religion?

16  A.    No.

17  Q.    Throughout these letters that we've looked at, what's the

18  gist, if you will, of the communication that you were having

19  with Mr. Wright?

20  A.    Mr. Wright continued -- he was writing continually in

21  regards to the policy and I was affirming that our policy would

22  be followed and clarifying policy for him.

23  Q.    Okay.

24        MS. GRANDE:  Your Honor, at this time I move Exhibit

25  18 into evidence.

1      THE COURT:  It'll be received.

2      (Defendant's Exhibit No. 18 was admitted into evidence.)

3  BY MS. GRANDE:

4  Q.   Exhibit 16, is this the same kind of communication again?

5  A.   Yes.

6  Q.   Any intent to deprive him of his religious practices?

7  A.   Absolutely not.

8      MS. GRANDE:  I move exhibit No. 16, into evidence,

9  Your Honor.

10      THE COURT:  It'll be received.

11      (Defendant's Exhibit No. 16 was admitted into evidence.)

12      MS. GRANDE:  I don't have anything further for

13  Chaplain Brown.

14      THE COURT:  Cross-examination?

15                  CROSS-EXAMINATION

16  BY MS. MILES:

17  Q.   Miss Brown, do you authorize the Religious Practices

18  Manual?

19  A.   No, I don't authorize it.  I'm a part of the process of

20  working and putting it together.

21  Q.   So you do have some say into what goes inside of the

22  policy, correct?

23  A.   I do have some say in working with it and presenting it to

24  the chain of command.

25  Q.   You stated that you -- you did your own research on the

1   Rastafarian faith; is that correct?

2   A.    That is correct.

3   Q.    And you reached out to different resources, correct?

4   A.    Correct.

5   Q.    Did you specifically ask if Rastafarian holy days require

6   a feast or a meal when you were conducting your research?

7   A.    That was the constant question that was asked.

8   Q.    And you talked that you researched or spoke with the

9   members of the Ba Beta Kristiyan Church of Haile Selassie,

10  correct?

11  A.    I did.

12  Q.    And that was Mr. Severin and Abuna Foxe, correct?

13  A.    Correct.

14  Q.    Outside of your alleged conversations with those two

15  individuals, did you speak with any other members of the Ba

16  Beta Kristiyan Church of Haile Selassie?

17  A.    No.

18  Q.    Do you think that speaking with individuals from that

19  church is important to understanding whether or not

20  Mr. Wright's celebrates holy days with a meal?

21  A.    I think I -- well, let me say it like this:  Because we

22  are inclusive, I took the middle of the road.  Anything that's

23  going so far to the left and so far to the right, then no.

24  Q.    So you don't believe that you should have reached out to

25  members of that faith in order to determine --

1  A.    I've already talked to two of the hierarchies.

2  Q.    And did you ask them whether or not holy days are

3  celebrated with a meal?

4  A.    No, I didn't.  They had already shared that, if you look

5  at the correspondence.

6  Q.    Isn't it true that you specifically sought out information

7  that supported your position?

8  A.    No, that's not true.

9          MS. MILES:  I have no other questions, Your Honor.

10         THE COURT:  Anything else?

11         MS. GRANDE:  No, Your Honor.

12         THE COURT:  Thank you, ma'am.  Please watch your step

13 stepping down.

14         You may call your next witness.

15         MS. GRANDE:  Your Honor, at this time I would call

16 Deputy Director Joyner to the stand.

17

18                    CARLTON JOYNER,

19      having been duly sworn, testified as follows:

20

21         THE COURT:  You may examine the witness.

22                 DIRECT EXAMINATION

23 BY MS. GRANDE:

24 Q.    Mr. Joyner, could you tell us what your position is and

25 where you work.

1  A.    My position is deputy director of prisons.  I work in

2  prison administration.

3  Q.    And what are some of your responsibilities as deputy

4  director of prisons?

5  A.    I currently oversee the chaplaincy section, I oversee the

6  classification section, diagnostic information technology, MIS

7  and population management.

8  Q.    And some of your responsibilities, I guess, entail

9  programs or auxiliary services that are provided to inmates?

10  A.    Yes, they do.

11  Q.    And what are some of those responsibilities that -- in

12  regards to your supervision of that area of inmate life?

13  A.    A few things.  One is I review policies on those areas.  I

14  work with the director on making sure that those areas are

15  running in accord with our policies.  We manage the sections.

16      The classification piece, we make sure we have appropriate

17  classification procedure in place to put offenders in a proper

18  custody level and housing level.

19      When it comes to population management, we make sure that

20  we have offenders transfer to facilities that are appropriate

21  for them to be transferred to.

22      With the IT section, we run the IT capabilities for the

23  Randall Building so they do all the IT work of the building.

24  We do training of staff when it relates to OPUS, our computer

25  system, so the training is done by our staff.

1    We also do fingerprint identification to make sure the

2 people we have in our system are the appropriate people.

3 Q.   Okay.  At sometime prior to being a deputy director, did

4 you work at Central Prison?

5 A.   I did.

6 Q.   What was your position at Central Prison?

7 A.   I actually worked there twice.  I've had about four

8 positions.  In my first employment at Central Prison I was a

9 correctional officer, I was a Program Assistant 1 and Program

10 Assistant 2.  My last tenure at Central Prison I was the warden

11 at Central Prison.

12 Q.   During the period of 2013, 2014 were you the warden at

13 Central Prison?

14 A.   I was.

15 Q.   When you were a warden at Central Prison, did you ever

16 meet with or speak to plaintiff, Mr. Wright, that you recall?

17 A.   I think we had some general conversations, but nothing I

18 can remember in particular.  Just basic general conversation.

19 Q.   Okay.  Do you ever recall, did you ever intentionally

20 deprive him of his ability to practice his religion?

21 A.   No.

22 Q.   Do you ever recall any conversations with him about his

23 religion?

24 A.   Not specifically I don't.

25 Q.   Okay.  At Central Prison would you say there are a lot or

1  not a lot of programs for inmates?

2  A.    A lot.

3  Q.    What about religious services?

4  A.    There are a lot.

5  Q.    Okay.  What kind of considerations have to be taken into

6  place for the orchestration of programs and religious services

7  at Central Prison?

8  A.    Staffing, for one.  We have to look at space, have to have

9  activities -- space is limited.  Central Prison, there's a

10  tremendous number of activities going on, so you have to -- you

11  saw the calendar earlier, so you have to share the space, so

12  you got to juggle spaces around to have programming or

13  religious activities in space.

14      Another thing we have to take into consideration also is

15  the security of the facility, and that's got to do with making

16  sure we have coverage to maintain active security while we also

17  do programs and religious activities.

18  Q.    In other words, when a custody officer is assigned to

19  monitor a religious service, where is that custody officer

20  pulled from?

21  A.    Generally, they are going to be pulled from operations.

22  Q.    And operations is responsible for what other coverage

23  areas in Central Prison?

24  A.    They cover food service, oftentimes they may have to go

25  out and cover the hospital, they cover towers and outside

1  perimeters of the facility.  So other areas other than an

2  actual dorm or housing area.

3  Q.    Do they also cover movement of inmates within the facility

4  or can they be shifted to cover particular units that are --

5  A.    They are shifted to any location where there's a need.

6  Q.    And when the number of operations officers is depleted, is

7  there sufficient staffing within Central Prison to replenish

8  that?

9  A.    No.

10 Q.    So it would leave the institution at a potential security

11 risk not having sufficient coverage?

12 A.    Yes.

13 Q.    Okay.  As far as staffing for religious services, how many

14 chaplains are generally assigned to cover any one particular

15 religious service?

16 A.    One chaplain per service.

17 Q.    And how many chaplains in total are there?

18 A.    There are three full-time chaplains at Central Prison.

19 Q.    And as far as program staff, are they ever assigned to

20 cover religious services as well?

21 A.    They are.

22 Q.    Okay.  As far as not only the security but the financial,

23 the cost, is there a cost associated with employing chaplains,

24 program staff and custody to supervise religious services?

25 A.    Yes, there is.  The hours that they are in those services

1  are hours that we got to calculate as part of their salary.

2  Q.   What about any overage hours that chaplains or custody

3  staff may work because of staff shortages?

4  A.   Then they would -- they would get overtime for those hours

5  so it would increase the liability to the department.

6  Q.   Okay.  Would additional hours such as hours we discussed

7  in, for example, food services, preparing Eid al-Adha meals, is

8  that an additional cost?

9  A.   It is.  It would be.

10  Q.   For logistical purposes, are there many windows in the

11  chow hall of open periods of time that are not being used by

12  other inmates in food service?

13  A.   In the dining hall -- after the last meal in the evening

14  generally be pretty much the only time that it not being used

15  by the staff or the dining hall doing anything, it would be

16  after hours.

17  Q.   In other words, if you're -- for the Green Corn

18  celebration, if they are going to celebrate in the dining hall,

19  as has been testified to, is it difficult or is it easy to find

20  an empty hour in the dining hall to accommodate that group

21  dining?

22  A.   If it was in the daytime, it would be extremely difficult;

23  but by it being in the evening, it makes it a little easier to

24  get the time, but it also means that you going to have staff,

25  like food service staff that are going to be working overtime

1  to make the meal happen.

2  Q.   And again, on average, could you speculate as to how much

3  per hour per staff member you would be paying?

4  A.   Central Prison, correction officer's salary is about

5  36,000.  Probably somewhere around the ballpark of $20 per

6  hour.

7  Q.   For program staff or chaplains, would that number be

8  higher or lower?

9  A.   Chaplains it would be higher.

10  Q.   How much would you speculate per hour for them?

11  A.   Ballpark figure, probably 25, 30 bucks.

12  Q.   Okay.  Food services staff?

13  A.   Depends on the level of the position.  If it was a

14  supervision -- or Supervision 1 or Supervision 2 it would

15  probably be in the general vicinity of the chaplain.

16  Q.   So if Central Prison were to undertake having an

17  additional feast or additional 47 feasts for Rastafarian per

18  year, would those accommodations only be to inmates at Central

19  Prison or how would those accommodations or changes be put in

20  place?

21  A.   No, we would have to make that a meal at all facilities

22  around the state.

23  Q.   And how many facilities are there?

24  A.   Fifty-five.

25  Q.   And approximately how many Rastafarian inmates does DPS or

1 prisons house?

2 A.    I think the last time I looked we had about 2800.

3 Q.    Okay.  So would you say the cost associated with the

4 additional feast, given there is 2800 inmates, would that be a

5 significant cost or insignificant cost?

6 A.    Significant.

7 Q.    Are there any other security concerns associated with

8 inmate gatherings such as communal feasts?

9 A.    Couple things.  I have seen -- actually say heard of --

10 instances where we've had meals of that nature where there have

11 been some disruptions.  Couple instances where I heard issues

12 where we had fights occurring at the situations, at the meals.

13     Another issue is we talked about -- you heard Chaplain

14 Stratton say we used to allow food come in from family members

15 and some issues with preparation and -- not just preparation,

16 another issue, and this also comes into play when we talk about

17 having food brought in from vendors, is the issue of the

18 possible introduction of contraband into a prison facility.

19 Q.    Is there an administrative burden associated with the

20 planning of these feasts and these celebrations?

21 A.    There is because you've got -- one, you've got to make

22 sure you've got adequate staff.  You got to make sure you've

23 got the space.  You got to make sure you got -- if you don't

24 have volunteers or members of the religious faith community

25 bringing in stuff, that you as a facility have enough food

1  prepared to amply feed the people in the group, so, yes, it's a
2  big undertaking on the administrative level.
3  Q.   Okay.  In your experience at Central Prison, were inmates
4  using -- for example, were inmates using a Zakat fund to
5  purchase religious meals for Islamic inmates?
6  A.   Yes.
7  Q.   Is the Zakat, to your knowledge, a tenet of the Islamic
8  faith?
9  A.   To my knowledge, I'm not sure.
10  Q.   Are inmates permitted to go out and fundraise for any
11  purpose or desire that they want?
12  A.   No.
13  Q.   Does that sort of fundraising have to be monitored or
14  administered by someone?
15  A.   It does.
16  Q.   Okay.  Would that be an additional administrative burden?
17  A.   Yes.
18  Q.   Did you previously give a -- provide an affidavit in this
19  case; do you recall?
20  A.   I did.
21  Q.   Just for refreshment purposes, I'd like to show you what's
22  been marked as Exhibit No. 41.
23       Do you recall whether you were able to reach a final
24  calculation or figure regarding the proposed cost of adding the
25  meals requested by Inmate Wright?

1  A.    I think I did.

2  Q.    Okay.  Would it assist you in any way if I were to show

3  you your affidavit?

4  A.    Yes.

5  Q.    Okay.  Is this your supplemental affidavit?

6  A.    It is.

7  Q.    I'm going to scroll to some figures here.  Here in these

8  paragraphs do you indicate how many services occur at Central

9  Prison every week.

10  A.    I do.

11  Q.    And how many is that?

12  A.    At least 27 programs with five to seven programs per day

13  on Monday through Thursday for inmates at Central Prison.

14  Q.    In paragraph 18, do you indicate how much that's costing

15  Central Prison solely for staffing cost?

16  A.    Central Prison, DPS, expends approximately $1,750 per week

17  in just staffing costs for religious services.

18  Q.    Okay.  In paragraph 20, do you calculate what the per week

19  spending by DPS is for staffing on religious services?

20  A.    I do.

21  Q.    What's that figure?

22  A.    That amount is approximately $98,000.

23  Q.    And in paragraph 30, do you calculate how much the

24  approximate cost of adding the additional means requested by

25  Inmate Wright, what expense that would be to the Department of

1  Public Safety?

2  A.    I do.

3  Q.    How much is that?

4  A.    $587,193.60.

5         MS. GRANDE:  I don't have anything further for

6  Mr. Joyner.

7         THE COURT:  Cross-examination.

8                    CROSS-EXAMINATION

9  BY MS. MILES:

10  Q.    Mr. Joyner, that amount you just mentioned, the 587, can

11  you break down how you arrived at that cost?

12  A.    Well, looked at the total number of Rastafarian inmates,

13  which at that particular time was 3,084, we looked at the cost

14  that was generated for staff to manage one of those events and

15  multiplied it by the number of events and the number of inmates

16  participating in the event.

17  Q.    Mr. Joyner, isn't it true that each facility had a system

18  in place that identifies what religious group an inmate is a

19  part of?

20  A.    When you say each place, what do you mean?

21  Q.    Each facility, DPS facility.

22  A.    The agency itself has a policy in place on how we

23  identify -- which group it identifies with.

24  Q.    Does it say Central Prison has a system in place that

25  identifies what inmate -- what religion an inmate is a part of?

1  A.    Does Central Prison?

2  Q.    Yes.

3  A.    Yes.

4  Q.    Isn't it true that each facility, DPS facility also has a

5  system in place that designates whether an inmate is affiliated

6  with a gang?

7  A.    That's an agency-wide policy as well.

8  Q.    So each facility is capable of knowing both what religious

9  group an inmate is a part of and whether or not they are gang

10  affiliated?

11  A.    True.

12  Q.    Isn't it true that inmates are not permitted to attend

13  programs or religious group services if they are on restrictive

14  housing or designated as a safe keeper?

15  A.    Yes.

16  Q.    Is that outlined in DPS's Religious Services Policy and

17  Procedures?

18  A.    I think it's in the policy where it relates to attending

19  feasts for holy days, but I don't think it's in the policy --

20  the reason they can't attend it is because they are on

21  restrictive housing, and those events are attended by inmates

22  in the general population.

23  Q.    And each facility, prison facility, closely monitors gang

24  activity, correct?

25  A.    Yes.

1  Q.   They are trained in knowing how to deal with the inmate

2  population; is that correct?

3  A.   Yes.

4  Q.   So would it be safe to say that a trained officer would be

5  able to respond appropriately to any gang activity?

6  A.   Not necessarily.

7  Q.   Would they be able to respond to gang activity?

8  A.   You say any gang activity?

9  Q.   Yes.

10  A.   I wouldn't necessarily say "any."

11  Q.   Would it be safe to say that an inmate engaging in any

12  kind of gang activity would have received a disciplinary

13  infraction if it was known?

14  A.   Yes.

15  Q.   Are you familiar with the memoranda issued for the

16  Muslims, American Indians, Jewish practitioners and Moorish

17  Science Temple of American practitioners regarding the

18  celebration of holy days?

19  A.   Yes.

20  Q.   Isn't it true that the prison is aware in advance based

21  off of memoranda issue of staffing needs and concerns?

22  A.   Not necessarily.  And the reason we're not is, one, we

23  know there's going to be an event, but you don't really know

24  how many staff you're going to need until you know how many

25  people are going to participate in the event.

1  Q.    But the officers aren't -- officers are planned ahead in

2  whether or not they are going to cover a particular event; is

3  that correct?

4  A.    The plans formulated to have staff coverage, correct.

5  Q.    So they are not being pulled away from their post at the

6  last minute; is that correct?

7  A.    Not necessarily.  Say if we got an event going on tonight,

8  we may have planned for four staff members, four custody staff

9  members to cover this event and one of the housing areas or one

10 of the units, we might have call-ins from four or five

11 different people and we got to juggle staff around to make sure

12 that housing area is covered.

13 Q.    But there is somewhat of a plan in place for what staff

14 member is going to be at a specific program or religious feast;

15 is that correct?

16 A.    From the chaplaincy services, the program staff, but not

17 per se from custody staff.

18 Q.    And isn't it true that DPS does, in fact, have in place

19 these policies that allow inmates in particular faiths to

20 celebrate holy days with a meal?

21 A.    Yes.

22 Q.    And DPS's policies allow for these religious groups to

23 purchase food, correct?

24 A.    Allow the groups to purchase food?

25 Q.    Yes.  Using inmate funding or the Zakat fund; that is part

1  of the policy, correct?

2  A.   Islamic inmates that use the Zakat fund.

3  Q.   And could, say, members of the American Indian use the

4  inmate funds to purchase food?

5  A.   Technically they're not supposed to.

6  Q.   But it's a part of policy?

7  A.   For them to use their funds, it's not.

8  Q.   Would it be safe to say that because DPS already has

9  policies in place for other religious groups to celebrate holy

10 days with a meal, they would also be able to allow the same

11 policies for Mr. Wright and other Rastafarians to celebrate

12 holy days with a meal?

13 A.   Would it be safe to say that?  I think the reason that it

14 would not be safe to say that is that we sort of -- we draw the

15 line on a couple things, and I guess the main thing is for us

16 to say we're going to provide a meal and have a policy for

17 every faith group is that that particular meal has to be a

18 tenet of the faith.

19 Q.   But they could allow for Mr. Wright and Rastafarians, if

20 it's a tenet of his faith, to celebrate holy days with a meal

21 similar to the other religious groups?

22 A.   If it was a tenet of the faith, yes.

23 Q.   Isn't it true that the food service staff are inmates?

24 A.   No.  The food service staff -- inmates work in the

25 kitchen, but food service staff are actually food service

1  officers or food service supervisors or food service managers
2  which are DPS staff.
3  Q.   Okay.  And are you aware of any alternatives that
4  Mr. Wright has suggested in purchasing food for the celebration
5  of Rastafarian holy days?
6  A.   No.
7  Q.   You mentioned that there's logistical and security and
8  cost concerns, correct?
9  A.   Uhm-uhm.
10 Q.   Despite the logistical challenges, cost and security
11 concerns as you mentioned, DPS still allows religious meals for
12 Muslims, Jews, American Indians, correct?
13 A.   We do.
14        MS. MILES:  No further questions.
15        THE COURT:  Anything else, Ms. Grande?
16              REDIRECT EXAMINATION
17 BY MS. GRANDE:
18 Q.   Is it your understanding of the Muslims, the American
19 Indians, the MSTAs, the Jewish, that those meals are a
20 requirement by the tenet of their faith?
21 A.   Yes.
22 Q.   Approximately how many faith groups would you say DPS
23 recognizes?
24 A.   15, 20.
25 Q.   Okay.  So of those 15 or 20, only four faith groups get

1  meals?

2  A.   Yes.

3  Q.   The other remaining 10 or 15 don't get meals, correct?

4  A.   Correct.

5  Q.   And would allowing Rastafarians to receive meals when it's

6  not required by a tenet of their faith have an effect on the

7  remaining inmate faith groups?

8  A.   Yes.

9  Q.   What would that be?

10 A.   It would cause those groups to seek to obtain the same

11 result, to have a meal for their faith group as well.

12 Q.   So groups such as the Wiccans, the Satanists, the Asatru,

13 the Hebrew Israelites, they could then come and request meals

14 as well?

15 A.   Correct.

16 Q.   Are inmates in restrictive housing provided feast meals

17 separately from the communal meal?

18 A.   No.

19 Q.   Okay.  Are STG inmates forbidden from going to communal or

20 congregate services?

21 A.   No.

22 Q.   Can STG be housed in general population?

23 A.   Yes.

24         THE COURT:  What is STG?

25         THE WITNESS:  Security Threat Group.

1  BY MS. GRANDE:

2  Q.   Gang affiliation, in other words, correct?

3  A.   Correct.

4  Q.   If a gang-affiliated inmate is permitted to go to

5  corporate services, could that potentially pose a security

6  risk?

7  A.   It's possible.

8  Q.   And again, inmates -- are inmates -- inmates with that

9  gang affiliation are not excluded from religious services?

10  A.   No.

11  Q.   Okay.  In addition to the staffing, the logistics, the

12  administrative costs -- the costs and the security, can you

13  think of any other burdens or difficulties that there would be

14  associated with implementing this number of feasts for this

15  number of holidays and this number of inmates?

16  A.   I think you pretty much hit on them all; the staffing

17  requirements, the time, the preparation, just changes operation

18  a good amount, makes it -- puts some strain on the operation.

19  The more you add, the more you strain the operation.

20  Q.   It would have an overall effect of the operations of the

21  prison?

22  A.   Right.

23           MS. GRANDE:  I don't have anything further.

24           THE COURT:  Any recross?

25           MS. MILES:  No, Your Honor.

1          THE COURT:  Any other witnesses?

2          MS. GRANDE:  It'll be Mr. Lassiter, Director

3   Lassiter, and he'll be the final witness, Your Honor.

4          THE COURT:  Come up and be sworn, sir.

5

6                    KENNETH LASSITER,

7        having been duly sworn, testified as follows:

8                  DIRECT EXAMINATION

9   BY MS. GRANDE:

10  Q.   Director Lassiter, can you state your position and where

11  you're employed at.

12  A.   Kenneth Lassiter, Director of Prisons.  I'm employed at

13  Division Headquarters here in Raleigh.

14  Q.   Were you ever employed at Central Prison?

15  A.   Yes, I was the warden of Central Prison.

16  Q.   For how many years?

17  A.   Nineteen months.

18  Q.   When you were at Central Prison, do you ever recall

19  interacting or having any conversations or meetings with the

20  plaintiff?

21  A.   Most likely, because I interact with all inmates, but I

22  think he was working around when I was there so I would have

23  had a conversation with Mr. Wright.

24  Q.   Do you ever recall any specific requests or interactions

25  that he made of you or about his religious practices?

1    A.    Not anything specific, no.

2    Q.    Okay.  To your knowledge, did you ever intentionally

3    deprive or impede Mr. Wright's ability to exercise his

4    religious practices?

5    A.    I never did.

6    Q.    Okay.  In other words, did you ever take away any of his

7    religious belongings?

8    A.    No, ma'am.

9    Q.    Okay.  So no direct interaction with him that you recall?

10   A.    No, ma'am.

11   Q.    Okay.  Are inmates at Central Prison who are not members

12   of one of the four groups we've talked about, MSTAs, American

13   Indian, Islamic or Jewish, permitted to receive special

14   religious meals?

15   A.    No, ma'am.

16   Q.    Are there any burdens or concerns that you would have with

17   the implementation of the additional feasts requested by

18   Mr. Wright?

19   A.    None with the exception of maybe -- along with what Deputy

20   Director Joyner said, the volume of what it would require

21   because of the number of holidays listed.  And the only truly

22   deciding factor of all of this is the fact that through

23   chaplaincy services and everyone we have to do research if it's

24   not a tenet of the faith.

25        We do take into effect the security aspect of it and the

1    cost of any activity.  If it was a true tenet of the faith, we

2    would adhere to it.  Based on what we're getting, it's not a

3    true tenet of the faith.

4         Chaplain Brown said in her testimony, between the two

5    fashions of Islam, we don't do something separate for them.  We

6    have several versions of Christianity that is inside of our

7    prisons, we don't do anything separate for them.  Christianity

8    being the largest religion we have in prison, they don't have a

9    feast for any of the groups.

10        So we don't intentionally not give someone the ability to

11   worship in the way they desire to, that's why we do allow the

12   corporate worship for the Rastafarians.  But we do not separate

13   based on the fact of one person or one group fashion for what

14   it is for them to be able to do something specific.  Not just

15   as relates to meals or a feast or whatever you want to clarify

16   that.

17        We want inmates to participate in their religious

18   functions as an agency.  When an inmate participates in the

19   functions, he or she is more likely to be more disciplined as

20   the expert said, so we want that.  But we can't allow just

21   anyone to come up with a fashion of religion and say this is

22   what I want.

23        We follow the rules of the American Correctional

24   Association and RLUIPA laws and we tend to make sure we are in

25   the middle of the road, as Chaplain Brown expressed, in

1  reference to looking around what our neighboring states are

2  doing.  So we are not not doing it simply because of the volume

3  of money, we do take that in effect, but the true element of

4  why is because it is not considered a tenet of the faith.

5  Q.   So that, for example, with the MSTAs, the American

6  Indians, the Islamic and the Jewish, that's why they are

7  permitted to have a feast is because it's a tenet of their

8  faith, correct?

9  A.   Yes.  When the religious document is -- when an inmate

10 requests some changes to be made in reference with religious

11 practice, it is researched and if it's just for a different

12 color headband or something different for the Native Americans,

13 it is researched why they need it and what impact does it have

14 on the person's ability to worship the faith in the correct

15 matter.  If it's going to have an adverse effect on it or it's

16 not a tenet of the faith, then we don't approve it.

17 Q.   During the course of this litigation has it been brought

18 to your attention, maybe some discrepancies or modifications

19 that may need to be made with regard to other aspects of the

20 Rastafarians practices as highlighted by Dr. Price, for

21 example?

22 A.   Yes.  One of the things that stood out to me, and I made a

23 note and I passed it to Mr. Joyner over there, was in reference

24 to the drums.  As relates to the drums, we say volunteers.  But

25 I heard in this room that we don't have volunteers for -- that

1  many volunteers for Rastafarian services.  So we do have a

2  welfare fund that we're able to purchase religious equipment

3  out of so we will be purchasing drums and adding it to the

4  policy for to be used by all Rastafarians regardless of what's

5  said because of the expert witness, Mr. Price.

6  Q.   In other words, drums were already approved, but they were

7  only approved for volunteers to use or bring in.

8       Now because of the lack of volunteers you discovered, they

9  will be permitted and provided by the prison?

10 A.   Yes.

11 Q.   And as far as the holy days or holidays and any

12 modification of -- of the specific days that are permitted, are

13 the recommendations from Dr. Price going to be taken under

14 advisement?

15 A.   Yes.  Chaplain Brown does a marvelous job of bringing

16 things to the forefront.  The trends that change often in

17 religion.  We do annual reviews of our policies.  Upon our

18 annual review, we will take into consideration any experts that

19 says this is now what is now going on that you need to be

20 looking into that relate to any specific religion.

21      So yes, I did make two notes.  You mentioned the drawings

22 and also about the fact that there is some discrepancies in the

23 way our policy is written in reference to how many days is

24 documented.  Even down to I think some exhibits showed back

25 before I was the director, when we sent out the memo we would

1  just duplicate the back page of the memo.  We really didn't

2  have any separation between the two.  That's why we see a

3  difference I think maybe in 2016 when Zakat was removed because

4  we realized that we don't use that but for one religion.  So

5  that would be attached to Islamic but not to Green Corn or

6  others because they're not authorized to use it because they

7  don't have Zakat accounts.

8  Q.   So you're saying, in other words, previous mention of

9  Zakat for American Indians, that was just incorrect where it

10 had been borrowed from an Islamic memorandum?

11 A.   No.   The back page of that memoranda, I'm not sure what

12 exhibit it is, is standard for all of the memos.  It's pretty

13 much here's what -- it's a breakdown.

14      Part of what we do is -- to try to be uniform is the

15 director's office issues the dates and time, and Islam is

16 important with sunrise and sunset so we have our people to make

17 sure that we're looking at when the sun is going to rise and

18 set and make sure we write the policy around that.

19      That is the only reason the memo is written, to get

20 specific dates.  The Religious Manual should already determine

21 what is authorized to do.  We give the dates and procedure.

22 Sometimes we saw the P card, that's a purchasing card and

23 sometimes we have funds for religious service that we can use

24 to purchase some of the things to help the inmates participate

25 in their religious services.  So that's the only purpose of

1  that director's memo.

2     It's for all facilities, but it's just to give specific

3  instructions on how to carry out this year.

4  Q.   It's only for religions that prisons or chaplaincy

5  services are of the understanding and belief that those are

6  required practices for those faith practices?

7  A.   Yes, ma'am.

8  Q.   You heard Deputy Director Joyner testify about the

9  potential expense and the logistical and staffing concerns

10 associated with the implementation of this number of feasts for

11 inmates.

12     Do you have any additional concerns?  I believe you said

13 the operations and the volume.  Would there be a way -- I guess

14 what I'm trying to get at is would there be a way to whittle

15 down or reduce the number of inmates who were permitted to

16 participate in the religious feasts or religious holidays?

17 A.   No, because if we do the research and it says it's a tenet

18 of the faith, then the volume is irrelevant to us in one way

19 and we would have to figure out how to accommodate between

20 volunteers and between what we can do and what we are

21 authorized to do with religious funds.

22     The other concerns that I would have strictly around the

23 Security Threat Group or the STG that Mr. Joyner mentioned.

24 Security threat activity right now in prison is the highest

25 it's ever been in the State of North Carolina.  So any function

1  that we're doing, whatever function we're doing with regard to

2  religious services, we have to try to account for that.

3      The sheer volume of inmates participating isn't known to

4  the officer in charge until the day of the event, the inmates

5  show up and because of -- Rastafarian, I'll use them as an

6  example because of the number -- Central Prison alone you may

7  have 65 inmates that are designated Rastafarian. Well, you

8  can't say you can't come because you haven't participated. So

9  we wouldn't know how many to plan for. And that happens now

10 with Islamic inmates.

11     Fortunately, we developed some programs where you have to

12 sign up and prove that you're fasting at the time for Islamic

13 inmates to be required for the feast.

14     It would be a logistical -- a lot of work behind the

15 scenes to be able to make it happen. Not using the excuse that

16 it couldn't happen because we're required to do it, we can make

17 it happen, but back to keep saying this, it's not required as a

18 tenet of the faith so that's why we're sitting here today is

19 because of that.

20 Q.  What about concerns about contraband, do you have any

21 additional concerns?

22 A.  Any time we allow volunteers in or we allow food items to

23 come in, there's a high risk of contraband into the facility,

24 yes, ma'am. That's why we went away from people being allowed

25 to bring food in themselves. That's why you heard several of

1  the people give testimony about vendors because we know if you

2  go to K Mart -- KFC or one of those places, more likely you

3  don't have time to put contraband inside of the food.

4  Q.   Now, have you ever personally observed contraband within

5  religious items?

6  A.   Oh, yes.  Headgear, Bibles, we're constantly getting cell

7  phones out of Bibles that have been hollowed out.  We

8  constantly find them in crowns.  You name it, they'll use it.

9  And Native American bags, prayer bags.  It's prevalent.  It's

10  not just one religious groups; it's all groups have people in

11  faith, just like on the streets, will abuse it and find out

12  ways to manipulate the system.

13  Q.   Do inmates use religion to try to manipulate or to -- for

14  nefarious purposes, in your experience?

15  A.   A great deal.  Some of our biggest concerns with any

16  religious gathering is gang activity as to whether it's a

17  meeting point.

18       Let's use Central Prison as an example.  Most of the

19  inmates at Central Prison never come in contact with each other

20  except for during religious services.  Unless they are in the

21  same housing unit, they never come in contact.  But when you do

22  religious service, because of the volume that Chaplain Speer

23  showed, there is so many that we couldn't break it down.

24  Central Prison has seven units -- six, building a seventh one.

25  If you break it down by unit, you couldn't do it.  So that's

1  the only time that population comes together is at religious

2  services.  And that's across the board at other facilities.

3  Q.   In other words, that would be their only opportunity to

4  communicate with inmates from another unit?

5  A.   Yes.  We have intelligence to show where inmates showing

6  Kosher, Kosher meals because we don't offer that at every

7  facility.  So gang members will declare they are Kosher to move

8  from facility to facility and meet with other people and talk

9  about what type of activity they are going to carry out and

10 then change their designation for their meal and are no longer

11 Kosher inmates.

12 Q.   Is there anything preventing inmates who are of the same

13 religious faith practice and on the same housing unit from

14 eating together in the chow hall?

15 A.   No, ma'am.

16        MS. GRANDE:  I don't have anything further.

17        THE COURT:  Cross-examination.

18                    CROSS-EXAMINATION

19 BY MS. MILES:

20 Q.   Mr. Lassiter, correct me if I'm wrong.  For the Muslim

21 inmates, did you say that they have to sign up to go to the

22 meals or to say they were celebrating or observing Ramadan?

23 A.   Yes.

24 Q.   So --

25 A.   Let me rephrase that.  When I was at Central Prison they

1  had to sign up.  That could have changed.  The Religious Manual

2  gives us the state-wide policy on how we will address religious

3  issues and how inmates will participate, but the superintendent

4  at each one has some flexibility to allow certain things to

5  happen at their prison on rare occasions.

6      So there may be some superintendents that say I don't have

7  three or four inmates designated as Islam, so I don't have to

8  put out a list.  The larger facilities, we have some facilities

9  18 people strong, so they need to know who is actually

10  participating because they have to call you from the individual

11  units.  So the list is not just to say you are participating,

12  it's a security measure so we know to go to Unit 1 to get two

13  inmates, not Unit 1 because it's lockup, but go to Unit 2 to

14  get two inmates, go to Unit 3, so it helps us logistically,

15  that log.

16  Q.   Is it possible that all the facilities could still issue

17  this program where an inmate would have to sign up to say

18  they're observing; for instance, the Muslims observing Ramadan

19  or if Mr. Wright was able to get to celebrate holy days, the

20  Rastafarian are observing this holy day, so they should be able

21  to participate?

22  A.    Yes, ma'am.

23  Q.   Are there procedures in place that also screen for

24  contraband, existing procedures?

25  A.    Rephrase your question.  I'm sorry.

1  Q.   Are there existing procedures in place that screen for

2  contraband?

3  A.   Yes, ma'am.

4  Q.   So there's already policies and procedures in place that

5  would allow for the security concerns that you mentioned to be

6  somewhat prevented; is that correct?

7  A.   I wouldn't say prevented.  Other measures in place now for

8  existing practices, yes, if we were to change or add an

9  additional unit or additional practice, we would have to change

10 policy, yes.  Could it be done?  Yes.

11 Q.   And you mentioned that there were some inconsistencies

12 with DPS's policy that you noted while Dr. Price was

13 testifying; is that correct?

14 A.   Yes, ma'am.

15 Q.   And Dr. Price stated that communal celebrations for

16 Rastafarians are important; isn't that correct?

17 A.   He said what again?

18 Q.   Dr. Price stated that communal celebrations are important

19 to the Rastafarian faith; isn't that correct?

20 A.   I didn't hear him say that.

21 Q.   I have one last question for you, Mr. Lassiter.  If

22 Mr. Wright is allowed to gather communally with other

23 Rastafarians and is provided the regular food tray, isn't it

24 true that the only expenditure that DPS would have to pay for

25 is the staffing?

1  A.   If he's allowed to gather and eat regular food what would

2  the additional cost be?  Staffing, yes.

3          MS. MILES:  No further questions.

4          THE COURT:  Thank you.

5          Anything else?

6                REDIRECT EXAMINATION

7  BY MS. GRANDE:

8  Q.   Would there also be a logistical burden associated with

9  gathering and eating a communal meal even if they were eating a

10 regular tray?

11 A.   Yes, depending upon what custody level the individual is,

12 what facility they are housed in.  All facilities are

13 different.  If Mr. Wright is allowed to do this, then we have

14 to do this for all 36,582 inmates.

15 Q.   And there would be an administrative burden at each

16 facility to plan these meals, correct?

17 A.   Yes, ma'am.

18 Q.   And there would be logistical difficulties in securing

19 times and places and locations for the meals, correct?

20 A.   Our dining halls, Mr. Joyner referenced to, we have a

21 scheduled feeding and counting, two of the longest things we do

22 inside of the facility, two of the most important things we do

23 and our staff generally leaves from the dining hall around

24 6:30, 7:00 o'clock, depending upon the size of the facility.

25 To add an additional -- I'll use Ramadan, for instance.  When

1    that happens, that's escalated to 8:30, 9:00 o'clock, the

2    staff.  So could it be done after hours?  Yes.  But Ramadan is

3    done at that time because that is the time the sun sets.

4       So I don't know in reference to what this request is about

5    what time of day this is referencing to.  All I know this is a

6    specific meal.

7       We actually had some serious conversations around this in

8    reference to it and it's not part of the tenets of the faith

9    and that's why we are saying no.

10       It doesn't have anything to do with the cost, I'll go back

11    to that, or the fact of the logistics of what we have to do.

12    It's the tenets of the faith that is not meeting that measure

13    for us and that's our bottom line.

14          MS. GRANDE:  I don't have anything further.

15          THE COURT:  Anything else?

16          MS. MILES:  No, Your Honor.

17          MS. GRANDE:  The defense rests.

18       I apologize.  I circled, Amy, that I have identified

19    Exhibits 11, 12 and 13, and I would like to collectively move

20    them in at this time.

21          THE COURT:  They'll be received.

22      (Defendant's Exhibit Nos. 11, 12, 13 was admitted into

23    evidence.)

24          THE COURT:  Let's take a recess until 5:25 and then

25    I'll hear closing argument.

1    (The proceedings were recessed at 5:14 p.m. and reconvened
2    at 5:25 p.m.)
3         THE COURT:  I'll hear argument first from the
4    plaintiff.
5         MS. MILES:  Your Honor, thank you for your time and
6    attention.
7         This is a clear case regarding Mr. Anthony Wright's
8    inability to practice the tenets of his faith in Rastafarian
9    with a religious significant meal and DPS's role and the
10   gatekeeper of permitting Mr. Wright in celebrating holy days,
11   Rastafarian holy days with a meal.
12        Under RLUIPA, Your Honor, Mr. Wright must first show
13   evidence of a religious exercise sincerely held within his
14   belief.
15        Mr. Wright testified that he seeks to celebrate four
16   holy days.  Both Mr. Wright and Mr. Severin testified to the
17   importance of each holy day celebrated within Ba Beta Kristiyan
18   Church of Haile Selassie and Rastafarian community as a whole.
19        Dr. Price, defendant's own expert, even testified
20   that Rastafarians do celebrate holy days.  It is important that
21   they gather communally.
22        Mr. Wright testified that leading up to the
23   celebration of holy days, as a tenet of his faith, he fasts in
24   order to spiritually prepare for that day.
25        You heard Mr. Severin testify about the importance of

celebrating holy days; and more specifically, the importance of
the religious significance of the meal provided for each holy
day.  And both Mr. Severin and Dr. Price agreed that at least,
at the very least, November 2nd and July 23rd are holy days
within the Rastafarian faith.

Next, Mr. Wright must demonstrate that defendant's
policy substantially burden his religious exercise.

Both defendants and Mrs. Dunston presented testimony
regarding defendant's policies as a whole.  The defendant
agreed there are no policies in place that allow Mr. Wright and
other Rastafarians to celebrate holy days communally with a
meal.

Mr. Wright testified that when he's unable to
celebrate these holy days, not only does it make him feel angry
but doesn't make him feel as if he is practicing the core
tenets of his faith, Your Honor.

What is clear here today is that defendants were
charged with the responsibility to research all religions,
including Rastafarian religion.  That in doing their research,
instead of speaking with Ba Beta Kristiyan Church of Haile
Selassie and determining whether or not holy days with a meal
is religiously significant, they chose to disregard that
portion of that research.

Your Honor, Mr. Wright has satisfied his burden.  The
burden is now on the defendant.

1          Under RLUIPA, the defendants must show that they have

2     a compelling governmental interest and that the burden placed

3     on Mr. Wright's religious exercise is the least restrictive

4     means in achieving that alleged compelling interest.

5          The defendants have alleged the compelling interest

6     in cause, security and staffing concerns; however, DPS's policy

7     is under-inclusive, Your Honor, because it allows for some

8     religious groups to celebrate holy days with a meal while not

9     allowing other religious groups with a core tenet to celebrate

10    religious holy days with a meal.

11          When there's an under-inclusive policy, Your Honor,

12    there's a presumption that DPS's interest is not compelling

13    because it's clear that they already have policies and

14    procedures in place that would allow them to establish the

15    celebration of holy days with a meal for Rastafarians.

16          In any case, the complete depravation of celebrating

17    holy days with a meal for Rastafarians is not the least

18    restrictive means in allowing -- in furthering their alleged

19    compelling government interest.

20          Both defendants and Ms. Dunston has testified that

21    there are system-wide policies in place for American Indians,

22    Muslims, Jews, MSTA practitioners to celebrate holy days with a

23    meal.

24          You heard Mr. Parrish, a Muslim faith helper at

25    Central Prison, testify that he's able to celebrate Eid al-Adha

1   and Eid al-Fitr both with a meal.  In any case, he's allowed to

2   -- DPS permits him to have volunteers or use the Zakat fund to

3   provide for their meals.  Whenever the Zakat fund or a

4   volunteer is unable to provide the meal for Muslim inmates, DPS

5   policy allows the Muslim to still allow them to gather

6   communally and receive their regular food tray.

7           The defendants have pointed out that there's a lack

8   of volunteers for the Rastafarian community, and that's true,

9   Your Honor.  However, Mr. Wright has testified he does not

10  expect DPS to fully fund the holy days with a meal.  He has

11  suggested an alternative that includes similar fundraising

12  efforts, such as the Inmate Service Club.  And at the very

13  least, the prison could allow Mr. Wright the opportunity to

14  gather communally with other Rastafarians and provide him with

15  the regular food tray.

16          Lastly, Your Honor, to the extent that Mr. Wright's

17  religious exercise is substantially burdened under the First

18  Amendment, he's entitled to monetary damages.

19          Thank you.

20          THE COURT:  Thank you.

21          Ms. Grande?

22          MS. GRANDE:  Your Honor, we're here today to decide

23  whether the current policies of DPS in not allowing Rastafarian

24  inmates to have communal feasts impose a substantial burden on

25  Mr. Wright.

1      Mr. Wright did not prove that today.  He cannot

2  demonstrate more than an inconvenience to his practice.  You

3  heard testimony from his expert that the foods laid out in the

4  exhibit they submitted are not required to be eaten.  For

5  example, vegetarians and vegans can consume other foods; that

6  the practices are largely individual.

7      Mr. Wright testified himself that when he moved to

8  North Carolina he didn't have the resources to attend a mansion

9  or tabernacle or a temple for Rastafarian practices and that he

10 would observe on his own.

11     DPS policies don't prohibit inmates from observing

12 individually and on their own.

13     We have not caused him to modify his behavior in any

14 way and violate his beliefs.

15     There is no substantial burden if a government

16 practice simply causes an exercise to be more difficult or to

17 be inconvenient, but doesn't pressure to modify his behavior in

18 some way.

19     We don't have an affirmative duty to provide every

20 inmate in every prison every religious accommodation that he

21 asks for.  *Cruz versus Beto* says that we do not have to treat

22 all religious groups the same.  We treat groups that require

23 religious meals, feasts as a tenet of their faith, commonly

24 accepted tenet amongst Shias, Sunnis, MSTAs, which is a branch

25 of Islam.  We provide them because they are required by their

1   faith practice.  Indisputably across all sects and
2   denominations of that faith practice are required.  That's when
3   we provide the meals.

4          We do not provide them simply because an inmate
5   asserts he belongs to some offshoot or some personal
6   interpretation of Scriptures that requires him to consume some
7   feast.

8          There's expert testimony that was presented today
9   that feasts are not a commonly accepted, commonly required
10  component of a religious celebration.

11         While they are present at a religious celebration,
12  you heard Dr. Price explain in context it's because of a matter
13  of convenience and sustenance and fellowship of the Rastafarian
14  faith.  It is not a, quote, breaking of the bread or
15  consumption of the wine as it were a communion host or a Seder
16  plate.  It is not something that is set out by commonly
17  accepted principles.

18         You heard testimony that in 1987 Abuna Foxe developed
19  a specific sect of Rastafarianism and then used his position as
20  a Rastafarian chaplain within the Department of Corrections in
21  New York to proselytize to inmates and other chaplains and
22  spread his brand, if you will, of Rastafarianism.  He now views
23  that as the exclusive brand or true form of Rastafarianism that
24  is only acceptable.

25         It is no fault to Mr. Wright, it's all he's ever been

exposed to.  He testified he was not a Rastafarian prior to

going to prison in 2003 and that he was baptized as a

Rastafarian.

You heard Dr. Price testify there are no sacraments,

there is no baptism, there is no initiation.  There is only a

personal devotion and a personal discipline to adhere to the

tenets of the faith.

DPS restrictions serve a compelling, legitimate

governmental interest even if there were substantial burden,

which we dispute that there is, even if there were, we have

interest in preserving security concerns, such as inmate

movements, staffing patterns, contraband control.  We have

cost, financial resources that have to go into consideration,

payment of overtime, payment of staff for additional services,

payment for the meals themselves.  You heard estimated an

approximate half a million dollars per year to accommodate

nearly 3,000 inmates, Rastafarian inmates that we have.  The

administrative burden of planning all of the services and all

of the meals, the logistical burden of planning times, when the

chow hall might be empty, but then also there's a program room

empty to be able to have the prayer service and have the meal

all at one time.

And is the policy of not allowing inmates to have

communal feasts applied uniformly and consistently?  Plaintiff

allege that it's not.  We allege it's not a policy of a total

prohibition of communal meals consistently.  It's a prohibition
of communal meals for faiths that don't require them.  And
Rastafarian, traditional Rastafarian principles do not require
communal feasts, so we do not offer them.

We do not offer them for Wiccans, we don't offer them
for Asatru, we don't even offer them for Christians because it
is not a required practice in the Christian faith, just like it
is not a required practice in the Rastafarian faith.

As far as damages, you've heard testimony that no
specific defendant intentionally or personally impeded on
Mr. Wright's abilities to observe his religious precepts or to
engage in his religious practices.  No one intended to prohibit
him or violate his rights.  Therefore, they are entitled to
qualified immunity.  They were operating in the parameter of
their jobs and responsibilities.  It precludes him from being
able to recover monetary damages against them in their
individual capacity.

These defendants responded reasonably to Mr. Wright's
requests.  They attempted to accommodate him within the
parameters of their authority.  Like Chaplain Stratton
testified, he requested an additional prayer service, she
attempted to accommodate that.  What she couldn't do was
accommodate him with a feast because it's not required by the
faith and it's outside her authority to do it.

Mr. Wright hasn't stated a claim for equal protection

here; that is not within the considerations of what we're

addressing here today.  He hasn't stated a claim alleging

dispirit treatment or retaliation with regards to his transfer

to Tabor CI.  That's not what we're here about today.

Again, as Director Lassiter testified, we're not in

the business of stopping inmates from engaging in their

religious practices.  The states have a vested interest in

allowing them to engage in their religious practices because

the inmates stay occupied, have some outlet for social and

moral purposes, and they also demonstrate a better

self-restraint or self-discipline and become hopefully more

well-behaved inmates was the implication from his testimony.

If it were required, the State would make the

accommodations that it could, as Mr. Lassiter testified, but it

is simply not a commonly accepted required practice.

And therefore, Your Honor, he has not demonstrated a

substantial burden; and even if he has, we have a compelling

governmental interest in administering and adopting and

implementing policies of general applicability to all inmates,

general applicability to all Rastafarian inmates, general

applicability to all Islam inmates and not adhering to any one

particular sect, and the law doesn't -- RLUIPA doesn't require

us to cater to any one particular sect over another.

THE COURT:  I'm going to take it under advisement.  I

think I'll probably end up writing an order -- well, findings

and conclusions.  It's conceivable I can call you back some day

and read those.  I do that sometimes in bench trials, but I

think I'll probably write an order with findings and

conclusions.

           So I'll take it under advisement.  I do thank counsel

for their work.

           We'll be in recess until tomorrow at 3:00 p.m.

            (The proceedings were recessed at 5:41 p.m.)

```
 1              UNITED STATE DISTRICT COURT

 2            EASTERN DISTRICT OF NORTH CAROLINA

 3

 4

 5            CERTIFICATE OF OFFICIAL REPORTER

 6  I, Amy M. Condon, CRR, CSR, RPR, Federal Official Court

 7  Reporter, in and for the United States District Court for the

 8  Eastern District of North Carolina, do hereby certify that

 9  pursuant to Section 753, Title 28, United States Code, that the

10  foregoing is a true and correct transcript of the

11  stenographically reported proceedings held in the

12  above-entitled matter and that the transcript page format is in

13  conformance with the regulations of the Judicial Conference of

14  the United States.

15

16  Dated this 25th day of June, 2018.

17

18                              /s/ Amy M. Condon_____

19                              Amy M. Condon, CRR, CSR, RPR

20

21

22

23

24

25
```